**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

CONGRUENT MEDIA RESOURCING LLC,

*Plaintiff,*

*v.*

IMPERVA, INC.

*Defendant.*

Case No. 2:26-cv-00461-JRG

**IMPERVA, INC.'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. The Parties ........ 3

B. The Asserted Patent ........ 3

III. LEGAL STANDARD ........ 6

A. Courts Routinely Resolve Patentability on a Motion to Dismiss ........ 6

B. Abstract Ideas Are Not Patentable Under 35 U.S.C. § 101 ........ 8

IV. ARGUMENT ........ 9

A. *Alice* Step One: The Asserted Patent Is Directed to an Abstract Idea ........ 10

B. *Alice* Step Two: The Asserted Patent Recites No Inventive Concept ........ 14

C. Claim 9 of the ’418 Patent Is Representative of All Claims ........ 17

D. Congruent’s Complaint, and Any Potential Amendment, Cannot Avoid Dismissal ........ 22

E. There Are No Claim Construction Disputes Preventing the Court From Ruling at the Rule 12 Stage ........ 22

V. CONCLUSION ........ 24

## TABLE OF AUTHORITIES

### Cases

*Affinity Labs of Texas., LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ... 8

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ... passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 7

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
687 F.3d 1266 (Fed. Cir. 2012) ... 7, 9

*Bilski v. Kappos*,
561 U.S. 593 (2010) ... 7

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
778 F. App'x 882 (Fed. Cir. 2019) ... 13

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) ... 2, 7, 23

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ... 7

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ... 8

*Cuvillier v. Taylor*,
503 F.3d 397 (5th Cir. 2007) ... 6

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F. App'x 529 (Fed. Cir. 2020) ... 10

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ... 8

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ... 8

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020) ... passim

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016)........................................................................................ 2

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ............................................................................... 13, 14

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)). ...................................................................................... 14

*Int'l Bus. Machines Corp. v. Zillow Grp. Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ....................................................................................... 15

*Intell. Ventures I LLC v. Cap. One Bank*,
792 F.3d 1363 (Fed. Cir. 2015)................................................................................... 9, 14

*Mobile Acuity Ltd. v. Blippar Ltd.*,
110 F.4th 1280 (Fed. Cir. 2024) ..................................................................................... 17

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
839 F. Appx. 520 (Fed. Cir. 2021).................................................................................. 23

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016),
*aff'd*, 680 F. App'x 1003 (Fed. Cir. 2017)...................................................................... 16

*OpenTV, Inc. v. Apple Inc.*,
No. 15-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016)........................................... 12

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
696 F. App'x 1014 (Fed. Cir. 2017) ........................................................................ 10, 14, 16

*Random Chat, LLC v. Altra Fed. Credit Union*,
No. 2:25-CV-00478-JRG, 2026 WL 636677 (E.D. Tex. Mar. 6, 2026)....................... 2, 7, 9, 10

*Reese v. Sprint Nextel Corp.*,
774 F. Appx. 656 (Fed. Cir. 2019).................................................................................. 23

*Simio, LLC v. FlexSim Software Products, Inc.*,
983 F.3d 1353 (Fed. Cir. 2020)....................................................................................... 23

*StrikeForce Techs., Inc. v. SecureAuth Corp.*,
No. 17-04314, 2017 WL 8808122 (C.D. Cal. Dec. 1, 2017),
*aff'd*, 753 F. App'x 914 (Fed. Cir. 2019)............................................................... 13, 16, 17

*Torus Ventures LLC v. Cawley Partners, LLC*,
No. 2:24-CV-00552-JRG, 2025 WL 1799327 (E.D. Tex. June 30, 2025)......................... 2, 7, 9

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ........ 13, 14

*U.S. Patent No. 7,679,637 LLC v. Google LLC*,
No. 2024-1520, 2026 WL 174922 (Fed. Cir. Jan. 22, 2026) ........ 10

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ........ 7, 24

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ........ 22

*Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*,
815 F. Supp. 3d 527 (E.D. Tex. 2025) ........ 2, 10

*Whitserve LLC v. Dropbox, Inc.*,
854 F. Appx. 367 (Fed. Cir. 2021) ........ 23

**Statutes**

35 U.S.C. § 101 ........ passim

**Rules**

Rule 12(b)(6) ........ 2, 6, 7

## I. <u>INTRODUCTION</u>

Plaintiff Congruent Media Resourcing LLC's ("Congruent") Complaint for patent infringement against Defendant Imperva, Inc. ("Imperva") should be dismissed because all claims of the only asserted patent, U.S. Patent No. 9,135,418 ("the '418 Patent"),[1] including the sole asserted claim (Claim 9, which is representative of all claims), are directed to a patent-ineligible abstract idea in violation of 35 U.S.C. § 101. Under the Supreme Court's two-part *Alice* test, a patent claim is ineligible if: (1) its basic thrust is directed to an abstract idea; and (2) it does not recite a technological inventive concept beyond that abstract idea. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). The claims of the '418 Patent—which are directed to the ***idea*** of securing information (*e.g.*, access to or by the claimed application), as opposed to how to secure information—fall far short of eligibility under this test.

***First***, the '418 Patent claims are invalid under § 101 because they are directed to nothing more than the abstract idea of controlling access to information. The Federal Circuit has already held that "controlling access to, or limiting permission to, resources" is an abstract idea. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020). Indeed, the claims held unpatentable in *Ericsson* recited an "interception module," 955 F.3d at 1325-26, much like the "intercepts" that constitute the bulk of claim 9 at issue here.

***Second***, the limitations of the '418 Patent claims provide no inventive concept because they merely add generic computer components to the abstract idea of controlling access to information. For example, Claim 9 recites that a general "processor" implements a method of receiving a conventional software "application," securing the application by imposing the intercept, and "repackaging" the application to include the intercept. The specification even

[1] The '418 Patent is available at Dkt. No. 1-1.

acknowledges that this intercept merely involves "replacement of an existing instruction or a new instruction" to, e.g., restrict communications with the application. '418 Patent, 1:66-2:3, 21:12-16. Moreover, the claims do not require any particular type of intercept, nor do they require implementing an intercept in any particular way. Thus, like the claims in *Ericsson*, the intercept limitation cannot provide an inventive concept.

Courts routinely grant motions to dismiss when a patent is directed to nothing more than an abstract idea. *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced."); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."); *Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 3-5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) after finding that the representative patent claim is "directed to a patent-ineligible concept" and "does not contain an inventive concept sufficient for patent eligibility under § 101"); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327, at *6, 8, 11 (E.D. Tex. June 30, 2025) (same); *Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*, 815 F. Supp. 3d 527, 536-37 (E.D. Tex. 2025) (holding that the patent is invalid under § 101 and dismissing plaintiff's claims with prejudice under Rule 12(b)(6)).

Because the '418 Patent is directed to patent ineligible subject matter, the Court should

grant this Motion to Dismiss.[2]

## II. BACKGROUND

### A. The Parties

Defendant Imperva is a global cybersecurity company headquartered in Austin, Texas, and with an office in Plano, Texas. Imperva helps more than 35,000 organizations protect applications, data, and identities. For instance, companies like Nasdaq, BlueCross BlueShield, and Discovery rely on Imperva.

By contrast, Congruent is not a technology company, and appears to have been formed in August 2025 for the sole purpose of asserting patents in litigation. *See* Dkt. No. 12-2. Congruent filed ten patent infringement suits in the last nine months.

### B. The Asserted Patent

The '418 Patent generally relates to securing a software application. '418 Patent, Abstract. The '418 Patent explains that applications running on an employee's personal smartphone may be compromised by malware or "questionable code." *Id.*, 1:23-30. Thus, according to the patent, employers may be concerned that "sensitive enterprise data, if installed on an employee's personal device, may be subject to attack from a dishonest source." *Id.*, 1:30-35. The '418 Patent suggests that due to this "potential security breach," employers have "resist[ed] integrating corporate apps and information in the operating environment of a worker's personal mobile device." *Id.*, 1:35-39.

The '418 Patent purports to overcome this alleged problem by securing the application. Specifically, the patent discloses "[a] method for generating a secure application." '418 Patent,

[2] Imperva also filed a Motion to Stay this matter in view of the U.S. Patent and Trademark Office granting a third-party petition for *ex parte* reexamination that will likely result in the invalidation of the '418 Patent. Were the Court to grant Imperva's Motion to Stay, the Court need not act on this Motion to Dismiss.

1:43-60. The non-secure application ("target application") is secured by binding "one or more intercepts" to the target application. *Id.*, 1:43-60. These intercept(s) adjust operation of the previously non-secure application so that it now behaves according to a particular security "policy" that reflects "restrictions, directives, or guidelines that an entity may wish to have enforced against or applied to the secure application." *Id.*, 1:57-64. In other words, an intercept modifies the "behavior" of the application. *Id.*, 1:57-61, 5:37-42, 6:57-61, 8:30-33, 21:12-16.

The '418 Patent claims do not recite any particular type of intercept or behavior modification. While the specification lists numerous ways that the behavior of the target application may be modified by the intercept to implement the alleged invention, the list includes nothing more than basic computer security operations that control access to information (e.g., restricting access to the application or other data). By way of "non-limiting examples," the target application behavior can my modified by (1) preventing operation during a predetermined time; (2) preventing operation outside a predetermined location; (3) preventing operation if non-compliant with a licensing model; (4) uninstalling the application; (5) deleting data associated with the application; (6) encrypting data associated with the application; (7) locking or deleting the application if the computing device is offline or disconnected for a predetermined time; (8) locking or deleting the application if authentication has been incorrectly presented a predetermined number of times; (9) disabling read and/or write to external storage; (10) requiring re-authentication if inactive for a predetermined amount of time; (11) forcing authentication prior to operation of the application; (12) preventing operation unless authentication meets predefined criteria; (13) preventing operation if an unauthorized modification has been performed on the computing device; (14) muting notifications from the application; (15) enabling storing data at an external location; (16)

replacing an existing video source with a new video; or (17) enabling a new input/output device that includes a mouse. '418 Patent, 4:61-5:31; *see also* '418 Patent, 3:21-4:9, 21:12-16 ("The term 'secure application' is defined as an application that has been modified to restrict communications between the application and unauthorized programs or devices or to alter or add features associated with the operation of the application.").

Applying an intercept to an application simply involves adding or replacing instructions. For example, the specification explains that "[a]n intercept … may be considered as an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." '418 Patent, 1:66-2:3. Finally, the specification discloses that the new instructions may be "repackage[d]" with the application so that the instructions and application are physically inseparable. *Id.*, 22:23-31. But the patent does not explain how the application is repackaged or becomes physically inseparable.

The concept of injecting new functionality into an application is not new. Indeed, the '418 Patent acknowledges that this process is "a method sometimes referred to as application wrapping or application securitization." '418 Patent, 12:19-24. The process does not require modifying or accessing source code. *Id.*, 1:64-66, 4:34-38, 6:61-63. And the method is implemented using a general purpose processor on "any suitable machine, including mobile devices and desktop computers." *Id.*, 12:48-56.

Claim 9 of the '418 Patent, which is the sole asserted claim (and representative of all '418 Patent claims), recites:

9. A method of generating a secure application, comprising:

via a processor:

[1] ***receiving a target application*** that is designed to interact with an

> operating system;
>
> [2] configuring the target application by ***imposing one or more intercepts on the target application***, wherein the imposition of the intercepts converts the target application into a secure application that maintains the interaction with the operating system; and
>
> [3] ***repackaging the secure application*** such that the intercepts are integrated with the secure application and are inseparable from the secure application.

’418 Patent, 41:19-31.

Claim 9 describes “generating” a “secure application” by “imposing one or more intercepts” on a pre-existing “target application” such that the “intercepts are integrated with the secure application and are inseparable from the secure application.” ’418 Patent, 41:19-31. The claim recites nothing beyond these simple steps, which are merely a form of controlling access to information on a computing device. The claim does not require any particular application type or any specific behavior modification from the intercept. The claim does not specify what instructions are introduced or modified by the intercept or in what way the access is limited. There is nothing in the claim that adds anything technological to the basic, recited steps.

## III. <u>LEGAL STANDARD</u>

### A. Courts Routinely Resolve Patentability on a Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint “must provide the plaintiff’s grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level.” *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). Legal conclusions in the complaint are given no deference and are left for the court to decide. *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must limit its review "to the contents of the pleadings." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion. In many cases, too, evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction.") (citation omitted).

This Court too has dismissed patent claims under 35 U.S.C. § 101 at the pleading stage, prior to claim construction. *Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 3-5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) after finding that the representative patent claim is "directed to a patent-ineligible concept" and "does not contain an inventive concept sufficient for patent eligibility under § 101"); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025

WL 1799327, at *6, 8, 11 (E.D. Tex. June 30, 2025) (same).

**B. Abstract Ideas Are Not Patentable Under 35 U.S.C. § 101**

In *Alice*, the Supreme Court set forth a two-step test to determine whether a patent is directed to ineligible subject matter. In the first step, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept," e.g., an "abstract idea." *Alice*, 573 U.S. at 218. "[T]he first-stage inquiry [looks] at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted). "In addressing the first step of the § 101 inquiry, as applied to a computer-implemented invention, it is often helpful to ask whether the claims are directed to 'an improvement in the functioning of a computer,' or merely 'adding conventional computer components to well-known business practices.'" *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016)).

If the claims are directed to an abstract idea, the second step of the *Alice* test "consider[s] the elements of each claim both individually and "'as an ordered combination,'" *Alice*, 573 U.S. at 217 (citation omitted), to determine whether the claim "contains an 'inventive concept,' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (citation omitted). An inventive concept must "ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Id.* at 217-18 (citation omitted). The recitation of "well-understood, routine, and conventional activities" does not supply an inventive concept. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Similarly, "'appending conventional steps, specified at a high level of generality,' [is] not 'enough' to supply an 'inventive concept.'" *Alice*, 573 U.S. at 222 (citation omitted). It is well established that the

use of a computer to implement an abstract idea does not, alone, create a patentable application. *Intell. Ventures I LLC v. Cap. One Bank*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). "[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the eligibility of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012).

## IV. ARGUMENT

Claim 9 of the '418 Patent—the sole asserted claim—is directed to the ineligible abstract idea of controlling access to information (*e.g.*, restricting communications with the application) and lacks any inventive concept. More specifically, the claim recites only conventional steps that simply control access by and to a "target application" to obtain a "secure application." The claim further fails to recite any specific technical approach, instead referring to intercepts that are nothing more than generic, unspecified instructions. Moreover, the claimed process is implemented in a generic processor, rather than any specialized computer components. The Federal Circuit has previously held that such claimed methods for controlling access to information, including using intercepts, are ineligible for patent protection. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020). Accordingly, Congruent's allegations of infringement should be dismissed. *See Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) for claims directed to a patent-ineligible concept); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327, at *6, 11 (E.D. Tex. June 30, 2025) (same).

The remaining claims of the '418 Patent fare no better. Claim 9 is representative of all claims, and thus the remaining claims are patent ineligible for the same reasons. Accordingly, any effort to amend the pleading to assert any alternative claims would be futile. *See Random*

*Chat*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *4-5 (dismissing case with prejudice where "granting leave to amend … would be futile") (citing *U.S. Patent No. 7,679,637 LLC v. Google LLC*, No. 2024-1520, 2026 WL 174922, at *5 (Fed. Cir. Jan. 22, 2026)).

### A. *Alice* Step One: The Asserted Patent Is Directed to an Abstract Idea

The '418 Patent, including Claim 9 (the only asserted claim), recites generic steps for controlling access to information (e.g., restricting communications with a secured application), in the context of a computer application, similar to those found ineligible in many other cases. Controlling access to information has long been recognized as a patent ineligible abstract idea. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020) ("Based on the claim language, we conclude that claims 1 and 5 are directed to the abstract idea of controlling access to, or limiting permission to, resources. Although written in technical jargon, a close analysis of the claims reveals that they require nothing more than this abstract idea."); *see also Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017) ("Under step one, the district court properly concluded that the asserted claims are directed to the abstract idea of 'providing restricted access to resources.'"); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 532, 538-39 (Fed. Cir. 2020) (affirming determination of patent ineligibility for claims controlling access to information utilizing "access control information," and an "access checker" that controlled said access); *Web 2.0*, 815 F. Supp. 3d at 534 (explaining "[t]he '913 Patent is directed towards the abstract idea of receiving, storing, and controlling access to a patient's health information.").

More specifically, Claim 9 of the '418 Patent is directed to "generating" a "secure application" by "imposing one or more intercepts" on a pre-existing "target application." '418 Patent, 41:19-31. In full, Claim 9 recites:

9. A method of generating a secure application, comprising:

> via a processor:
>
> [1] ***receiving a target application*** that is designed to interact with an operating system;
>
> [2] configuring the target application ***by imposing one or more intercepts on the target application***, wherein the imposition of the intercepts converts the target application into a secure application that maintains the interaction with the operating system; and
>
> [3] ***repackaging the secure application*** such that the intercepts are integrated with the secure application and are inseparable from the secure application.

*Id.*, 41:19-31. The specification describes an "intercept" as "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." *Id.*, 1:66-2:3. This turns the application into a "secure application"—"an application that has been modified to restrict communications between the application and unauthorized programs or devices or to alter or add features associated with the operation of the application." *Id.*, 21:12-16. Thus, the intercept includes instructions that limit access to or by the "target" application, and the claim does not specify what instructions or in what way the access limited.

The Federal Circuit's decision in *Ericsson* is particularly instructive here. In *Ericsson*, the Federal Circuit found the claims at issue patent ineligible—reversing a decision of the U.S. District Court for the Eastern District of Texas to the contrary. The scope of the claims at issue in *Ericsson* is similar to the scope of Claim 9 of the '418 Patent at issue here. In *Ericsson*, the disputed claim recited as follows:

> 1. A system for controlling access to a platform, the system comprising:
>
> a platform having a software services component and an interface component, the interface component having at least one interface for providing access to the software services component ***for enabling application domain software to be installed, loaded, and run in the platform***;

> ***an access controller for controlling access to the software services component*** by a requesting application domain software via the at least one interface, the access controller comprising:
>
> an ***interception module*** for receiving a request from the requesting application domain software to access the software services component;
>
> and a decision entity for determining if the request should be granted wherein the decision entity is a security access manager, ***the security access manager holding access and permission policies***; and
>
> wherein the ***requesting application domain software is granted access to the software services component*** via the at least one interface if the request is granted.

*Ericsson*, 955 F.3d at 1325-26 (emphasis added).

The unpatentable *Ericsson* claim focuses on the same general concept as Claim 9 of the '418 Patent: securing an application by using an "interception module" to decide (based on "permission policies") whether to allow or disallow said application access to a "software services component." Thus, both the *Ericsson* claim and the claim at issue here are fundamentally focused on the same idea: controlling access to information. Other courts have similarly recognized that claims of this nature are abstract. *See OpenTV, Inc. v. Apple Inc.*, No. 15-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016) ("The [] patent claims are directed to the abstract idea of controlling access rights of software applications to access other software applications in the technological environment of interactive television systems.").

The claims of the '418 Patent, including the sole asserted Claim 9, are directed to nothing more than the abstract idea of controlling access to information. Claim 9 as a whole merely recites—in less detail than *Ericsson*—securing an application by imposing "intercepts" on a target application. Again, these "intercepts" are described as nothing more than "an actual replacement of an existing instruction or a new instruction" that turns the application into a

"secure application" (*e.g.*, by restricting communications with the application) ('418 Patent, 1:66-2:3, 21:12-16)—akin to the "interception module" in *Ericsson* that is described as simply intercepting a request for the purposes of determining whether or not to allow a certain application. *See Ericsson*, 955 F.3d at 1330 (explaining an "interception module" was insufficient to provide an inventive concept); *see also Bridge & Post, Inc. v. Verizon Commc'ns*, Inc., 778 F. App'x 882, 892 (Fed. Cir. 2019) ("'[I]ntercepting' traffic is itself an abstract idea."); *StrikeForce Techs., Inc. v. SecureAuth Corp.*, No. 17-04314, 2017 WL 8808122, at *7 (C.D. Cal. Dec. 1, 2017) (explaining an "interception device" performs a "purely functional and generic" role), *aff'd*, 753 F. App'x 914 (Fed. Cir. 2019).

In addition, Claim 9 of the '418 Patent uses broad functional language (*e.g.*, "is designed to interact with an operating system"; converting into a "secure" application; "maintains the interaction with the operating system"; "integrated with the secure application and are inseparable from the secure application"), without reciting how to achieve it, which does not save the claim from abstractness. Generic functional language is insufficient to pass *Alice* Step 1. *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064 (Fed. Cir. 2026). ("We have also held claims using purely result-focused functional language, containing no specificity about how the purported invention achieves those results, to be directed to an abstract idea."); *Ericsson*, 955 F.3d at 1328 (holding claims were directed to an abstract concept when they "merely make generic functional recitations that requests are made and then granted."); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (holding claims were for ineligible subject matter where "claim 1 here only uses generic functional language to achieve these purported solutions … Nothing in the claims or their constructions … requires anything other than conventional computer and network components operating according to their ordinary functions.").

Finally, limiting the claim to a general computing environment by requiring implementation in a general purpose "processor" does not change the result. Narrowing an abstract idea by "subject matter," or "a particular use or environment" does not save the claim from being directed to an abstract idea. *GoTV Streaming*, 166 F.4th at 1064.

Thus, "where, as here, the bulk of the claim provides an abstract idea, and the remaining limitations provide only necessary antecedent and subsequent components, the claim's character as a whole is directed to that abstract idea." *Ericsson*, 955 F.3d at 1326-1327 (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016)).

### B. *Alice* Step Two: The Asserted Patent Recites No Inventive Concept

The claims of the '418 Patent do not recite an inventive concept, but merely invoke "well-understood, routine [and] conventional" technology to carry out the abstract idea. *See Alice*, 573 U.S. at 225. The Federal Circuit has explained that "claims [which] recite no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner" fail *Alice* Step 2. *Prism*, 696 F. App'x at 1018. Claim elements that "merely add[] computer functionality to increase the speed or efficiency of the process do[] not confer patent eligibility on an otherwise abstract idea." *Intell. Ventures I*, 792 F.3d at 1370-71 (explaining that a term in the claim "simply describes a generic web server with attendant software" and this was insufficient to provide an inventive concept). Further, "[s]teps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility." *Id.* at 1370-71 (explaining claims that require "the use of a software brain tasked with tailoring information and providing it to the user provides no additional limitation beyond applying an abstract idea.") (internal quotation marks omitted). The inventive concept also must be present *in the claim itself*—not only in the specification. *Two-Way Media*, 874 F.3d at 1338-39 (holding that the asserted claims could not overcome that "the *claim*—as opposed

to something purportedly described in the specification—is missing an inventive concept.") (emphasis in original).

There is no such inventive concept to be found in Claim 9 of the '418 Patent. Rather, the claim refers to entirely conventional aspects of a computer system (a "processor") for controlling access by and to a "target application." The claim's recital of "intercepts" does nothing to save it—just like the phrase "interception module" did nothing to save the claims in *Ericsson*. As explained above, the claimed "intercepts" in the '418 Patent merely refer to generic and unspecified instructions that somehow "convert[] the target application into a secure application." The claim does not describe a specific technical approach to accomplishing the claimed result of obtaining a "secure application." As here, when claims use "functional language, at a high level of generality and divorced from the computer technology, to recite the claimed functions," the limitations are seen as simply "describ[ing] the abstract method without providing more." *Int'l Bus. Machines Corp. v. Zillow Grp. Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022). Tellingly, the '418 Patent concedes that its purportedly new technology was "a method sometimes referred to as application wrapping or application securitization." '418 Patent, 12:19-24. Claim 9 also recites "repackaging" the application, but once again, does not provide a technological solution for doing so. The specification likewise does not explain how the application is repackaged or becomes physically inseparable from the intercept.

The claims at issue in *Ericsson* are once again analogous. Like the functional language in Claim 9 of the '418 Patent (*e.g.*, "is designed to interact with an operating system"; converting into a "secure" application; "maintains the interaction with the operating system"; "integrated with the secure application and are inseparable from the secure application"), in *Ericsson* "[t]he most specific elements actually recited in the claim [were] 'an access controller

for controlling access,' 'an interception module for receiving a request,' and 'a decision entity for determining if the request should be granted.'" *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1330 (Fed. Cir. 2020). The Federal Circuit held that "[n]one of these elements are sufficient to turn the claim into anything more than a generic computer for performing the abstract idea of controlling access to resources." *Id.*

*Prism* also supports Claim 9's lack of any inventive concept. In *Prism*, the Federal Circuit held that the claims at issue failed *Alice* Step 2 because the "asserted claims recite no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner." *Prism*, 696 F. App'x at 1018. Similar to the '418 claims that control access using basic computer components like a processor and intercept, the claims at issue in *Prism* were directed to a "method for controlling access … to protected computer resources" and included steps of "[1] receiving, ... [2] authenticating, ... [and] [3] permitting access" using an authentication server. *Id.* at 1016; *see also Network Apparel Grp., LP v. Airwave Networks Inc.,* No. 6:15-CV-00134, 2016 WL 4718428 at *8 (W.D. Tex. Mar. 30, 2016) (concluding "the claimed 'access rules' do not supply an inventive concept" where the "access rules" determined whether a device could access a network), *aff'd*, 680 F. App'x 1003 (Fed. Cir. 2017).

The Central District of California's decision in *StrikeForce* is also instructive. There, at the motion to dismiss stage, the Court rejected the plaintiff's argument that an "interception device" was inventive, and instead found that it "performs the 'purely functional and generic' role of a router." *StrikeForce*, 2017 WL 8808122, at *7. The Court further found that "the interception element is similar to the process for diverting identity data from the access server to the authentication server that was addressed and rejected in *Prism*." *Id.* at *2, *8. Thus, the Court held that the claim lacked an inventive concept because it "merely recite[d] a host of

elements that are indisputably generic computer components" like those in *Prism*. *Id.* at *7 (quoting *Prism*, 696 F. App'x at 1017). Here, the "intercepts" of the '418 Patent are generic computer components (instructions) that perform a function akin to the "interception device" or "interception element" from *StrikeForce*, and thus cannot supply the inventive concept. *StrikeForce*, 2017 WL 8808122 at *7.

The enforcement of "policies" in some of the '418 claims also cannot provide an inventive concept. Indeed, the claims at issue in *Ericsson* ***also*** included the concept of enforcing "permission policies" when deciding to allow or disallow access, and the Federal Circuit found no inventive concepts there. *See Ericsson*, 955 F.3d at 1326, 1331. That is because enforcing policies that ultimately just control access to and by a target application is nothing more than the abstract idea itself.

### C. Claim 9 of the '418 Patent Is Representative of All Claims

Claim 9 is representative of the remaining claims of the '418 Patent, i.e., independent claims 1 and 16, as well as dependent claims 2-8, 10-15, and 17-20. Accordingly, these other claims suffer from the same defects as Claim 9 and are ineligible under § 101.

Dependent Claims 10-15 depend from Claim 9, are substantially similar to Claim 9, and add nothing of substance, rendering Claim 9 representative of claims 10-15 for patent eligibility purposes. *See e.g., Mobile Acuity Ltd. v. Blippar Ltd.,* 110 F.4th 1280, 1292 (Fed. Cir. 2024). Claim 10 requires that the imposed intercepts be associated with one or more unspecified policies—it does not require a specific policy or functionality, just that some undefined "behavior" be modified according to an unspecified policy. '418 Patent, 41:32-36. Claim 11 requires that the act of imposing intercepts replace references of a target application with different references from an unspecified library or that secure references be inserted to replace non-secure references. *Id.*, 41:37-42. Again, no specifics are provided for turning

"secure references" into "non-secure references," so the claim is directed to little more than the concept of controlling access. Claim 12 requires that the intercepts be "selected from default intercepts to be applied … on a group basis." *Id.*, 41:43-46. The claims do not limit the "default intercepts" to any specific intercepts, so the details are unclaimed once again, and collecting the unspecified intercepts into a group does not change their abstract nature. Claim 13 requires that configuration of the target application be conducted "without access to the source code of the target application," which does not change the abstract nature of the invention. (It also refers to the conventional and well-known concept of "application wrapping" or "application serialization," as the specification itself acknowledges. *See id.*, 12:19-35, 41:47-50.) Claim 14 merely requires "publishing" the secure application in a "secure application repository," which the specification describes as "a medium that offers one or more secure applications for download to a computing device and may or may not require authentication to access and/or download the secure application." *Id.*, 11:25-29, 42:1-3. This broad description renders the concept of a "secure application repository" practically meaningless and equivalent to simply storing the application somewhere—which does nothing to change the claim's abstractness. Claim 15 merely requires that conversion of the target application "maintains the availability of the application programming interfaces (API) associated with the operating system such that a developer of the target application is enabled to make use of [said APIs]." *Id.*, 42:4-9. The recited APIs are conventional legacy components associated with the operating system, and also do nothing to change the abstractness of the claims.

Claim 9 is also representative of independent Claim 16 and its dependent claims (Claims 17-20). Independent Claim 16 recites:

> 16. A method of remotely managing a secure application, comprising:

> [1] selecting a secure application installed on a computing device, wherein the secure application was created from a target application by imposing one or more intercepts on the target application; and
>
> [2] remotely managing the secure application by enforcing one or more policies against the secure application installed on the computing device such that the behavior of the secure application is modified from and overrides the original behavior of the target application.

’418 Patent, 42:10-20.

Claim 16 is at least as abstract as Claim 9, and is similarly directed to the abstract idea of controlling access to information. Claim 16 recites “selecting” a secure application that was created by “imposing” the same intercepts recited in Claim 9, and remotely “managing” the secure application according to one or more unspecified “policies” that modify the “behavior” of the application. This recitation of changing the “behavior” of the application with “policies” is how the specification describes the concept of “intercepts.” ’418 Patent, 1:61-64, 5:37-42, 6:57-61, 8:30-33, 21:12-16. Thus, the idea is the same: controlling access to or by the target application.

Dependent Claims 17-20 do not add anything of substance or significance to independent Claim 16 for the purposes of assessing eligibility. Claim 17 merely requires enforcing unspecified policies governing information access on an “individual or group basis,” which would appear to be the only options, and therefore does not actually add anything. ’418 Patent, 42:21-25. Claim 18 recites policies to be enforced, but these policies merely reinforce the abstract nature of the claims, as they all concern controlling access to or by the target application (e.g. limiting access during a “predetermined time,” when a device is “located outside a predetermined location,” when there is “non-compliance of an imposed licensing model,” when “uninstalling the secure application” has been requested, or when “deleting data associated with the secure application” has been requested.). *Id.*, 42:26-39. Each was a well-

known and conventional approach for controlling access to information, and the claims and patent are silent with respect to any specific technical approach for creating "intercepts" that would accomplish these desired results. Claim 19 requires storing the secure application in a "secure partition of the computing device" which merely describes where to store the application and does nothing to change its abstractness. To the extent said partition limits access by unauthorized users, this limitation only further reinforces that the claim is directed to the abstract idea of controlling access to information. *Id*., 42:39-43. Claim 20 requires "not interfer[ing] with personal data belonging to a user" or the same computing device, which again also does not affect that abstractness of the claim and only further reinforces the abstract idea of controlling access to information (and this claim is silent as to how to specifically achieve this result). *Id*., 42:44-48.

Claim 9 is also representative of independent Claim 1 and its dependent claims (Claims 2-8). Claim 1 recites:

> 1. A method of operating a secure application, comprising:
>
> [1] receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior;
>
> [2] in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and
>
> [3] via a processing unit, performing the second application behavior.

'418 Patent, 40:44-58.

Claim 1 is, yet again, about controlling access to information, specifically controlling access by or to that target application by the use of a "secure application." Claim 1 does not

expressly recite "intercepts." Claim 1 instead recites "forcing" a secure application to "override" the behavior of an original target application and performing the behavior associated with the secure application. But changing the "behavior" of an application is how the specification discusses the concept of an intercept (*id*., 1:61-64, 5:37-42, 6:57-61, 8:30-33, 21:12-16), and thus the concept of claim 1 is similar to claim 9.

Dependent Claims 2-8 do not add anything of significance to Independent Claim 1 for the purpose of assessing eligibility. Claims 2 and 3 require "selectively permitting the secure application to engage in the first application behavior," which effectively means controlling when the target application will access information so that it can behave normally and does nothing to change the abstract nature of the claim. '418 Patent, 40:59-67. Claim 3 additionally requires that such permitting be conditioned "on predetermined criteria." *Id*., 40:62-67. These claims are similarly as abstract as the claims that require the enforcement of "policies." Indeed, Claim 4 recites that said conditions would, in fact, be "based on a policy"—again an unspecified and generic way to control access to and by the target application. *Id*., 41:1-2. Claim 5 requires "encapsulat[ing]" the secure application "to prevent data sharing." *Id*., 41:3-5. This claim also does not affect abstractness as it again refers to limiting access to information and recites no inventive concept. Claim 6 requires that the secure application be received from a "secure application repository," but as explained above in connection with Claim 14, the "secure application repository" does nothing to avoid abstractness. *Id*., 41:6-9. Claim 7 requires that the manner in which the claim controls access to information is via a "password or personal identification number (PIN)" which also does not change the abstractness of the claims. *Id*., 41:10-14. Indeed, patent claims directed to passwords for authentication have routinely been considered patent ineligible abstract ideas with no inventive concept. *See Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1358 (Fed. Cir.

2021) ("[N]othing in the claims is directed to a new authentication technique; rather, the claims are directed to combining longstanding, known authentication techniques to yield expected additory amounts of security."). Claim 8 depends from Claim 7 and further requires a "grace period" that selectively waives "the password or PIN"—which is yet another generic and conventional approach for controlling the application's access. '418 Patent, 41:15-18.

### D. Congruent's Complaint, and Any Potential Amendment, Cannot Avoid Dismissal

Congruent's Complaint fails to make any allegations that raise a factual issue relevant to the patent eligibility analysis under Step 2 of *Alice*. At best, Congruent cites to additional descriptions of the specification (Dk. No. 1 ¶¶11-16), but this cannot salvage the '418 claims under Step 2 of *Alice*, because such details are not recited in the claims. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1329 (Fed. Cir. 2020) ("Even assuming that Ericsson's explanation of the scheme described in the specification is correct, this cannot provide an inventive concept at step two because it is not recited in claims."). For example, Claim 9 of the '418 Patent does not refer to replacing references to system services with references to a library that applies the necessary mechanisms, or inserting secure references into the code of an application to replace non-secure references. Dk. No. 1 ¶14. Similarly, Claim 9 does not refer to interposing system API calls or encryption for additional protection. *Id*. As yet another example, Claim 9 does not recite byte code injection or link replacement calls. *Id.* ¶15. Thus, such details from the specification, and parroted in the Complaint, cannot supply an inventive concept.

### E. There Are No Claim Construction Disputes Preventing the Court From Ruling at the Rule 12 Stage

The Court need not conduct claim construction to find the claims unpatentable on the pleadings. "[C]laim construction is not an inviolable prerequisite to a validity determination

under § 101." *Reese v. Sprint Nextel Corp.*, 774 F. Appx. 656, 659 (Fed. Cir. 2019). Rather, to the extent Congruent contends that the Court cannot dismiss before entertaining claim construction, it is incumbent upon Congruent to both (1) allege specific constructions; and (2) demonstrate how those constructions would render the claims patentable. For instance, in *Whitserve LLC v. Dropbox, Inc.*, 854 F. Appx. 367 (Fed. Cir. 2021), the Federal Circuit rejected the argument that the district court erred by dismissing under § 101 before claim construction, because the plaintiff "waived any such argument by failing to request claim construction below, and by failing to explain how a different construction of any claim term would lead to a different result." *Id.* at 373. Numerous other Federal Circuit opinions have reached the same conclusion. *E.g.*, *Simio, LLC v. FlexSim Software Products, Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (affirming dismissal where the plaintiff "ha[d] not explained how it might benefit from any particular term's construction under an *Alice* § 101 analysis"); *Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. Appx. 520, 524-25 (Fed. Cir. 2021); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

Even if Congruent were to propose specific constructions, the Court here "can fully understand the ***basic character*** of the claims without claim construction" and thus "there is no claim construction dispute relevant to eligibility." *Reese*, 774 F. Appx. at 660. As discussed, Claim 9 is directed to conventional steps that control access by and to a "target application" to obtain a "secure application." Any potential construction of the terms of Claim 9 would not change this basic character of the claim.

Nor can any potential construction supply an inventive concept under *Alice* Step 2. The concept of securing an application is not new. Indeed, the '418 Patent acknowledges that this process is "a method sometimes referred to as application wrapping or application securitization." '418 Patent, 12:19-24. And the method is implemented using a general

purpose processor on "any suitable machine." *Id.*, 12:48-56.

Congruent cannot show that any claim term would need to be construed before the Court conducts the § 101 analysis. As such, "[n]o formal claim construction [is] required because the asserted claims disclose[] no more than 'an abstract idea garnished with accessories' and there [is] no 'reasonable construction that [c]ould bring [them] within patentable subject matter.'" *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014).

## V. <u>CONCLUSION</u>

For the foregoing reasons, Imperva respectfully requests that the Court GRANT Imperva's Motion to Dismiss with prejudice. While the Complaint asserts only Claim 9 of the '418 Patent, because all the claims of the patent are ineligible, any attempt by Congruent to assert different claims of the '418 Patent would be futile.

Dated: August 12, 2026

Respectfully submitted,

*/s/ Andrew Gish*
Andrew Gish (NY Bar No. 4918454)
(admitted in the Eastern District of Texas)
**GISH PLLC**
41 Madison Avenue, Floor 31,
New York, NY 10010
andrew@gishpllc.com
Telephone: (212) 518-2000

Thomas J. Pardini (CA Bar No. 313401)
(admitted pro hac vice)
**GISH PLLC**
50 California Street, Suite 1500
San Francisco, CA 94111
tom.pardini@gishpllc.com
Telephone: (415) 630-8960

*Attorneys for Defendant Imperva, Inc.*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document has been served on counsel of record who are deemed to have consented to electronic service on August 12, 2026, via electronic filing using the Court's CM/ECF system.

*/s/ Andrew Gish*
Andrew Gish

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S 35 U.S.C. § 101 MOTION PRACTICE ORDER**

______ The parties agree that prior claim construction is not needed to inform the Court's analysis as to patentability.

__X__ The parties disagree on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Andrew Gish*
Andrew Gish