**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br><br>Plaintiff,<br>v.<br><br>**IMPERVA, INC.,**<br><br>Defendant. | C.A. No. 2:26-cv-00461-JRG<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

# FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Congruent Media Resourcing LLC, pursuant to Rule 15(a)(1)(B), Fed.R.Civ.P., files this First Amended Complaint for Patent Infringement against Imperva, Inc., and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Congruent Media Resourcing LLC ("Plaintiff") is a Texas limited liability company with a principal place of business located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2. On information and belief, Defendant Imperva, Inc. ("Defendant") is a corporation organized and existing under the laws of Delaware with a place of business at 6900 Dallas Parkway, Plano, TX 75204. Defendant has a registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 6900 Dallas Parkway, Plano, TX 75204.

5. Without limitation, on information and belief, within this state and this District, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein. In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas and this District. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas and this District. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas and this District. Defendant has committed such purposeful acts and/or transactions in Texas and this District such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6. Venue is proper in this district under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 6900 Dallas Parkway, Plano, TX 75204. On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. UNITED STATES PATENT NO. 9,135,418

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On September 15, 2015, United States Patent No. 9,135,418 ("the '418 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '418 Patent is titled "System and Method for Creating Secure Applications." A true and correct copy of the '418 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Congruent Media Resourcing LLC is the assignee of all right, title, and interest in the '418 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '418 Patent. Accordingly, Congruent Media Resourcing LLC possesses the exclusive right and standing to prosecute the present action for infringement of the '418 Patent by Defendant.

**A. Technological Background**

11. For more than three decades, the cybersecurity industry has evolved through a series of reactive technological phases, each attempting to address emerging weaknesses in increasingly distributed and autonomous computing environments. In the late 1980s, computing environments were largely isolated. Malware spread primarily through physical media, such as floppy disks, and security threats were localized to individual machines. This era produced the first generation of cybersecurity: signature-based antivirus scanners, which attempted to detect malicious code after it had already reached the endpoint. The signature-based antivirus scanners relied on static signature databases and could not keep pace with evolving malware. Once malicious code reached the device, there was no real defense to the virus.

12. In the 1990s and early 2000s, as networks expanded, organizations shifted toward network firewalls, which are perimeter-based defenses that filtered traffic at the network boundary. The prevailing assumption was binary: anything inside the firewall was trusted; anything outside

was untrusted. But this binary architectural solution had a fatal flaw that would be exposed by the modernization of the workforce.

13. The advent of cloud computing, Software-as-a-Service ("SaaS"), and the proliferation of mobile devices in the late 2000s disrupted this perimeter-based model. Enterprise data was no longer confined to a physical corporate data center. It was hosted in distributed environments, accessed via web platforms, and downloaded onto employee smartphones operating on public Wi-Fi networks. For example, as explained in the '418 Patent, companies were confronted with employees using personal smartphones for work such that corporate apps could be operating on untrusted personal devices with untrusted applications. (Ex. A at 1:25-33). Applications can contain malware or some other questionable code that can lead to security breaches and the release of secure information. (*Id.* at 1:28-38). Corporate applications that would be safe running in a secure corporate environment were therefore exposed to risky environments that could access the corporate applications and through those applications gain access to the secure corporate environment. (*Id.* at 1:44-38). The perimeter therefore dissolved as mobile devices, SaaS platforms, and cloud computing displaced the traditional corporate network.

14. Recognizing the fatal flaw of the perimeter-based defense model, the industry was forced to rethink its foundational security assumptions. In 2010, John Kindervag, an analyst at Forrester Research, published a seminal paper titled *No More Chewy Centers: Introducing the Zero Trust Model of Information Security*. (https://media.paloaltonetworks.com/documents/Forrester-No-More-Chewy-Centers.pdf). Kindervag stated that security professionals must "eliminate the idea of a trusted network" entirely, advocating instead that "all network traffic is untrusted." This Zero Trust mandate required that trust be continuously verified, regardless of a user's location. However, early implementations of Zero Trust were still heavily reliant on

network segmentation and micro-perimeters. The industry soon realized that if the network infrastructure could no longer be inherently trusted, the new security boundary had to be tied directly to the entity requesting the access.

15. This realization resulted in the era of Identity and Access Management (IAM) as the primary security control mechanism. As noted by cybersecurity architects in Cyber Defense Magazine, the modern consensus became clear: "In today's cloud-first, hybrid, and borderless world, that perimeter has dissolved.... Identity is no longer a security feature; it is the perimeter." (Sudhakar Tiwari, *Identity Is the New Perimeter: Why IAM Is the Frontline of Cybersecurity*, https://www.cyberdefensemagazine.com/identity-is-the-new-perimeter-why-iam-is-the-frontline-of-cybersecurity-2/). As human-centric identity controls matured and hardened, malicious actors pivoted their attack vectors. Instead of simply trying to steal a user's password to bypass the front door, attackers began targeting the applications themselves. If an attacker could compromise an application running locally on an endpoint, they could bypass network firewalls and cloud identity checks entirely. The inventors of the '418 Patent recognized these security flaws and the need to protect the applications themselves.

16. As of the priority date of the '418 Patent, app wrapping did not exist in the mainstream enterprise tools and there were no systems that would override app behavior. App wrapping is a technical process that modifies a compiled mobile application by injecting additional executable instructions—commonly referred to as "intercepts"—into the application package without access to the application's source code. In the 2011–2012 timeframe, neither Android nor iOS provided any native mechanism for enterprises to alter the internal behavior of third-party applications, and no commercial tools existed that could safely decompile, modify, and repackage such applications while preserving their ability to run on the underlying operating system. App

wrapping addressed this technical deficiency by disassembling the application, identifying predictable instructions and system-API calls, and binding intercepts that replace or interrupt those instructions at runtime. After injection, the application is repackaged and resigned as a new, "secure" application in which injected security functions intercept, modify, or override selected application behavior at runtime. This process enables fine-grained runtime control—such as enforcing encryption, blocking unsafe file operations, redirecting network traffic, or preventing unauthorized inter-process communication—that cannot be achieved through device-level management tools or OS-level permissions. Existing device-management and perimeter-security solutions could control access to applications, but generally could not directly alter the internal execution of a compiled third-party application without access to source code while preserving compatibility with the operating system.

17. There are several technologies that have been employed to secure web applications. Two categories of these technologies include a Web Application Firewall ("WAF") and Runtime Application Self-Protection ("RASP").[1] A WAF operates in a manner similar to a firewall or shield like a perimeter-based defense: it monitors and filters traffic between the web application and the Internet. (*See* https://www.checkpoint.com/cyber-hub/cloud-security/what-is-application-security-appsec/rasp-vs-waf/).

18. Although WAF is an effective tool, it has several limitations. These limitations include difficult configuration setup, limitations in detecting or preventing certain attacks, including attacks that evade signature-based detection or exploit application-specific behavior, and

---

[1] The "Hyper Cycle for Application Security" report published in July 2012, by Gartner, a global IT research and consulting firm, is frequently cited as the foundational publication in which RASP was labeled and contextually defined as an emerging solution bridging gaps left by existing approaches. The published report post-dates the priority date for United States Patent No. 9,135,418.

high maintenance requirements to avoid attacks from being engineered to bypass the WAF. For example, like traditional network measures, WAF only monitors network traffic and user sessions to identify suspicious activity, but it does not monitor traffic and data within an application, leaving the organization vulnerable to application attacks. (https://www.crowdstrike.com/en-us/cybersecurity-101/cloud-security/runtime-application-self-protection-rasp/#:~:text=RASP%20enables%20protection%20at%20the,oversight%20and%20maintenance%20once%20deployed). WAF is also not effective for protecting against applications containing malware or infected applications. This costly and complex system using WAF requires significant in-house expertise, resulting in significant limitation. (*See* https://sourcedefense.com/glossary/limitations-of-waf/).

19. By contrast, RASP focuses on the application itself and RASP tools often sit inside or alongside the web application code. By being able to analyze applications during runtime, RASP can provide real-time contextual monitoring and to explain what kind of attack was detected and remediated. (*See* https://github.com/resources/articles/security/what-is-rasp). Therefore, RASP helps detect threats and identify vulnerabilities during their operational phase. One key difference between WAF and RASP is that RASP is generally designed to protect live applications from threats as they execute by integrating with existing infrastructure. (*See* https://www.checkpoint.com/cyber-hub/cloud-security/what-is-application-security-appsec/rasp-vs-waf/). Once an attack is detected, one method RASP uses to remediate is to block the attack. (*See* https://github.com/resources/articles/security/what-is-rasp). RASP can also intercept, modify, or override application behavior during runtime in response to detected threats.

20. WAF and RASP systems are often used together, serving as a multi-pronged approach to security. The two technologies complement each other, as WAF systems operate like a firewall, while RASP systems act as a security agent within the application itself. (*See*

https://www.fastly.com/learning/security/waf-vs-rasp-what-are-the-differences). Security experts understand that WAF solutions are an "external first line of defense" as a "perimeter sentinel" whereas RASP solutions "are embedded within the software application" once they have bypassed the WAF perimeter. (*See* https://github.com/resources/articles/security/what-is-rasp). The '418 Patent focuses on integrating security into applications.

21. The need for in-line, application-level security has been exponentially accelerated by the rise of Artificial Intelligence and autonomous AI agents. The cybersecurity industry is no longer securing just human employees, but non-human identities as well. Traditional "Identity as the Perimeter" solutions fail completely when applied to Non-Human Identities (NHI). If an AI agent's static credential is stolen via a prompt injection or source code leak, an attacker gains immediate, programmatic, and automated access to the enterprise infrastructure. Furthermore, because AI agents generate their own code, evaluate data, and execute external "tool calls" without human intervention, security can no longer rely on pre-execution authentication checks. Security must operate dynamically at runtime. This technological imperative has given rise to the modern necessity of AI Runtime Guardrails and dynamic NHI proxies.

22. These modern architectural systems represent the current apex of the cybersecurity evolution. To properly secure an AI agent, these systems do not merely monitor logs or passively grant access. Instead, they act as an inseparable orchestration layer deeply integrated into the AI application. When an autonomous agent attempts a potentially malicious action or tries to utilize a static credential, these guardrails actively intercept the system call. They physically override the agent's native intent, forcing the application to adopt a secure alternative behavior, such as requesting a Just-In-Time (JIT) token or sanitizing a command, before the operating system is allowed to process the request.

23. Against this technological backdrop, the '418 Patent introduced systems and methods for creating secure applications through the imposition of intercepts, overriding, and repackaging techniques that integrated security functionality directly into the application itself.

**B. The Invention of the '418 Patent**

24. The invention in the '418 Patent relates to systems and methods for creating secure workspaces and applications, including the management and enhancement of same. (Ex. A at 1:16-19). The goal of the '418 Patent is to reduce security breaches by creating secure workspaces and applications. (*Id.* at 1:16-38). To do this, the '418 Patent discloses imposing one or more intercepts that convert an unsecured target application to a secure application. (*Id.* at 1:54-57). An intercept may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3). By adding an intercept onto the target applications, the behavior of the secure application can be different from the original behavior of the target application such that the disclosed system modifies the manner in which the application executes, enabling selected application operations to be intercepted, redirected, substituted, or controlled during runtime. (*Id.* at 1:57-61). Unlike perimeter-based security solutions, the disclosed intercepts become integrated with the secured application itself and are not separable.

25. The '418 Patent further explains that, after one or more intercepts are imposed on the target application, the resulting secure application may be repackaged with the bound intercepts integrated into the original application files. (*Id.* at 2:4-6). Through this repackaging process, the intercepts may become physically inseparable from the application, creating an immutable deployable entity. (*Id.* at 2:7-10). As a result, the secure application can resist attempts to remove or bypass the integrated security functionality. (*Id.* at 2:10-11). The repackaging process therefore

creates a modified executable application in which the injected security functions become part of the application itself rather than operating as a separate external security layer.

26. The ‘418 Patent explains that generating the secure application can preserve the operating-system interactions originally defined for the target application and the operating system for which the target application was designed. (*Id.* at 2:11-15). By preserving those operating-system interactions, the secure application remains compatible with its intended operating system despite the insertion of intercepts and other security functionality. (*Id.* at 2:15-21). As a result, the secure application can continue to perform its intended functions while enforcing enhanced security controls and policy mechanisms. Preserving operating-system interactions permits the modified application to retain its intended functionality despite the insertion of additional executable instructions and security controls.

27. The ‘418 Patent describes a specific, technical solution to modifying a target application to create a secure application. Specifically, the ’418 Patent discusses binding one or more intercepts to a target application. (*Id.* at 1:54-57). One example of an intercept can be the replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3). The ‘418 Patent further describes repackaging the bound intercepts with the original files such that they are physically inseparable from the original files. This prevents the secure application from having the intercepts removed by an unauthorized party. (*Id.* at 2:4-11; 6:64-7:6; *see* https://sourcedefense.com/glossary/limitations-of-waf/). Similarly, the ’418 Patent describes this repackaging to avoid having a malicious attacker remove the intercepts themselves. These techniques alter the executable structure and runtime operation of the target application itself rather than merely applying external rules or monitoring application activity.

28. The ‘418 Patent provides details regarding how application securitization occurs. Specifically, it discloses automated application-securitization techniques that can be performed without modifying source code, thereby reducing programmer oversight and errors. (Ex. A at 12:19-26). Additionally, the ‘418 Patent provides examples of this, including 1) replacing references to system services with references to a library that applies the necessary mechanisms and policies and 2) inserting secure references into the code of an application to replace non secure references. (*Id.* at 12:24-35). Specifically, this securitization process may include interposing system API calls to allow a secure framework to intercept and control application functions. (*Id.* at 21:43-49). This process may further include encryption for additional protection of applications. (*Id.* at 21:49-58). One major benefit may be that management layers may be injected onto the compiled applications, removing the need for source code or developer implemented application changes. (*Id.* at 12:36-47).

29. The ‘418 Patent further discloses concrete implementation techniques for imposing intercepts. One example method is called byte code injection, which replacing byte code API calls with intercepts. (*Id.* at 22:45-51). This is particularly useful for applications formatted for the Android operating system. (*Id.*; *also id.* at Figure 11, 23:45-60). Another disclosed technical method is to link replacement calls for native object code. (*Id.* at 22:51-57). This method is useful for applications that use native code and do not run under a virtual machine. (*Id.*). An example of this type of injection is link injection, which replaces preexisting system calls or the inclusion of new instructions in an immutable entity. (*Id.* at 24:64-25:24). The ‘418 Patent further discloses that linking order may be statically or dynamically linked, and that priority can be established during runtime. (*Id.* at 25:6-17). Finally, a system of obfuscation may prevent further modification or reversal of the securitization process. (*Id.* at 25:15-17).

30. The '418 Patent further discloses a reconstruction and repackaging phase that integrates the injected security functionality into the application. (*Id.* at 24:3-21). This is performed by a repackager. (*Id.* at 24:3-7). The repackager may be made of software or hardware elements and may be further modified by secure object references injected before. (*Id.* at 24:7-9). In addition, this reconstructed and modified application may need a new certificate to be trusted. (*Id.* at 24:11-16).

31. The ‘418 Patent provides details regarding runtime behavioral substitution. For example, the original behavior of the target application may be different from that of the secure application through previously-unavailable functional features. (*Id.* at 3:61-64). For example, a new instruction may interrupt program flow. (*Id.* at 2:1-3). Or the secure application can override the first application behavior with the second application behavior such that the second application behavior takes priority over the first application behavior. (*Id.* at 6:25-32). As such, rather than halting the performance of an application, the override allows the request to be completed except through the second application behavior rather than the first application behavior. (*Id.* at 9:4-12). The ‘481 Patent provides examples of such overriding including overriding pre-existing byte codes, overriding pre-existing references with secure references, overriding normal system APIs, and overriding restriction messages. (*Id.* at 2:43-3:10, 7:19-25, 27:53-57, 39:63-40:1). For example, the invention can interrupt unsafe API calls, redirect requests to access secure storage, prevent unencrypted network transmissions, and prevent usage of unprotected IPC channels. These techniques enable the secure application to continue operating while substituting secure behavior for original application behavior.

32. The solutions disclosed in the ‘418 Patent are directed to specific improvements in computer and application security technology. Rather than merely identifying, monitoring, or

evaluating security threats, the disclosed techniques modify executable applications through intercept insertion, code-level integration, repackaging, and runtime behavioral substitution to create secure applications capable of maintaining compatibility with their underlying operating systems while enforcing enhanced security functionality.

**Asserted Claim**

33. Claim 1 of the '418 Patent claims:

> A method of operating a secure application, comprising:
>
> receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior;
>
> in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and
>
> via a processing unit, performing the second application behavior.

(Ex. A at 40:44-58).

34. Claim 9 of the '418 Patent claims:

> A method of generating a secure application, comprising:
>
> via a processor:
>
> receiving a target application that is designed to interact with an operating system;
>
> configuring the target application by imposing one or more intercepts on the target application, wherein the imposition of the intercepts converts the target application into a secure application that maintains the interaction with the operating system; and
>
> repackaging the secure application such that the intercepts are integrated with the secure application and are inseparable from the secure application.

(Ex. A at 41:19-31).

## IV. COUNT I (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 9,135,418)

35. Upon information and belief, Defendant has directly infringed and is directly infringing claim 1 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method by using the Imperva AI Application Security. Upon information and belief, Defendant has also directly infringed and is directly infringing claim 9 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method by using the Imperva RASP ("Accused Instrumentality").

36. **Direct Infringement of Claim 1**. As explained below, Imperva uses Imperva AI Application Security to perform a method of operating a secure application. Imperva AI Application Security is designed to secure AI applications. A target application may include, for example, a homegrown GenAI application or another AI-enabled application. Imperva AI Application Security operates a secure application from a target application by mitigating AI cybersecurity risks and reducing or preventing data leakage. Imperva AI Application Security is able to take a target application and operate it as a secure application. Application Security manages LLM threats. Imperva describes that the need for this new type of security is AI driven automation, which has led to a rise in global internet traffic. This automated traffic makes legitimate intent harder to distinguish. As a result, upon information and belief, Imperva launched AI Application Security in part to handle additional bot requests and AI based threats.




(*E.g.*, https://www.imperva.com/products/ai-application-security/).




(*E.g.*, https://www.imperva.com/products/ai-application-security/).




(*E.g.*, https://www.imperva.com/resources/resource-library/reports/2026-bad-bot-report/).

37. Imperva distinguishes how its AI Application Security product protects against risks in a way that traditional WAF tools cannot. This is because, as the 418 Patent describes (Ex. A at 15:29-33, 25:8-10), it operates as a runtime protection layer that can address security concerns such as prompt injection, data leakage, and system prompt exposure among others. (*E.g.*, https://www.imperva.com/resources/resource-library/datasheets/ai-application-security-securing-your-genai/). As Imperva states in its marketing materials, "Imperva AI Application Security is a purpose-built runtime protection layer for homegrown applications powered by LLMs or GenAI. It sits in front of chatbots, virtual assistants, and AI-driven workflows to block prompt injection, prevent sensitive data leakage, stop system-prompt exposure, filter harmful outputs, and control

unbounded model consumption-addressing AI-specific risks that traditional WAF or endpoint tools cannot." (*Id.*).

38. Imperva's officially released videos further indicate how end results can apply to operate a secure application. In the non-limiting example below, the system can take multiple actions, including redacting a prompt. One or more of these actions is not possible with a Web Application (WAF) solution.




(*E.g.*, https://www.youtube.com/watch?v=UXFCavYNVZo&t=118s at 2:02).

39. Imperva AI Application Security performs the step of receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior. Imperva AI Application Security activates a security application. It takes a target application and operates as a SaaS reverse proxy. All inputs

and outputs to and from a large language model are analyzed, along with interactions. Each interaction and associated inputs and outputs comprise, for example, a set of functions. Imperva AI Application Security, upon information and belief, evaluates functions and provides modifications based on security guardrails and adaptive risk scoring. This results in the activation of a secure application.




(*E.g.*, https://www.imperva.com/products/ai-application-security/).

40. Imperva AI Application Security performs the step of, in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior. After a security event is detected, Imperva Application Security forces a secure application to override the first application behavior with the second application behavior. The example below concerns information leakage. Here, acts are taken to provide data protection based on a certain type of detected pattern. These actions override prior action of a target application. This results in a secure application operation which is designed to override the target application functions.




(*E.g.*, https://www.imperva.com/products/ai-application-security/).

41. Imperva AI Application Security performs the step of, via a processing unit, performing the second application behavior. A second application behavior is used when a condition triggering operation of a secure application occurs. In the example below, a dynamic prompt injection attempt behavior was blocked and modified such that second application behavior was applied.




(*E.g.*, https://www.imperva.com/products/ai-application-security/). Imperva provides further examples of its AI Application behavior in the official video below.




(*E.g.*, https://www.youtube.com/watch?v=UXFCavYNVZo at 1:58).

42. **Direct Infringement of Claim 9**. As explained below, Imperva uses Imperva RASP to perform a method of generating a secure application. Imperva RASP leverages Runtime Application Self-Protection ("RASP") technology to protect applications.



(*E.g.*, https://www.imperva.com/resources/datasheets/Runtime-Application-Self-Protection-RASP.pdf).



# Imperva RASP at a glance

## Benefits of Imperva Runtime Application Self-Protection

- RASP-protected applications in production are secure by default, no matter where or how they are deployed.
- RASP requires no signature updates or learning mode, no external network calls, and negligible CPU and memory consumption by leveraging patented LANGSEC techniques, leading to fast time to value and low total cost of ownership (TCO).
- RASP buys you time to fix and patch vulnerabilities, because your applications are secure regardless of latent vulnerabilities in original or third-party software.
- RASP provides a context-enriched perspective of security from the inside of your apps with unprecedented visibility into application attacks, events & risks.



(*E.g.*, https://www.imperva.com/resources/datasheets/Runtime-Application-Self-Protection-RASP.pdf).

43. Imperva uses Imperva RASP to perform the step of receiving a target application that is designed to interact with an operating system.




Figure 1: Imperva RASP plugins sit within applications to examine threats in real-time and with full application context, delivering reputable site traffic while blocking threats

(*E.g.*, https://www.imperva.com/resources/datasheets/Runtime-Application-Self-Protection-RASP.pdf).

44. Imperva uses Imperva RASP to perform the step of configuring the target application by imposing one or more intercepts on the target application, wherein the imposition of the intercepts converts the target application into a secure application that maintains the interaction with the operating system. Imperva describes its solution as being a "continuous integration" that "is part of the app throughout the SSDLC [Secure Software Development Life cycle]." Imperva describes how Imperva RASP differs from WAF in that it is tightly coupled with the application code. Imperva further describes that RASP does not sit in front of web applications like the complementary WAF solution. This provides the benefit of contextual awareness of security threats and vulnerabilities. Imperva further describes its solution as sitting inside the application.

3. **DevSecOps** - Builders are often forced to work closely with Defenders, (teams within the CSO / CISO org) or security admins to fix or mitigate their vulnerability backlogs. While processes like Secure SDLC, scanning tools like SAST/DAST/IAST, and penetration testing all point to issues within applications, the pressures of time, budget, performance, and the challenges of remediation often force developers to push code to production in spite of known risks.




Figure 2: The Secure Software Development Life Cycle (SSDLC) as it aligns with automated DevOps processes

## WAFS vs. RASP: isn't a WAF enough?

A web application firewall (WAF) normally sits in front of web applications, inspecting incoming HTTP request traffic for known attack payloads and abnormal usage patterns. When a suspicious payload or usage is detected, the WAF can either report the violation or report and block the request. WAFs are a great option for protecting against the following types of attack: volumetric (DDoS), bot automation (harvesting, scraping, etc.), account takeover (credential stuffing), and API security (north/south).

imposing one or more intercepts

RASP offers a critical layer of attack prevention behind a WAF or next-generation WAF. The RASP approach differs from traditional WAFs because it is tightly coupled with the application code. RASP uses contextual awareness, without blacklists or whitelists, to detect threats and provide assurance that a particular payload will not be able to exploit an unknown part of the application code. RASP technology inspects the complete (and often-times transformed data) in the context of how the application will use it, if and only if the application will attempt to use the data. The result is very low false positives and high visibility into vulnerabilities — including weaknesses previously unknown to the organization. In this way, RASP complements WAFs and serves as a last line of defense in application security.

imposing one or more intercepts

RASP can be woven directly into the DevOps build/deployment process so applications can safely be deployed into production without any delays. RASP's detection and prevention features can be embedded directly into every application release as part of the automated CI/CD pipeline, which means applications can automatically self-protect no matter where they sit in the SSDLC. Security tests are no longer tied to release schedules and remediation is prioritized using production attack data.

(*E.g.*, https://www.imperva.com/resources/whitepapers/Imperva-A-Guide-to-RASP.pdf).

45. Imperva uses Imperva RASP to perform the step of repackaging the secure application such that the intercepts are integrated with the secure application and are inseparable from the secure application. Imperva describes the core feature is that RASP be able to always remain on. Upon information and belief, a software vulnerability or threat cannot merely turn off Imperva RASP itself or otherwise remove the intercepts as a simple bypass to this security solution.

> **Fulfilling compliance requirements**
>
> Depending on the implementation, RASP can provide critical technical controls for organizations attempting to meet stringent regulatory security and data privacy compliance standards, thanks to a few key functions:
>
> - RASP provides data validation mechanisms to prevent the exploitation of potentially vulnerable coding constructs in software. Data that flows into and through an application can be inspected by RASP to protect from known, common application layer attacks and, depending on the methodology, zero-day threats.
> - Incorporating RASP during application development is a simple and consistent way to implement the security and visibility capabilities needed in a Secure Development Lifecycle for both custom-built and off-the-shelf software applications. Whether deployed during the SDLC or DevOps process, RASP security controls can travel with the application and always remain "on".

(*E.g.*, https://www.imperva.com/resources/whitepapers/Imperva-A-Guide-to-RASP.pdf).

46. **Indirect Infringement**. Upon information and belief, Defendant has been and now is indirectly infringing by way of inducing infringement and contributing to the infringement of claims 1 and 9 of the '418 Patent in the State of Texas, in this District, and elsewhere in the United States, by providing the Accused Instrumentality for use as described above by Defendant's customers. Defendant advertised, offered for sale, and/or sold the Accused Instrumentality to its customers for use in a manner that Defendant knew infringed claims 1 and 9 of the '418 Patent. For example, Defendant provided marketing material and advertising that the Accused Instrumentality performs the claimed method of operating a secure application as claimed in claim 1 of the '418 Patent. (*Supra* ¶¶36-41 (identifying marketing materials)). For example, Defendant provided marketing material and videos advertising that the Accused Instrumentality performs the

claimed method of generating a secure application from a target application designed to interact with an operating system as claimed in claim 9 of the ‘418 Patent. (*Supra* ¶¶42-45 (identifying marketing materials)).

47. On information and belief, since Defendant became aware of the ‘418 Patent and the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of inducing infringement by specifically intending to induce infringement by providing the Accused Instrumentality to its customers and by aiding and abetting its use as demonstrated by the marketing materials in a manner known to infringe by Defendant. Since becoming aware of the infringing use of the Accused Instrumentality, Defendant knew that the use of the Accused Instrumentality by its customers as instructed constituted direct patent infringement. Despite this knowledge, Defendant continued to encourage and induce its customers to use the Accused Instrumentality to infringe as described above and provided instructions for using the Accused Instrumentality to infringe, including through instructional materials, support, and user’s guides. Exemplary materials are cited above. (*Supra* ¶¶36-45 (identifying marketing materials)). Defendant therefore knowingly induced infringement and specifically intended to encourage and induce the infringement of the ‘418 Patent by its customers.

48. On information and belief, since Defendant became aware of the infringement at least as of the date of the service of the original Complaint, Defendant is and has been committing the act of contributory infringement by intending to provide the identified Accused Instrumentality to its customers knowing that it is a material part of the invention, knowing that its use was made and adapted for infringement of the ‘418 Patent, and further knowing that the accused use of the Accused Instrumentality is not a staple article or commodity of commerce suitable for substantially non-infringing use. As described above, Defendant was aware that all material claim limitations

are satisfied by the use and implementation of the Accused Instrumentality by Defendant's customers in the manner described above yet continued to provide the Accused Instrumentality to its customers knowing that it is a material part of the invention. (*Supra* ¶¶36-45 (identifying marketing materials)). As described above, since learning of the infringement, Defendant knew that the use and implementation of the Accused Instrumentality by its customers was made and adapted for infringement of the '418 Patent. (*Id.*). A new act of direct infringement occurred each time a customer implemented and/or used the Accused Instrumentality in the manner described above. After Defendant became aware that the use of the Accused Instrumentality infringes claims 1 and 9 of the '418 Patent, Defendant knew that each such new use was made and adapted for infringement of claims 1 and 9 of the '418 Patent and Defendant continued to advertise and provide the Accused Instrumentality for such infringing activities. (*Supra* ¶¶36-45 (identifying marketing materials)). Furthermore, as described more fully above, the Accused Instrumentality has functionality designed to perform the steps in the manner described above and is therefore not a staple article or commodity of commerce suitable for substantially non-infringing use. (*Id.*).

49. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '418 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

50. Unless a preliminary and permanent injunction is issued enjoining Defendant and all others acting in active concert therewith from infringing the '418 Patent, Plaintiff will be greatly and irreparably harmed.

51. Plaintiff is only asserting method claims and as such the marking requirements of 35 U.S.C. 287(a) do not apply. *Crown Packaging Technology, Inc. v. Rexam, Beverage Can Co.*, 559 F.3d 1308, 1316-1317 (Fed. Cir. 2009) ("Because Rexam asserted only the method claims of the '839 patent, the marking requirement of 35 U.S.C. 287(a) does not apply."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed.Cir. 1983) ("It is 'settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." (*Quoting Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983)). Plaintiff has therefore complied with the marking requirements 35 U.S.C. 287(a).

## V. JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claims 1 and 9 of United States Patent No. 9,135,418 has been infringed and is being infringed, either literally and/or under the doctrine of equivalents, directly and/or indirectly, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Defendants be preliminarily and permanently enjoined from any further activity or conduct that infringes;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

September 2, 2026

DIRECTION IP LAW

/s/David R. Bennett
David R. Bennett (IL Bar No.: 6244214)
Steven G. Kalberg (IL Bar No.: 6336131)
Direction IP Law
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667
dbennett@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2026, I electronically filed the above documents with the Clerk of Court using CM/ECF which will send electronic notification of such filings to all registered counsel.

*/s/ David R. Bennett*
David R. Bennett