**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| CONGRUENT MEDIA RESOURCING LLC,<br><br>Plaintiff,<br><br>v.<br><br>IMPERVA, INC.,<br><br>Defendant. | **C.A. No. 2:26-cv-00461**<br>**(Lead Case)**<br><br>**JURY TRIAL DEMANDED** |
| CONGRUENT MEDIA RESOURCING LLC,<br><br>Plaintiff,<br><br>v.<br><br>SILVERFORT, INC.,<br><br>Defendant. | **C.A. No. 2:26-cv-00643**<br>**(Member Case)**<br><br>**JURY TRIAL DEMANDED** |

**SILVERFORT, INC.'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1
II. BACKGROUND .......... 3
III. LEGAL STANDARD .......... 5
A. Courts Routinely Resolve Patentability on a Motion to Dismiss .......... 5
B. Abstract Ideas Are Not Patentable Under 35 U.S.C. § 101 .......... 7
IV. ARGUMENT .......... 8
A. *Alice* Step One: The Asserted Claim Is Directed to an Abstract Idea .......... 9
B. *Alice* Step Two: The Asserted Claim Recites No Inventive Concept .......... 13
C. The Remaining Claims of the '418 Patent Are Likewise Ineligible Under § 101 Because Claim 1 Is Representative of All Claims .......... 16
D. Congruent's Complaint Allegations, and Any Potential Amendment, Cannot Avoid Dismissal .......... 21
E. There Are No Claim Construction Disputes Preventing the Court From Ruling at the Rule 12 Stage .......... 23
V. CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016)....................12

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)....................6, 12, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012)....................11, 13

*Bilski v. Kappos*,
561 U.S. 593 (2010)....................11

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
778 F. App'x 882 (Fed. Cir. 2019) ....................17, 22

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017)....................7, 11, 28

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ....................11

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)....................12

*Cuvillier v. Taylor*,
503 F.3d 397 (5th Cir. 2007) ....................10

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F. App'x 529 (Fed. Cir. 2020) ....................14

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)....................12

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020).................... *passim*

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016)....................7, 11

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ....................17, 18

*Int'l Bus. Machines Corp. v. Zillow Grp. Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ....................19

*Intell. Ventures I LLC v. Cap. One Bank*,
*792 F.3d 1363 (Fed. Cir. 2015)* ....................13, 18, 19

*Mobile Acuity Ltd. v. Blippar Ltd.*,
110 F.4th 1280 (Fed. Cir. 2024) ....................22

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
839 F. App'x. 520 (Fed. Cir. 2021) ....................28

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016), *aff'd*,
680 F. App'x 1003 (Fed. Cir. 2017) ....................20

*OpenTV, Inc. v. Apple Inc.*,
No. 15-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016)....................16

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
696 F. App'x 1014 (Fed. Cir. 2017) ....................14, 18, 20

*Random Chat, LLC v. Altra Fed. Credit Union*,
No. 2:25-CV-00478-JRG, 2026 WL 636677 (E.D. Tex. Mar. 6, 2026).................... *passim*

*Reese v. Sprint Nextel Corp.*,
774 F. App'x. 656 (Fed. Cir. 2019) ....................28

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ....................14, 27, 29

*Simio, LLC v. FlexSim Software Products, Inc.*,
983 F.3d 1353 (Fed. Cir. 2020)....................28

*StrikeForce Techs., Inc. v. SecureAuth Corp.*,
No. 17-04314, 2017 WL 8808122 (C.D. Cal. Dec. 1, 2017), *aff'd*, 753 F.
App'x 914 (Fed. Cir. 2019)....................17, 21, 22

*Torus Ventures LLC v. Cawley Partners, LLC*,
No. 2:24-CV-00552-JRG, 2025 WL 1799327 (E.D. Tex. June 30, 2025) ....................8, 12, 13

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017)....................17, 19

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring)....................................................11, 29

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) .........................................................................................26

*Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*,
815 F. Supp. 3d 527 (E.D. Tex. 2025)..............................................................................8, 14

*Whitserve LLC v. Dropbox, Inc.*,
854 F. App'x. 367 (Fed. Cir. 2021) ..................................................................................28

**Statutes**

35 U.S.C. § 101 ................................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................................................................................... *passim*

## I. INTRODUCTION

Plaintiff Congruent Media Resourcing LLC's ("Congruent") Complaint for patent infringement against Defendant Silverfort, Inc. ("Silverfort") should be dismissed because all claims of U.S. Patent No. 9,135,418, including the asserted claim, Claim 1 (which is representative of all claims), are directed to a patent-ineligible abstract idea in violation of 35 U.S.C. § 101. Under the Supreme Court's two-part *Alice* test, a patent claim is ineligible if: (1) its basic thrust is directed to an abstract idea; and (2) it does not recite a technological inventive concept beyond that abstract idea. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). The claims of the '418 Patent—which are directed to the idea of controlling access to software resources—fall far short of eligibility under this test.

First, the '418 Patent claims are invalid under § 101 because they are directed to nothing more than the idea of "controlling access to, or limiting permission to, [software] resources," which the Federal Circuit has already held is an abstract idea. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020). Indeed, courts have repeatedly invalidated such claims.

Second, the limitations of the '418 Patent claims provide no inventive concept because they merely add generic steps and conventional computer components to the abstract idea of controlling access to software resources. For example, Claim 1 recites that a generic "input device" receives a request to activate a "secure application" that was already "created from a target application" by imposing a "second set of functions" on the application's original functions, and that a generic "processing unit" then performs the second set of functions in place of the original ones. The claim provides no specificity as to what the second set of functions is, how it is imposed, how the override is accomplished, or what the overriding behavior does. The specification describes the functions imposed on a target application only as the "replacement of

an existing instruction or a new instruction" that, for example, restricts communications with the application. '418 Patent, 1:43-60, 1:66-2:3, 21:12-16. The claims do not require any particular imposed function or behavior modification, nor do they require implementing one in any particular way. Thus, like the "interception module" within the access controller in *Ericsson* that the Federal Circuit held was insufficient to provide an inventive concept, *Ericsson*, 955 F.3d at 1329, the imposed-function and override limitations of Claim 1 cannot provide an inventive concept.

Third, Congruent's own description of the '418 Patent cannot save Claim 1. The Complaint's allegations about how the patent's securitization process supposedly works, including byte code injection, link injection, interposing system API calls, encryption, and re-signing certificates, are drawn from the specification and appear nowhere in Claim 1. Compl. ¶¶ 11-14. Unclaimed disclosure is "not recited in the claims," and so it "cannot provide an inventive concept." *Ericsson*, 955 F.3d at 1329.

Courts routinely grant motions to dismiss when a patent is directed to nothing more than an abstract idea. *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced."); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."); *Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 3-5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) after finding that the representative patent claim is "directed to a patent-ineligible concept" and "does not contain an inventive concept sufficient for patent eligibility under §

101"); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327, at *6, 8, 11 (E.D. Tex. June 30, 2025) (same); *Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*, 815 F. Supp. 3d 527, 536-37 (E.D. Tex. 2025) (holding that the patent is invalid under § 101 and dismissing plaintiff's claims with prejudice under Rule 12(b)(6)).

Because the '418 Patent is directed to patent-ineligible subject matter, the Court should grant this Motion to Dismiss.

## II. BACKGROUND

The '418 Patent generally relates to securing a software application. '418 Patent, Abstract. The '418 Patent explains that applications running on an employee's personal smartphone may be compromised by malware or "questionable code." *Id.*, 1:23-30. Thus, according to the patent, employers may be concerned that "sensitive enterprise data, if installed on an employee's personal device, may be subject to attack from a dishonest source." *Id.*, 1:30-35. The '418 Patent suggests that due to this "potential security breach," employers have "resist[ed] integrating corporate apps and information in the operating environment of a worker's personal mobile device." *Id.*, 1:35-39.

The '418 Patent purports to overcome this alleged problem by securing the application. The patent describes taking an existing, non-secure application (the "target application") and adding to it a second set of functions that changes how the application behaves, yielding a "secure application." '418 Patent, 1:43-60. The added functions operate according to a "policy that reflects restrictions, directives or guidelines that an entity may wish to have enforced against or applied to the secure application." *Id.*, 1:57-64. In other words, the added functions modify the "behavior" of the application. *Id.*, 1:57-61, 5:37-42, 6:57-61, 8:30-33, 21:12-16. The specification describes the method of operating the resulting secure application, as recited in asserted Claim 1: receiving a request to activate the secure application and, in response, "forcing

the secure application to override the first application behavior with the second application behavior." *Id.*, 6:19-32.

The '418 Patent claims do not recite any particular behavior modification. The specification's own "non-limiting examples" of how a target application's behavior may be modified range from ordinary access restrictions, such as preventing operation during a predetermined time, outside a predetermined location, or unless authentication meets predefined criteria, to changes having nothing to do with security, such as replacing the application's video source or enabling the use of a mouse. '418 Patent, 4:61-5:31 (listing seventeen examples). The patent's definition of a "secure application" is equally broad, covering any application "modified to restrict communications between the application and unauthorized programs or devices or to alter or add features associated with the operation of the application." *Id.*, 21:12-16. Claim 1 does not limit the recited "second application behavior" to any of these, or to anything else.

The concept of injecting new functionality into an application is not new. Indeed, the '418 Patent acknowledges that this process is "a method sometimes referred to as application wrapping or application securitization." '418 Patent, 12:19-24. The patent describes application wrapping as "an automated process that augments an application with new capabilities." *Id.*, 12:23-24. The process does not require modifying or accessing source code. *Id.*, 1:64-66, 4:34-38, 6:61-63. And the method is implemented using a general-purpose processor on "any suitable machine, including mobile devices and desktop computers." *Id.*, 12:48-56.

Claim 1 of the '418 Patent (which is representative of all '418 Patent claims) recites:

1. A method of operating a secure application, comprising:

> [1] receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set

> of functions that are imposed on the first set of functions and that are associated with a second application behavior;
>
> [2] in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and
>
> [3] via a processing unit, performing the second application behavior.

’418 Patent, 40:44-58.

Claim 1 describes “operating” a “secure application” that “was created from a target application” by imposing a “second set of functions” on the target application’s “first set of functions,” and then “forcing the secure application to override the first application behavior with the second application behavior.” ’418 Patent, Cl. 1. The claim recites nothing beyond these simple steps, which are merely a form of controlling access to software resources on a computing device. The claim does not require any particular application type, any particular imposed function, or any specific behavior modification. The claim does not specify what instructions are introduced or modified, how the override is carried out, or in what way the access is limited. There is nothing in the claim that adds anything technological to the basic, recited steps.

## III. LEGAL STANDARD

### A. Courts Routinely Resolve Patentability on a Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint “must provide the plaintiff’s grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level.” *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). Legal conclusions in the complaint are given no deference and are left for the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). The Court must limit its review "to the contents of the pleadings." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion. In many cases, too, evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction.") (citation omitted).

This Court too has dismissed patent claims under 35 U.S.C. § 101 at the pleading stage, prior to claim construction. *Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 3-5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) after finding that the representative patent claim is "directed to a patent-ineligible concept" and "does not contain an inventive concept sufficient for patent eligibility under §

101"); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327, at *6, 8, 11 (E.D. Tex. June 30, 2025) (same).

**B. Abstract Ideas Are Not Patentable Under 35 U.S.C. § 101**

In *Alice*, the Supreme Court set forth a two-step test to determine whether a patent is directed to ineligible subject matter. In the first step, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept," e.g., an "abstract idea." *Alice*, 573 U.S. at 218. "[T]he first-stage inquiry [looks] at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted). "In addressing the first step of the § 101 inquiry, as applied to a computer-implemented invention, it is often helpful to ask whether the claims are directed to 'an improvement in the functioning of a computer,' or merely 'adding conventional computer components to well-known business practices.'" *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016)).

If the claims are directed to an abstract idea, the second step of the Alice test "consider[s] the elements of each claim both individually and "'as an ordered combination,'" *Alice*, 573 U.S. at 217 (citation omitted), to determine whether the claim "contains an 'inventive concept,' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (citation omitted). An inventive concept must "ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Id.* at 217-18 (citation omitted). The recitation of "well-understood, routine, and conventional activities" does not supply an inventive concept. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Similarly, "'appending conventional steps, specified at a high level of generality,' [is] not 'enough' to supply an 'inventive concept.'" *Alice*, 573 U.S. at

222 (citation omitted). It is well established that the use of a computer to implement an abstract idea does not, alone, create a patentable application. *Intell. Ventures I LLC v. Cap. One Bank, 792 F.3d 1363, 1367 (Fed. Cir. 2015)*. "[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the eligibility of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), 687 F.3d 1266, 1278 (Fed. Cir. 2012).*

## IV. ARGUMENT

Claim 1 of the '418 Patent is directed to the ineligible abstract idea of controlling access to, or limiting permission to, software resources, and lacks any inventive concept. Claim 1 recites only conventional steps that apply a second, overriding behavior to an application already modified from a "target application" (e.g., to restrict communications with the application). Claim 1 fails to recite any specific technical approach, instead referring to a "second set of functions" that are nothing more than generic, unspecified instructions imposed on the application's existing functions. Moreover, the claimed method is carried out by a generic "input device" and "processing unit," rather than any specialized computer components. The Federal Circuit has previously held that such claimed methods for controlling access to, or limiting permissions to, software resources are ineligible for patent protection. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020). Accordingly, Congruent's allegations of infringement should be dismissed. *See Random Chat, LLC v. Altra Fed. Credit Union*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *1, 5 (E.D. Tex. Mar. 6, 2026) (granting motion to dismiss under Rule 12(b)(6) for claims directed to a patent-ineligible concept); *Torus Ventures LLC v. Cawley Partners, LLC*, No. 2:24-CV-00552-JRG, 2025 WL 1799327, at *6, 11 (E.D. Tex. June 30, 2025) (same).

Claim 1 is also representative of every other claim of the ’418 Patent. The remaining claims, none of which Congruent has asserted, fare no better under § 101.

Any effort to amend the pleading to assert alternative claims would be futile. *See Random Chat*, No. 2:25-CV-00478-JRG, 2026 WL 636677, at *4-5 (dismissing case with prejudice where “granting leave to amend … would be futile”) (citing U.S. Patent No. 7,679,637 LLC v. Google LLC, No. 2024-1520, 2026 WL 174922, at *5 (Fed. Cir. Jan. 22, 2026)). That is particularly so in this § 101 context, where “[n]o amendment to a complaint can alter what a patent itself states.” *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023) (affirming “district court did not err in finding amendment futile” after dismissing complaint under § 101).

### A. *Alice* Step One: The Asserted Claim Is Directed to an Abstract Idea

The ’418 Patent, including representative Claim 1, recites generic steps for controlling access to, or limiting permissions to, software resources (e.g., restricting communications with a secured computer application), similar to those found ineligible in many other cases. Controlling access to software resources has long been recognized as a patent-ineligible abstract idea. *See Ericsson Inc. v. TCL Commc’n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020) (“Based on the claim language, we conclude that claims 1 and 5 are directed to the abstract idea of controlling access to, or limiting permission to, resources. Although written in technical jargon, a close analysis of the claims reveals that they require nothing more than this abstract idea.”); *see also Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App’x 1014, 1017 (Fed. Cir. 2017) (“Under step one, the district court properly concluded that the asserted claims are directed to the abstract idea of ‘providing restricted access to resources.’”); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App’x 529, 532, 538-39 (Fed. Cir. 2020) (affirming determination of patent ineligibility for claims controlling access to information utilizing “access control information,” and an “access checker” that controlled said access); *Web 2.0*, 815 F. Supp. 3d at 534 (explaining

"[t]he '913 Patent is directed towards the abstract idea of receiving, storing, and controlling access to a patient's health information."). Claim 1 is, if anything, more abstract than the claim in *Ericsson*. It recites no access, permission, authorization, or policy at all. The claim requires only a request to launch a program, the substitution of one set of functions for another, and the performance of the substituted behavior. Claim 1 therefore covers any means of making a program run something other than what it was written to run.

More specifically, Claim 1 of the '418 Patent is directed to activating an application whose original behavior has been overridden by a second, imposed behavior. '418 Patent, 40:44-58. The claim does not say what the "second set of functions" is, only that it is "imposed on the first set of functions" and that the resulting behavior "takes priority." The specification describes the functions imposed on a target application only as "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." *Id.*, 1:66-2:3. Claim 1 therefore recites imposing unspecified instructions that modify the "target" application to limit access or permissions, and the claim does not specify what those instructions are or in what way the access or permissions are limited.

The Federal Circuit's decision in *Ericsson* is particularly instructive here. In Ericsson, the disputed claim recited as follows:

> 1. A system for controlling access to a platform, the system comprising:
>
> a platform having a software services component and an interface component, the interface component having at least one interface for providing access to the software services component for enabling application domain software to be installed, loaded, and run in the platform;
>
> an access controller for controlling access to the software services component by a requesting application domain software via the at least one interface, the access controller comprising:

> an interception module for receiving a request from the requesting application domain software to access the software services component;
>
> and a decision entity for determining if the request should be granted wherein the decision entity is a security access manager, the security access manager holding access and permission policies; and
>
> wherein the requesting application domain software is granted access to the software services component via the at least one interface if the request is granted.

*Ericsson*, 955 F.3d at 1325-26 (emphasis added).

The unpatentable *Ericsson* claim focuses on the same general concept as Claim 1 of the ’418 Patent: securing an application by using an “interception module” to decide (based on “permission policies”) whether to allow or disallow said application access to a “software services component.” Thus, both the *Ericsson* claim and the claim at issue here are fundamentally focused on the same idea: controlling access to software resources. The parallel is close: like the *Ericsson* claim, Claim 1 recites receiving a request and then determining what the requesting software may do, “in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior.” Other courts have similarly recognized that claims of this nature are abstract. *See OpenTV, Inc. v. Apple Inc.*, No. 15-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016) (“The [] patent claims are directed to the abstract idea of controlling access rights of software applications to access other software applications in the technological environment of interactive television systems.”).

The claims of the ’418 Patent, including asserted Claim 1, are directed to nothing more than the abstract idea of controlling access to, or limiting permissions to, software resources. Claim 1 as a whole merely recites, in less detail than *Ericsson*, activating an application and

applying to it a second, overriding set of functions. Again, those imposed functions are described as nothing more than "an actual replacement of an existing instruction or a new instruction" that turns the application into a "secure application" (e.g., by restricting communications with the application) ('418 Patent, 1:66-2:3, 21:12-16), akin to the "interception module" in *Ericsson*, which the court described as simply intercepting a request in order to determine whether to allow a certain application. *See Ericsson*, 955 F.3d at 1330 (explaining an "interception module" was insufficient to provide an inventive concept); *see also Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) ("'[I]ntercepting' traffic is itself an abstract idea."); *StrikeForce Techs., Inc. v. SecureAuth Corp.*, No. 17-04314, 2017 WL 8808122, at *7 (C.D. Cal. Dec. 1, 2017) (explaining an "interception device" performs a "purely functional and generic" role), *aff'd*, 753 F. App'x 914 (Fed. Cir. 2019).

In addition, Claim 1 of the '418 Patent uses broad functional language (e.g., "forcing the secure application to override the first application behavior with the second application behavior"; "takes priority over the first application behavior"; "performing the second application behavior"), without reciting how to achieve it, which does not save the claim from abstractness. Generic functional language is insufficient to pass *Alice* Step 1. *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064 (Fed. Cir. 2026) ("We have also held claims using purely result-focused functional language, containing no specificity about how the purported invention achieves those results, to be directed to an abstract idea."); *Ericsson*, 955 F.3d at 1328 (holding claims were directed to an abstract concept when they "merely make generic functional recitations that requests are made and then granted."); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (holding claims were for ineligible subject matter where "claim 1 here only uses generic functional language to achieve these

purported solutions … Nothing in the claims or their constructions … requires anything other than conventional computer and network components operating according to their ordinary functions.”).

Finally, limiting the claim to a general computing environment by requiring an “input device” and a general-purpose “processing unit” does not change the result. The patent defines a “processing unit” as “one or more components that execute sets of instructions,” and identifies input devices as “a keyboard, mouse, keypad, touch screen, or the like.” ’418 Patent, 10:60-62, 13:25-28. Narrowing an abstract idea by “subject matter,” or “a particular use or environment” does not save the claim from being directed to an abstract idea. *GoTV Streaming*, 166 F.4th at 1064.

Thus, “where, as here, the bulk of the claim provides an abstract idea, and the remaining limitations provide only necessary antecedent and subsequent components, the claim’s character as a whole is directed to that abstract idea.” *Ericsson*, 955 F.3d at 1326-1327 (*citing In re TLI Commc’ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016)).

**B. *Alice* Step Two: The Asserted Claim Recites No Inventive Concept**

The claims of the ’418 Patent do not recite an inventive concept, but merely invoke “well-understood, routine [and] conventional” technology to carry out the abstract idea. *See Alice*, 573 U.S. at 225. The Federal Circuit has explained that “claims [which] recite no more than the sort of ‘perfectly conventional’ generic computer components employed in a customary manner” fail *Alice* Step 2. *Prism*, 696 F. App’x at 1018. Claim elements that “merely add[] computer functionality to increase the speed or efficiency of the process do[] not confer patent eligibility on an otherwise abstract idea.” *Intell. Ventures I*, 792 F.3d at 1370-71 (explaining that a term in the claim “simply describes a generic web server with attendant software” and this was insufficient to provide an inventive concept). Further, “[s]teps that do nothing more than spell

out what it means to 'apply it on a computer' cannot confer patent-eligibility." *Id.* at 1370-71 (explaining claims that require "the use of a software brain tasked with tailoring information and providing it to the user provides no additional limitation beyond applying an abstract idea.") (internal quotation marks omitted). The inventive concept also must be present in the claim itself—not only in the specification. *Two-Way Media*, 874 F.3d at 1338-39 (holding plaintiff could not overcome that "the claim—as opposed to something purportedly described in the specification—is missing an inventive concept.") (emphasis in original).

There is no such inventive concept in Claim 1 of the '418 Patent. Rather, the claim refers to entirely conventional aspects of a computer system, an "input device" and a "processing unit," for modifying the behavior of a "target application" to control access to software resources. The patent defines a "processing unit" as "one or more components that execute sets of instructions," and identifies input devices as "a keyboard, mouse, keypad, touch screen, or the like." '418 Patent, 10:60-62, 13:25-28. The claim's recital of a "second set of functions" that "override" the application's original behavior does nothing to save it, just as the "interception module" in the "access controller" did nothing to save the claims in *Ericsson*. As explained above, the imposed functions of the '418 Patent are generic and unspecified instructions that somehow convert the target application into a secure application. The claim does not describe a specific technical approach to accomplishing the claimed result of obtaining a "secure application," and it does not describe how the override is achieved. As here, when claims use "functional language, at a high level of generality and divorced from the computer technology, to recite the claimed functions," the limitations are seen as simply "describ[ing] the abstract method without providing more." *Int'l Bus. Machines Corp. v. Zillow Grp. Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022). Tellingly, the '418 Patent concedes that its purportedly new technology was "a method sometimes referred

to as application wrapping or application securitization," an "automated process" for which "[n]o source code needs to be modified." '418 Patent, 12:19-26.

The claims at issue in Ericsson are once again analogous. Like the functional language in Claim 1 of the '418 Patent (e.g., "forcing the secure application to override the first application behavior with the second application behavior"; "takes priority over the first application behavior"; "performing the second application behavior"), in *Ericsson* "[t]he most specific elements actually recited in the claim [were] 'an access controller for controlling access,' 'an interception module for receiving a request,' and 'a decision entity for determining if the request should be granted.'" *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1330 (Fed. Cir. 2020). The Federal Circuit held that "[n]one of these elements are sufficient to turn the claim into anything more than a generic computer for performing the abstract idea of controlling access to resources." *Id.*

Prism also supports Claim 1's lack of any inventive concept. In Prism, the Federal Circuit held that the claims at issue failed *Alice* Step 2 because the "asserted claims recite no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner." *Prism*, 696 F. App'x at 1018. Similar to the '418 claims that control access to software resources using basic computer components like an input device, a processing unit, and unspecified imposed instructions, the claims at issue in Prism were directed to a "method for controlling access … to protected computer resources" and included steps of "[1] receiving, ... [2] authenticating, ... [and] [3] permitting access" using an authentication server. *Id.* at 1016. Claim 1's steps of receiving a request, forcing an override, and then performing the resulting behavior track that same structure. *See also Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-CV-00134, 2016 WL 4718428 at *8 (W.D. Tex. Mar. 30, 2016) (concluding "the

claimed 'access rules' do not supply an inventive concept" where the "access rules" determined whether a device could access a network), *aff'd*, 680 F. App'x 1003 (Fed. Cir. 2017).

The Central District of California's decision in *StrikeForce* is also instructive. There, at the motion to dismiss stage, the court rejected the plaintiff's argument that an "interception device" was inventive, and instead found that it "performs the 'purely functional and generic' role of a router." *StrikeForce*, 2017 WL 8808122, at *7. The court further found that "the interception element is similar to the process for diverting identity data from the access server to the authentication server that was addressed and rejected in *Prism*." *Id.* at *2, *8. Thus, the court held that the claim lacked an inventive concept because it "merely recite[d] a host of elements that are indisputably generic computer components" like those in *Prism*. *Id.* at *7 (quoting *Prism*, 696 F. App'x at 1017). Here, the unspecified functions that Claim 1 imposes on the target application are generic computer components (instructions) that perform a function akin to the "interception device" or "interception element" from *StrikeForce*, and thus cannot supply the inventive concept. *StrikeForce*, 2017 WL 8808122 at *7.

Thus, because the claims of the '418 Patent do not recite an inventive concept, they fail *Alice* Step 2 and are unpatentable.

### C. The Remaining Claims of the '418 Patent Are Likewise Ineligible Under § 101 Because Claim 1 Is Representative of All Claims

Claim 1 is representative of the remaining claims of the '418 Patent, including independent Claims 9 and 16 and dependent Claims 2-8, 10-15, and 17-20. Accordingly, these other claims suffer from the same defects as Claim 1 and are ineligible under § 101.

First, independent Claim 1 is representative of Claim 9 and, regardless, Claim 9 is independently unpatentable under § 101. Claim 9, like Claim 1, is directed to the abstract idea of controlling access to software resources (in both claims, using a "secure application"). Where

Claim 1 is directed to "operating a secure application," Claim 9 is directed to "generating" one. Claim 9 also recites the term "intercepts," but that word adds nothing to change the § 101 analysis. The specification describes an intercept as "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow," '418 Patent, 1:66-2:3, which is similar to the unspecified instruction swapping that Claim 1 calls a "second set of functions" imposed on the target application's first set. *Id.*, 1:43-60, 6:19-25; *see* Compl. ¶ 11 (describing the patent as "imposing functions, such as intercepts, that convert an unsecured target application to a secure application"). Intercepting is itself an abstract idea. *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) ("'[I]ntercepting' traffic is itself an abstract idea."); *see also Ericsson*, 955 F.3d at 1330; *StrikeForce*, 2017 WL 8808122, at *7. With respect to *Alice* Step 2, Claim 9 also does not supply an inventive concept. Beyond the abstract idea itself, Claim 9 adds only a generic "processor" and a "repackaging" step. The specification describes repackaging only by its result, that the instructions and the application become physically inseparable, and it never explains how the application is repackaged or how the intercepts become inseparable from it. '418 Patent, 22:23-31.

Dependent Claims 10-15 depend from Claim 9, are substantially similar to Claim 9, and add nothing of substance, rendering Claim 1, through Claim 9, representative of Claims 10-15 for patent eligibility purposes. *See, e.g.*, *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1292 (Fed. Cir. 2024).

Claim 10 requires that the imposed intercepts be associated with one or more unspecified policies—it does not require a specific policy or functionality, just that some undefined "behavior" be modified according to an unspecified policy. '418 Patent, 41:32-36. Enforcing

"policies" cannot provide an inventive concept. *See Ericsson*, 955 F.3d at 1326, 1331. That is because enforcing policies that ultimately just control access to software resources is nothing more than the abstract idea itself.

Claim 11 requires that the act of imposing intercepts replace references of a target application with different references from an unspecified library, or that secure references be inserted to replace non-secure references. '418 Patent, 41:37-42. Again, no specifics are provided, so the claim is directed to the concept of controlling access.

Claim 12 requires that the intercepts be "selected from default intercepts to be applied … on a group basis." *Id.*, 41:43-46. The claims do not limit the "default intercepts" to any specific intercepts, so the details are unclaimed once again, and collecting the unspecified intercepts into a group does not change their abstract nature.

Claim 13 requires that configuration of the target application be conducted "without access to the source code of the target application," which does not change the abstract nature of the invention. (It also refers to the conventional and well-known concept of "application wrapping" or "application serialization," as the specification itself acknowledges. *See id.*, 12:19-35, 41:47-50.)

Claim 14 merely requires "publishing" the secure application in a "secure application repository," which the specification describes as "a medium that offers one or more secure applications for download to a computing device and may or may not require authentication to access and/or download the secure application." *Id.*, 11:25-29, 42:1-3. This broad description renders the concept of a "secure application repository" practically meaningless and equivalent to simply storing the application somewhere, so the claim remains abstract.

Claim 15 merely requires that conversion of the target application "maintains the availability of the application programming interfaces (API) associated with the operating system such that a developer of the target application is enabled to make use of [said APIs]." *Id.*, 42:4-9. The recited APIs are conventional legacy components associated with the operating system, and do not change the abstractness of the claims.

Claim 1 is also representative of independent Claim 16 and its dependent claims (Claims 17-20). Claim 16 is at least as abstract as Claim 1, and is similarly directed to the abstract idea of controlling access to, or limiting permissions to, software resources. Claim 16 recites "selecting" a secure application that was created by "imposing" intercepts on a target application, and remotely "managing" the secure application according to one or more unspecified "policies" that modify the "behavior" of the application. This recitation of changing the "behavior" of the application with "policies" is how the specification describes the concept of "intercepts." '418 Patent, 1:61-64, 5:37-42, 6:57-61, 8:30-33, 21:12-16. Thus, the idea is the same: controlling access to software resources. Claim 16 also recites a similar override as Claim 1, requiring that the secure application's behavior "is modified from and overrides the original behavior of the target application." *Id.*, 42:10-20.

Dependent Claims 17-20 do not add anything of substance to independent Claim 16 for the purposes of assessing eligibility. Claim 17 merely requires enforcing unspecified policies governing information access on an "individual or group basis," the only apparent options, and therefore does not actually add anything. '418 Patent, 42:21-25. Claim 18 recites policies to be enforced, but these policies merely reinforce the abstract nature of the claims, as they all concern controlling access to software resources (e.g. limiting access during a "predetermined time," when a device is "located outside a predetermined location," when there is "non-compliance of

an imposed licensing model," when "uninstalling the secure application" has been requested, or when "deleting data associated with the secure application" has been requested). *Id.*, 42:26-39. Each was a well-known and conventional approach to controlling access to software resources, and the claims and patent are silent with respect to any specific technical approach for creating "intercepts" that would accomplish these desired results. Claim 19 requires storing the secure application in a "secure partition of the computing device," which merely describes where to store the application and does nothing to change its abstractness. To the extent said "partition" limits access by unauthorized users, this limitation only further reinforces that the claim is directed to the abstract idea of controlling access to software resources. *Id.*, 42:39-43. Claim 20 requires "not interfer[ing] with personal data belonging to a user," which again only reinforces the abstract idea of controlling access to software resources (and is silent on how to specifically achieve this result). *Id.*, 42:44-48.

Finally, dependent Claims 2-8 do not add anything of significance to independent Claim 1 for the purpose of assessing eligibility. Claims 2 and 3 require "selectively permitting the secure application to engage in the first application behavior"—i.e., controlling when the target application will access software resources so that it can behave normally—which does nothing to change the abstract nature of the claim. '418 Patent, 40:59-67. Claim 3 additionally requires that such permitting be conditioned "on predetermined criteria." *Id.*, 40:62-67. These claims are as abstract as the claims that require the enforcement of "policies." Indeed, Claim 4 recites that said conditions would, in fact, be "based on a policy"—again an unspecified and generic way to control access to and by the target application. *Id.*, 41:1-2. Claim 5 requires "encapsulat[ing]" the secure application "to prevent data sharing." *Id.*, 41:3-5. This claim also does not affect abstractness as it again refers to limiting access to software resources and recites no inventive

concept. Claim 6 requires that the secure application be received from a "secure application repository," but as explained above in connection with Claim 14, the "secure application repository" does not avoid abstractness. *Id.*, 41:6-9. Claim 7 requires that the manner in which the claim controls access to software resources is via a "password or personal identification number (PIN)," which also does not change the abstractness of the claims. *Id.*, 41:10-14. Indeed, patent claims directed to passwords for authentication have routinely been considered patent-ineligible abstract ideas with no inventive concept. *See Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1358 (Fed. Cir. 2021) ("[N]othing in the claims is directed to a new authentication technique; rather, the claims are directed to combining long-standing, known authentication techniques to yield expected additory amounts of security."). Claim 8 depends from Claim 7 and further requires a "grace period" that selectively waives "the password or PIN"—which is yet another generic and conventional approach for controlling the application's access. '418 Patent, 41:15-18.

### D. Congruent's Complaint Allegations, and Any Potential Amendment, Cannot Avoid Dismissal

Congruent's Complaint devotes several paragraphs to describing the '418 Patent's disclosure. Compl. ¶¶ 11-14. None of it raises a factual issue relevant to the patent eligibility analysis. Congruent's description of the patent merely underscores the claims' abstract nature, and its descriptions of the specification are not claimed and thus cannot provide an inventive concept under Step 2 of *Alice*. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1329 (Fed. Cir. 2020) ("Even assuming that Ericsson's explanation of the scheme described in the specification is correct, this cannot provide an inventive concept at step two because it is not recited in [the] claims.").

Congruent's allegations about the technical operation of the alleged invention are untethered to Claim 1 and are irrelevant to the Step 2 analysis. *Ericsson*, 955 F.3d at 1329. For example, Claim 1 of the '418 Patent does not refer to "replacing references to system services with references to a library that applies the necessary mechanisms and policies," or to "inserting secure references into the code of an application to replace non secure references." Compl. ¶ 12. Similarly, Claim 1 does not refer to "interposing system API calls" or to "encryption for additional protection of applications." *Id.* Nor does it recite "byte code injection" or "link replacement calls for native object code." *Id.* ¶ 13. And Claim 1 does not refer to issuing "a new certificate to be trusted." *Id.* ¶ 14. Such details, wholly unclaimed, cannot supply an inventive concept.

Congruent's description of the patent's intercepts fares no better. The Complaint alleges that the '418 Patent "discloses imposing functions, such as intercepts, that convert an unsecured target application to a secure application," and that those functions "may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." Compl. ¶ 11. That is a restatement of the abstract idea at the same level of generality as the claim. An open-ended description of generic instructions that alter what an application is permitted to do only confirms that the '418 Patent recites an abstract idea, and it cannot supply an inventive concept because none of it appears in Claim 1.

Nor could Congruent cure these defects by amending. Amendment is futile where, as here, ineligibility appears on the face of the patent, because "[n]o amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023). The same is true of any attempt to swap in different claims of the '418 Patent, each of

which is ineligible for the reasons given above. *See Random Chat*, 2026 WL 636677, at *4-5 (dismissing with prejudice where "granting leave to amend … would be futile").

### E. There Are No Claim Construction Disputes Preventing the Court From Ruling at the Rule 12 Stage

The Court need not conduct claim construction to find the claims unpatentable on the pleadings. "[C]laim construction is not an inviolable prerequisite to a validity determination under § 101." *Reese v. Sprint Nextel Corp.*, 774 F. App'x. 656, 659 (Fed. Cir. 2019). Rather, to the extent Congruent contends that the Court cannot dismiss before entertaining claim construction, it is incumbent upon Congruent both to (1) allege specific constructions and (2) demonstrate how those constructions would render the claims patentable. For instance, in *Whitserve LLC v. Dropbox, Inc.*, 854 F. App'x. 367 (Fed. Cir. 2021), the Federal Circuit rejected the argument that the district court erred by dismissing under § 101 before claim construction, because the plaintiff "waived any such argument by failing to request claim construction below, and by failing to explain how a different construction of any claim term would lead to a different result." *Id.* at 373. Numerous other Federal Circuit opinions have reached the same conclusion. *E.g.*, *Simio, LLC v. FlexSim Software Products, Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (affirming dismissal where the plaintiff "ha[d] not explained how it might benefit from any particular term's construction under an Alice § 101 analysis"); *Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x. 520, 524-25 (Fed. Cir. 2021); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

Even if Congruent were to propose specific constructions, the Court here "can fully understand the basic character of the claims without claim construction" and thus "there is no claim construction dispute relevant to eligibility." *Reese*, 774 F. App'x. at 660. As discussed, Claim 1 is directed to conventional steps that control access, or limit permissions, to software

resources by overriding the behavior of a "target application" with that of a "secure application." Any potential construction of the terms of Claim 1 would not change this basic character of the claim.

Nor can any potential construction supply an inventive concept under *Alice* Step 2. The concept of securing an application is not new. Indeed, the '418 Patent acknowledges that this process is "a method sometimes referred to as application wrapping or application securitization." '418 Patent, 12:19-26. And the method is implemented using a general-purpose processor on "any suitable machine." *Id.*, 12:48-56.

Congruent cannot show that any claim term must be construed before the Court conducts the § 101 analysis. As such, "[n]o formal claim construction [is] required because the asserted claims disclose[] no more than 'an abstract idea garnished with accessories' and there [is] no 'reasonable construction that [c]ould bring [them] within patentable subject matter.'" *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014).

## V. CONCLUSION

For the foregoing reasons, Silverfort respectfully requests that the Court GRANT Silverfort's Motion to Dismiss the Complaint with prejudice. While the Complaint asserts only Claim 1 of the '418 Patent, because all the claims of the patent are ineligible, any further attempt by Congruent to assert different claims of the '418 Patent would be futile. "No amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023) (affirming dismissal of complaint under § 101 because amendment was futile).

Dated: September 23, 2026

**FISH & RICHARDSON P.C.**

*/s/ Rodeen Talebi*
Neil J. McNabnay
Texas Bar No. 24002583
Lance Wyatt
Texas Bar No. 24093397
Rodeen Talebi
Texas Bar No. 24103958
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
mcnabnay@fr.com
wyatt@fr.com
talebi@fr.com

**COUNSEL FOR DEFENDANT SILVERFORT, INC.**

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), counsel for Silverfort and Congruent met and conferred by telephone on September 22, 2026. The parties were unable to reach an agreement and have reached an impasse, leaving an open issue for the Court to resolve. This motion is opposed by Congruent.

*/s/ Lance E. Wyatt, Jr.*
Lance E. Wyatt, Jr.

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on September 23, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Rodeen Talebi*
Rodeen Talebi

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S**
**35 U.S.C. § 101 MOTION PRACTICE ORDER**

_____ The parties agree that prior claim construction is not needed to inform the Court's analysis as to patentability.

X____ The parties disagree on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Lance E. Wyatt, Jr.*
Lance E. Wyatt, Jr.