**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br><br>Plaintiff,<br>v.<br><br>**IMPERVA, INC.,**<br><br>Defendant. | C.A. No. 2:26-cv-00461-JRG<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

**PLAINTIFF CONGRUENT MEDIA RESOURCING LLC'S OPPOSITION TO DEFENDANT IMPERVA, INC.'S MOTION TO DISMISS UNDER RULE 12(b)(6)**

October 8, 2026

David R. Bennett
Steven G. Kalberg
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

I. SUMMARY OF THE ARGUMENT ..... 1

II. STATEMENT OF FACTS ..... 2

A. Background ..... 2

1. The Technological Problem Confronting the Industry ..... 3

2. What Was Well-Understood, Routine, and Conventional in Early 2012 and What Was Not ..... 4

B. Asserted Claims 1 and 9 ..... 6

C. Claims 1 and 9 are Asserted Against Different Imperva Products ..... 7

III. STATEMENT OF LAW ..... 8

A. Standard of Review for Motions to Dismiss ..... 8

B. Law on 35 U.S.C. §101 ..... 9

IV. ARGUMENT ..... 10

A. Claim 9 is Not Representative of Claim 1 Because Claim 9 Addresses Different Technological Problems and has Different Technological Improvements ..... 10

B. Claims 1 and 9 are Directed to a Patent Eligible Concept Under Step One ..... 12

1. Claims 1 and 9 are Not Directed to "Controlling Access to Information" Because the Claims are New Methods for Generating a Secure Application and Operating a Secure Application that Do Not Control Access to Information Like Prior Art Perimeter-Based Defenses ..... 12

2. Claims 1 and 9 are Technological Solutions to Technological Problems ..... 14

3. Federal Circuit Cases Addressing Securing Computer Systems Support the Patent Eligibility of Claims 1 and 9 ..... 16

4. The Interception Module in *Ericsson's* Access Control Claim is Fundamentally Different from the Imposed Intercepts in the Secure Application in Claim 9 and the Secure Application in Claim 1 with Two Sets of Functions that, Upon Request, Prioritizes Secure Behavior to Override the Unsecure Behavior ..... 19

5. The Federal Circuit has Routinely Held Software Claims Patent Eligible Regardless of Whether Conventional Components are Used ..... 21

C. Claims 1 and 9 are Patent Eligible Under Step Two Because They Have Several Inventive Concepts ..... 22

1. Defendant Failed to Analyze Claim 9 as an Ordered Combination and Failed to Draw Reasonable Inferences in CMR's Favor ..... 22

2. Claim 9 has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination ........ 23

3. Claim 1 also has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination ........ 27

D. The Court's Jurisdiction is Limited to Asserted Claims 1 and 9 ........ 29

E. At a Minimum, Claim Construction and Factual Issues Preclude Dismissal........ 29

CONCLUSION........ 30

## TABLE OF AUTHORITIES

**Cases**


*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed.Cir. 2018) .................... 9, 10, 22

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S.Ct. 2347 (2014).................... 9, 21, 22

*Ancora Techs. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed.Cir. 2018) .................... 16, 17

*Astellas Pharma, Inc. v. Sandoz Inc.*,
117 F.4th 1371 (Fed.Cir. 2024) .................... 9

*Bascom Global Internet Serv. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed.Cir. 2016) .................... 10, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................... 8

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed.Cir. 2018). .................... 25, 30

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed.Cir. 2020) .................... 19

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed.Cir. 2019) .................... 9

*Commil USA, LLC v. Cisco Sys.*,
135 S.Ct. 1920 (2015).................... 9

*Contour IP Holding LLC v. GoPro, Inc.*,
113 F.4th 1373 (Fed.Cir. 2024) .................... 14, 19, 21

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed.Cir. 2014) .................... 9

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed.Cir. 2016) .................... 10

*Ericsson v. TCL*,
955 F.3d 1317 (Fed.Cir. 2020) .................... passim

*Exergen Corp. v. Kaz USA, Inc.*,
725 F. App'x 959 (Fed.Cir. 2018).................... 25

*Finjan v. Blue Coat*,
879 F.3d 1299 (Fed.Cir. 2018) .................... 18

*Fox Group, Inc. v. Cree, Inc.*,
700 F.3d 1300 (Fed.Cir. 2012) .................... 29

*Gesture Tech. Partners, LLC v. LG Elecs. Inc.*,
No. CV 21-19234 (SRC), 2024 WL 5196815 (D.N.J. Dec. 23, 2024).................... 23

*Intell. Ventures II LLC v. FedEx Corp.*,
No. 2:16-CV-00980-JRG, 2019 WL 2297048 (E.D. Tex. Mar. 29, 2019) .............................. 23

*Jervis B. Webb Co. v. S. Sys., Inc.*,
742 F.2d 1388 (Fed.Cir. 1984) .............................. 29

*Lowrey v. Texas A & M Univ. Sys.*,
117 F.3d 242 (5th Cir. 1997) .............................. 30

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
132 S.Ct. 1289 (2012) .............................. 9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed.Cir. 2016) .............................. 14, 19

*Mentone Solutions LLC v. Digi Int'l Inc.*,
2021 WL 5291802 (Fed.Cir. 2021) .............................. 21

*Microsoft Corp. v. i4i Ltd.*,
564 U.S. 91 (2011) .............................. 9

*Miller Mendel, Inc. v. City of Anna*,
107 F.4th 1345 (Fed.Cir. 2024) .............................. 29

*Pay As You Go, LLC v. Verifone, Inc.*,
No. 8:25-CV-00660-JLB-CPT, 2026 WL 860686 (M.D. Fla. Mar. 30, 2026) .............................. 23

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) .............................. 9

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed.Cir. 2012) .............................. 29

*StrikeForce Techs., Inc. v. SecureAuth Corp.*,
2017 WL 8808122, at *7 (C.D. Cal. Dec. 1, 2017),
*aff'd*, 753 F. App'x 914 (Fed.Cir. 2019) .............................. 25, 29

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed.Cir. 2020) .............................. 21

*Thales Visionix, Inc. v. U.S.*,
850 F.3d 1343 (Fed.Cir. 2018) .............................. 22

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed.Cir. 2017) .............................. 9

*Voiceage EVS LLC v. HMD Glob. Oy*,
No. CV 19-1945-GBW, 2025 WL 1397239 (D. Del. May 14, 2025) .............................. 23

**Statutes**

35 U.S.C. §101 .............................. 1, 9, 22

**Rules**

Rule 12(b)(6), Fed.R.Civ.P. .............................. 8

Plaintiff Congruent Media Resourcing LLC ("CMR") hereby opposes Defendant Imperva Inc.'s ("Imperva" or "Defendant") Motion to Dismiss Under Rule 12(b)(6) (Dkt. 26).

## I. SUMMARY OF THE ARGUMENT

Imperva's motion should be denied because it mischaracterizes claims 1 and 9 of U.S. Patent No. 9,124,418 (the "'418 Patent") at an impermissibly high level of abstraction and disregards the distinct technological problems and solutions recited by the claims. Neither claim is directed to "controlling access to information." Claim 9 is a build-time method for generating a secure application by imposing code-level intercepts on a target application, preserving its operating system interactions, and repackaging it so the intercepts are integrated and inseparable. In contrast, claim 1 is a runtime method for operating a secure application with two different application behaviors that forces the imposed secure behavior to override the application's original behavior. Claim 9 is also not representative of claim 1 because the claims solve different technological problems, operate at different stages, and recite materially different solutions.

At step one of the 35 U.S.C. §101 analysis, the asserted claims are directed to specific improvements in computer-security technology, not the abstract idea of "controlling access to information." The prior art relied on perimeter-based defenses that operated outside applications and could be bypassed by attacks on the applications themselves. The '418 Patent instead secures applications at the application level: claim 9 transforms executable code through intercept insertion and inseparable repackaging, while claim 1 changes execution flow by giving imposed secure behavior priority over original behavior. Federal Circuit decisions recognizing patent eligibility for specific computer-security and software improvements—including *Ancora*, *Finjan*, *McRO*, *Contour*, and *TecSec*—support treating these claimed techniques as concrete technological solutions rather than abstract results. Imperva's reliance on *Ericsson* is misplaced because *Ericsson*

involved a gatekeeping access controller outside the application, not code-level intercepts integrated into an application or a forced runtime override of application behavior.

The asserted claims are also separately patent eligible at step two. The First Amended Complaint and the patent allege that the claimed features—including generating a secure application from a target application, imposing intercepts that modify program flow while preserving operating-system interactions, repackaging the application so the intercepts are inseparable, and forcing secure behavior to override original behavior at runtime—were not well-understood, routine, and conventional in 2012. Imperva fails to analyze the claims as ordered combinations and improperly asks the Court to disregard factual allegations that must be accepted as true at the pleading stage. Those allegations, as well as disputes concerning the meaning of terms such as "intercept," "secure application," "override," and "operating system," present factual and claim-construction issues that cannot be resolved against CMR on a Rule 12(b)(6) motion. The Court also lacks jurisdiction over unasserted claims because only claims 1 and 9 are asserted. Accordingly, drawing all reasonable inferences in CMR's favor and applying the presumption of validity, the Court should deny the motion; alternatively, CMR requests leave to amend any pleading deficiency identified by the Court.

## II. STATEMENT OF FACTS

### A. Background

The '418 Patent addresses a technological problem rooted in computer technology related to improved methods for creating secure workspaces. (Ex. A at 1:17-19). The claims of the '418 Patent claim priority to October 10, 2011. (Ex. A at Cover). As explained below, prior to 2012, cybersecurity was reactive and relied on perimeter-based defenses that create a protective barrier that secures the boundary of the network to block unauthorized external access and cyber threats.

The invention took a fundamentally different approach to cybersecurity by anticipating that an application was a potential bad actor and focused on specific methods to secure applications.

### 1. The Technological Problem Confronting the Industry

As alleged in the First Amended Complaint ("FAC"), the '418 Patent arose in the midst of a fundamental architectural failure in enterprise cybersecurity. For decades, the industry relied on reactive, perimeter-based defenses that assumed corporate systems were isolated and that anything inside the perimeter was trustworthy. (FAC ¶¶ 11-12). In the 1980s, signature-based antivirus attempted to detect known malicious code only *after* it reached the endpoint by relying on static signature databases, an approach that could not keep pace with evolving malware. (FAC ¶11). In the 1990s, network firewalls filtered traffic at the network boundary based on the binary assumption that internal traffic was trusted and external traffic was not. (FAC ¶12). Neither technology modified or controlled the internal execution of applications; both operated entirely outside the application layer. (FAC ¶16).

By the late 2000s, that assumption collapsed. Cloud computing, SaaS (Software-as-a-Service) platforms, and the widespread use of personal smartphones for work dissolved the perimeter entirely. (FAC ¶¶ 13-15). Corporate applications were now running on untrusted personal devices, alongside untrusted third-party apps, exposing sensitive enterprise data to malware and hostile code. (FAC ¶ 13; '418 Patent at 1:25-38). As explained in the '418 Patent, applications installed on personal devices may contain malware or some other questionable code, and corporate apps running on such devices were exposed to risky environments capable of accessing secure enterprise systems. ('418 Patent at 1:28-38, 1:44-48).

Around 2010, the industry attempted to address this collapse by adopting the Zero Trust model, which treated all network traffic as untrusted and required continuous verification of identity regardless of location. (FAC ¶14). But early Zero Trust implementations still relied heavily

on network segmentation and micro-perimeters. (*Id.*). This led to Identity and Access Management (IAM) systems that verified a user or device's identity before granting access. (FAC ¶15). IAM hardened identity controls, but it did not address a critical gap: attackers increasingly targeted the applications themselves. (*Id.*). If a malicious actor compromised a local application binary, they could bypass network firewalls, identity checks, and cloud controls entirely. (*Id.*). As of the priority date of the '418 Patent, there was no mechanism for enterprises to modify or control the internal execution of compiled third-party applications to enforce security policies at runtime. (FAC ¶15).

**2. What Was Well-Understood, Routine, and Conventional in Early 2012 and What Was Not**

The technological landscape in early 2012 was defined by a critical deficiency: although enterprises increasingly relied on mobile applications running on untrusted personal devices, the industry had no well-understood, routine, and conventional mechanism for modifying a compiled application's internal behavior, injecting new executable instructions, or repackaging the application such that the injected security logic became inseparable from the original binary. (FAC ¶¶ 13-16). This deficiency is central to the inventions claimed in claims 1 and 9 of the '418 Patent. Features of the claimed invention including application wrapping, intercept injection, runtime overriding of application behavior, and repackaging compiled binaries with inseparable security instructions were not well-understood, routine, and conventional in 2012.

The step in claim 9 of injecting intercepts into the application package to modify the compiled application is a technical process known as application wrapping ("app wrapping"). (FAC ¶16). App wrapping did not exist in mainstream enterprise tools and there were no systems that would override app behavior. (*Id.*). Neither Android nor iOS provided any native mechanism to alter the internal behavior of third-party applications, inject executable instructions, or repackage compiled apps while maintaining interaction with the operating system. (*Id.*). Existing

device-management tools could restrict access to applications, but they generally could not directly alter the internal execution of a compiled third-party application without access to source code. (FAC ¶ 16). App wrapping addressed this technical deficiency by disassembling the application, identifying predictable instructions and system-API calls, and binding intercepts that replace or interrupt those instructions at runtime. (*Id.*). Unlike existing device-management and perimeter-security solutions that controlled access to applications but could not protect against infected applications, app wrapping secures a system at the application level.

The '418 Patent introduced a new technical architecture that did not exist in conventional tools. It discloses binding intercepts to predictable instructions in a target application to convert it into a secure application with different runtime behavior. (FAC ¶¶ 24, 27; '418 Patent at 1:54-57, 1:66-2:3). These intercepts "replace existing instruction[s]" or "interrupt program flow," enabling the secure application to override original behavior—exactly what claim 1 requires when it recites forcing the secure application to override the first application behavior with the second application behavior. (FAC ¶¶ 24, 31; '418 Patent at 6:25-32). The patent further discloses repackaging the modified application such that the intercepts "are physically inseparable from the application," creating an immutable application resistant to tampering. (FAC ¶¶ 25-27; '418 Patent at 2:4-11). This inseparable integration is directly reflected in claim 9, which requires "repackaging the secure application such that the intercepts are integrated with the secure application and are inseparable from the secure application." The '418 Patent also teaches preserving operating-system interactions despite the insertion of intercepts, another capability absent from conventional tools. (FAC ¶ 26; '418 Patent at 2:11-21). Claim 9 expressly incorporates this requirement by reciting that the secure application maintains the interaction with the operating system.

Finally, the '418 Patent discloses concrete implementation "intercept" techniques—

byte-code injection, link-time replacement of native calls, interposing system APIs, encryption, obfuscation, and dynamic linking priority—that were not well-understood, routine, and conventional in 2012. (FAC ¶¶ 28-29; ’418 Patent at 21:43-58; 22:45-57; 24:64-25:24). These techniques enable the secure application to interrupt unsafe API calls, prevent unencrypted transmissions, and block insecure IPC channels—precisely the type of runtime behavioral substitution described in claim 1. (FAC ¶¶ 31-32; ’418 Patent at 2:43-3:10; 39:63-40:1).

In short, as of early 2012, the industry lacked any well-understood, routine, and conventional mechanism for (1) imposing intercepts on compiled applications, (2) overriding application behavior at runtime, (3) repackaging applications with inseparable security instructions, or (4) preserving operating system interactions after such modification. The ’418 Patent introduced a specific, technical solution to these problems, and claims 1 and 9 recite those non-conventional improvements directly.

**B. Asserted Claims 1 and 9**

Against this backdrop, the ‘418 Patent introduced a specific, technical solution: modifying compiled applications by binding intercepts to predictable instructions, overriding application behavior, and repackaging the application such that the intercepts become inseparable. (FAC ¶¶ 23-32). Claim 1 recites a method of operating a secure application with two sets of functions associated with different application behaviors created from a target application, where the secure application is forced to override original behavior with the prioritized new secure behavior:

> A method of operating a secure application, comprising:
>
> receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior;

> in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and
>
> via a processing unit, performing the second application behavior.

(Ex. A at 40:44-58).

Claim 9 recites generating a secure application by imposing intercepts on a target application and repackaging the application such that the intercepts are integrated and inseparable and operating system interactions are preserved:

> A method of generating a secure application, comprising:
>
> via a processor:
>
> receiving a target application that is designed to interact with an operating system;
>
> configuring the target application by imposing one or more intercepts on the target application, wherein the imposition of the intercepts converts the target application into a secure application that maintains the interaction with the operating system; and
>
> repackaging the secure application such that the intercepts are integrated with the secure application and are inseparable from the secure application.

(Ex. A at 41:19-31).

### C. Claims 1 and 9 are Asserted Against Different Imperva Products

Claims 1 and 9 recite materially different methods, a distinction reflected in CMR's infringement allegations against different Imperva products. Claim 1 is asserted against Imperva AI Application Security, which operates at runtime, by recognizing dynamic prompt-injection behavior and modifying the application's response to prevent manipulation. (FAC ¶¶37, 40–41). Consistent with that alleged operation, claim 1 requires a secure application containing imposed functions associated with a second secure application behavior and, in response to an activation request, forces that behavior to override and take priority over the application's original behavior.

(‘418 Patent at 40:45–56).

Claim 9 is asserted against Imperva RASP, which embeds detection and prevention functionality into an application so that the application protects itself against exploitation of vulnerable code. (FAC ¶¶44–45). Claim 9 similarly operates at the application level but, unlike claim 1, recites a build-time process: imposing intercepts on a target application while preserving its operating-system interaction, then repackaging the resulting secure application so that the intercepts are integrated with, and inseparable from, it. (‘418 Patent at 41:19–31). The distinction between Web Application Firewalls (“WAFs”) and Runtime Application Self-Protection (“RASP”) further illustrates this application-level focus. A WAF filters traffic outside the application without modifying its internal execution, whereas RASP operates within or alongside application code during execution. (FAC ¶¶17–20). CMR does not accuse WAF of infringement but alleges that Imperva RASP infringes claim 9’s application-level method. (FAC ¶¶42–45).

The accused products therefore illustrate the claims’ materially different operation: claim 1 recites a runtime override of application behavior, while claim 9 recites a build-time transformation that integrates inseparable intercepts into the application. Because the claims operate at different stages and require different technical mechanisms, claim 9 is not representative of claim 1, and the claims must be analyzed separately under § 101.

## III. STATEMENT OF LAW

### A. Standard of Review for Motions to Dismiss

The standard for ruling on a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., is whether, under any plausible reading of the pleadings, the plaintiff would be entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When evaluating such a motion, “the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.” *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150 (2000); *also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261-62 (Fed.Cir. 2017).

**B. Law on 35 U.S.C. §101**

"[T]he presumption of validity afforded to patents under § 282 applies equally to *all* grounds of validity, including the eligibility of the claimed subject-matter." *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1378 (Fed.Cir. 2024) (emphasis in original); *also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed.Cir. 2019). This presumption "takes away any need for a plaintiff to prove [its] patent is val*id*." *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 643 (2015). The burden of establishing invalidity rests on Defendant to prove invalidity by clear and convincing evidence. *Id.* at 632, 648-649; *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011).

The §101 analysis consists of two steps. *Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1296-1297 (2012). The first step determines whether the claim is directed to a patent ineligible concept. *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). The second step examines the claim elements individually and as an ordered combination "to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S.Ct. at 2357 (citation omitted). Even if an invention recites an abstract idea, the invention is patentable if it has "additional features to ensure that the claim is more than drafted to monopolize the abstract idea." *Id.* (internal brackets removed). The limitations must be considered both individually and as an ordered combination in this step. *Id.* at 2355. Claims have an inventive concept when they "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed.Cir. 2018).

Software claims are not abstract if "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed.Cir. 2014). Even

if software claims use generic computers, they are eligible if they do not preempt the idea on the Internet or generic computers performing conventional activities. *Bascom Global Internet Serv. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-51 (Fed.Cir. 2016); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed.Cir. 2016).

Patent eligibility is a question of law, but there can be subsidiary fact questions that must be resolved before the ultimate legal question. *Aatrix*, 882 F.3d at 1127-1128. "Whether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact." *Id.* at 1138.

## IV. ARGUMENT

Imperva's motion should be denied because it collapses two materially different claims into an overgeneralized abstraction and disregards the specific computer-security improvements each claim recites. Properly analyzed, both claims are directed to concrete technological computer-security improvements rather than the abstract idea of controlling access to information and they have inventive concepts when the limitations are viewed individually and as a whole. At minimum, the pleaded allegations concerning what was well-understood, routine, and conventional, together with claim-construction disputes, preclude dismissal under Rule 12(b)(6). The Court should therefore deny the motion.

### A. Claim 9 is Not Representative of Claim 1 Because Claim 9 Addresses Different Technological Problems and has Different Technological Improvements

Defendant incorrectly argues that claim 9 is representative of claim 1 even though the claims address different technological problems and different technological improvements. Claim 9 improves how applications are built, whereas claim 1 improves how applications are run.

Claim 9 is a method of ***generating*** a secure application, which is a build-time transformation of a compiled application. It addresses the technological problem of how to

generate a secure application. In 2012, enterprises had no mechanism to modify the internal execution of compiled third-party applications without source code, inject new executable instructions, or repackage the application with inseparable security logic. (FAC ¶¶ 15-16). Claim 9 introduces a non-conventional app wrapping architecture involving intercept binding, code injection, and inseparable repackaging. (FAC ¶¶ 24-29; '418 Patent at 1:54-2:3; 21:43-58; 22:45-57; 24:64-25:24, 41:19-31). It generates a secure application by receiving a target application, imposing intercepts that convert it into a secure application while maintaining operating system interactions, and repackaging the application such that the intercepts are inseparable. ('418 Patent at 41:19-31). Claim 9 is therefore a specific improvement in application-level security technology: creating an immutable, repackaged secure application that preserves operating system interactions after the intercepts are inserted.

In contrast, claim 1 is a method for ***operating*** a secure application, which is a runtime mechanism. It addresses a different technological problem: how to ensure that the secure application's injected behavior governs execution flow at runtime when the application is activated. Claim 1 is a method that operates a secure application by receiving a request to activate the secure application, forcing the secure application to override the first application behavior with the second application behavior, and performing the prioritized second application behavior. The FAC explains that, as of 2012, no conventional system could override application behavior at runtime, interrupt unsafe API calls, redirect storage requests, prevent unencrypted transmissions, or block insecure IPC channels. (FAC ¶¶ 16, 31-32). Claim 1 solves that problem by reciting a runtime override mechanism in which the secure application forcibly substitutes secure behavior for original behavior. Claim 1 and claim 9 are therefore not interchangeable because they address different technological problems, operate at different stages of the securitization process, and recite

different non-conventional technical solutions.

### B. Claims 1 and 9 are Directed to a Patent Eligible Concept Under Step One

#### 1. Claims 1 and 9 are Not Directed to "Controlling Access to Information" Because the Claims are New Methods for Generating a Secure Application and Operating a Secure Application that Do Not Control Access to Information Like Prior Art Perimeter-Based Defenses

Imperva's framing of claims 1 and 9 as directed to the abstract idea of "controlling access to information" is wrong because the claims do not control access at all. The claims modify executable instructions and program flow, which are fundamentally different from access control. Imperva's abstraction analysis relies on ignoring the actual claim language, the technological problem identified in the FAC, and the specific technical solution recited in the asserted claims.

Claim 9 does not require controlling access to information or resources. It recites a non-conventional method for transforming a compiled application into a secure application through code-level modification and inseparable repackaging, which is fundamentally different from access control. The focus of claim 9 is how to generate a secure application, not what access the application has or what has access to the application. In claim 9, a secure application is generated by imposing "intercepts" on the target application. As defined in the '418 Patent, "intercepts" are "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program." ('418 Patent at 1:66-2:3). This definition of "intercepts" does not address securing a program by controlling access; instead, "intercepts" address securing a program by changing the operational flow of the program. Imperva identifies "non-limiting examples" in the patent specification of results from using "intercepts." (Doc. 26 at 4-5). However, claim 9 does not claim those results. Instead, claim 9 discloses ***how*** the result is accomplished: modifying the application code by imposing intercepts that alter the operational flow of the application.

Claim 9 also requires repackaging the application such that the intercepts are inseparable and the application still maintains operating system interactions, which is unrelated to controlling access. (‘418 Patent at 41:25-31). As explained in the ‘418 Patent, repackaging an application so that the injected code is physically inseparable from the original code prevents intercepts from being removed by unauthorized parties. (‘418 Patent at 2:11-15, 22:27-31). “Controlling access to information” relates to whether a user or device may access data, files, or resources, which resembles perimeter-based defenses like firewalls, Zero Trust, and IAM. (*Supra* §II.A.1). Access-control systems do not create secure applications. In contrast, rather than controlling access to information, claim 9 secures applications by altering the internal structure of the application itself.

Claim 1 also does not require controlling access to information or resources. The focus of claim 1 is how the secure application behaves when activated, not access control. Again, the industry previously used perimeter-based defenses to control access to information whereas claim 1 solves a problem at the application level. Claim 1 requires a secure application created from a target application with two sets of functions: the original functions and the injected secure functions. (FAC ¶24; ’418 Patent at 40:46-58). Furthermore, the limitation “forcing the secure application to override the first application behavior with the second application behavior” is a technical execution-flow directive that determines which instructions to execute, not which information may be accessed. (‘418 Patent at 40:46-58). This “forcing” limitation is the opposite of access control. It does not control access to information; it forces the application to execute secure instructions instead of unsecured ones. Claim 1 is therefore a runtime behavioral-override mechanism that dictates which executable instructions take priority when the application runs, not an access-control mechanism.

By reducing claims 1 and 9 to “controlling access to information,” Imperva improperly

abstracts away the claims' express limitations and their technological focus on generating or operating a secure application. Imperva's abstract idea fails to capture claim 9's specific method of generating a secure application by imposing "intercepts"—replacement or new instructions capable of interrupting program flow and conditionally returning control to the program—and repackaging the application so that the intercepts are integrated with, and inseparable from, it. Nor does the abstract idea capture claim 1's distinct method of operating a secure application by imposing a second set of functions on a first set of functions and, upon activation, forcing the prioritized second secure application behavior to override the first application behavior. Imperva's abstract idea disregards these concrete limitations and describes the claims "at such a high level of abstraction and untethered from the language of the claims [that it] all but ensures that the exceptions to § 101 swallow the rule." *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380 (Fed.Cir. 2024).

Properly analyzed, as explained below, claims 1 and 9 are directed to specific technological improvements in operating and generating secure applications, not an abstract idea. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed.Cir. 2016) (claims are patent-eligible when they are "specifically designed to achieve an improved technological result in conventional industry practice.").

**2. Claims 1 and 9 are Technological Solutions to Technological Problems**

The invention in claims 1 and 9 solved a technological problem with a technological solution. In the prior art, existing security tools relied on access control that operated outside of the application and could not modify its internal execution. (FAC ¶¶ 11-20). But access control had a critical gap because malicious actors could bypass perimeter-based defenses like network firewalls, identity checks, and cloud controls entirely by targeting the applications themselves. (FAC ¶¶14-15). This vulnerability became apparent as employees increasingly used personal

devices, including smartphones, for work and stored corporate information on those devices, thereby exposing corporate applications and data to malware present on the devices. (‘418 Patent at 1:23-39). The security problem in the industry was therefore a technical deficiency in computer architecture: access to systems was controlled but applications within the systems were not protected. The inventions in the ‘418 Patent solved the technological problems resulting from malicious actors bypassing perimeter-based defenses through a method for generating a secure application through a build-time transformation of a compiled application and a method for operating a secure application through a runtime behavioral override mechanism. Both methods change where and how the security is implemented from the perimeter to the application level.

Claim 9 is a build-time method that creates a structurally different secure application from an unsecured application by changing the executable code of the target application. Starting with a target application that interacts with an operating system, intercepts are imposed on the target application to convert the target application into a secure application while maintaining the interaction with the operating system. (‘418 Patent at 41:22-28). The intercepts are defined as an "actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." (*Id.* at 1:66-2:3). The method then repackages the secure application such that the intercepts "are integrated with the secure application and are inseparable from the secure application." (*Id.* at 2:4-11; FAC ¶¶ 25-27). The result is an immutable secure application created with modified executable code. Claim 9 focuses on the specific way an application is modified to secure it, rather than claiming the result of a secure application. It is therefore not directed to an abstract idea, but to a specific technological solution that alters an application's structure to address a computer-specific security problem and improve computer functionality.

Claim 1 recites a runtime method for operating a structurally defined "secure application" created by imposing a second set of functions, associated with a secure application behavior, on the target application's original set of functions and application behavior. ('418 Patent at 40:45-51). When a request is received to activate the secure application, the secure application is forced to override the original behavior with the secure behavior so that the secure behavior takes priority. (*Id.* at 40:52-56). Similar to claim 9, claim 1 has a secure application with a different structure from an unsecured app: a formerly unsecured app with added secure functions. Claim 1 also requires a technical execution-flow directive: "forcing the secure application to override the first application behavior with the second application behavior." Claim 1 is therefore not directed to an abstract idea because it requires using a new application with a specific modified executable structure that, when executed, forces the application to override its original behavior by prioritizing secure behavior, which improves computer capabilities.

**3. Federal Circuit Cases Addressing Securing Computer Systems Support the Patent Eligibility of Claims 1 and 9**

Imperva's reliance on cases involving access control is misplaced because the asserted claims are directed to securing applications themselves, not controlling access to information. Federal Circuit decisions addressing specific technological improvements to computer security support the patent eligibility of claims 1 and 9.

In *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed.Cir. 2018), the claim was a method of restricting software operation within a license for use with a computer. *Id.* at 1345-46. The claim required storing a structure containing a license in specific BIOS memory and using that structure for verification by interacting with the distinct memory that contains the program to be verified. *Id.* at 1348-49. The district court held that the claim was abstract because it did not focus on how usage of BIOS leads to improved security and that BIOS typically stores data. *Id.* at 1346.

The Federal Circuit reversed, holding that "[i]mproving security—here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1348. The claim solved "a technological problem with computers: vulnerability of license-authorization software to hacking" and the claimed method "specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way." *Id.* at 1348-49.

Like the method claim in *Ancora*, claims 9 and 1 improve security by a specific technique that departs from earlier approaches to solve the security problem. Earlier approaches used perimeter-based defenses, but applications were left unsecured and vulnerable to attack. (FAC ¶15). Claims 1 and 9 depart from the earlier approaches by focusing on securing the applications, rather than perimeter-based defenses, as demonstrated by the preambles: claim 9 is "generating a secure application" and claim 1 is "operating a secure application." ('418 Patent at 40:44, 41:19). The claims then describe the structural feature that effectuates the functional improvement. Claim 9 structurally changes a target application by imposing "intercepts" to convert the target application into a secure application that maintains interaction with the operating system and repackaging the secure application so that the intercepts are integrated and inseparable from the secure application. (*Id.* at 41:24-31). Claim 1 requires a secure application with a second set of secure functions and behavior that are imposed on the first set of functions and behavior of the target application; upon receiving a request to activate the secure application, the method forces the second secure application behavior to take priority over and override the first application behavior. (*Id.* at 40:45-56). Like in *Ancora*, claims 9 and 1 are "an improvement in computer functionality that has the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Ancora*, 908 F.3d at 1349.

Another relevant Federal Circuit case involving securing computers, *Finjan v. Blue Coat*, 879 F.3d 1299 (Fed.Cir. 2018), involved a method of providing computer security by scanning a downloadable and attaching the results of that scan to the downloadable itself in the form of a "security profile." *Id.* at 1303. The Federal Circuit held the claim was not directed to an abstract idea because the claimed method scans a downloadable and attaches the virus scan results to the downloadable in the form of a newly generated file. *Id.* at 1304. The Court distinguished the claimed invention from traditional code-matching virus scans that compared code to a database of known suspicious code. *Id.* at 1304. The Federal Circuit held that the claimed method was patent eligible because it "employs a new kind of file that enables a computer security system to do things it could not do before." *Id.* at 1305. The *Finjan* defendant argued that the very short method claim was abstract because it did "not sufficiently describe how to implement that idea." *Id.* at 1303, 1305. The Federal Circuit rejected the argument holding that "the claims recite more than a mere result. Instead, they recite specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result." *Id.* at 1305.

Like the method claim in *Finjan*, claims 1 and 9 require a newly generated application with added code to secure the app. Claim 9 recites specific steps for generating a secure application by imposing intercepts (*i.e.*, modified or new instructions) on a target application that is then repackaged so that the intercepts are integrated and inseparable from the secure application. ('418 Patent at 41:24-31). Claim 1 recites specific steps for operating a secure application created by imposing a second set of functions, associated with secure behavior, on the target application's original set of functions. (*Id.* at 40:46-56). Upon receiving a request to activate the secure application, the method forces the secure behavior to take priority over and override the application's original behavior. (*Id.*). Both claims require an application created by adding new

code and are distinguishable from perimeter-based security. The asserted claims are therefore patent eligible because they are "drawn to a 'specific means or method that improves the relevant technology.'" *Contour*, 113 F.4th at 1379 (*quoting McRO*, 837 F.3d at 1314)); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed.Cir. 2020).

#### 4. The Interception Module in *Ericsson's* Access Control Claim is Fundamentally Different from the Imposed Intercepts in the Secure Application in Claim 9 and the Secure Application in Claim 1 with Two Sets of Functions that, Upon Request, Prioritizes Secure Behavior to Override the Unsecure Behavior

Imperva's reliance on *Ericsson v. TCL*, 955 F.3d 1317 (Fed.Cir. 2020), is misplaced because the claim in *Ericsson* bears no resemblance in structure, focus, or technological context to claim 9 of the '418 Patent. The Federal Circuit invalidated the *Ericsson* claim because it merely recited an access controller that received a request and determined whether to grant permission to a software service. The method of claim 9 of the '418 Patent does not perform access control, does not evaluate permissions, and does not regulate access to information or resources. It performs a non-conventional build-time transformation of executable code—a fundamentally different form of computer functionality.

Imperva relies on the "interception module" in *Ericsson* solely because that term resembles the "intercept" recited in claim 9. The concepts, however, are functionally and technologically distinct. In *Ericsson*, the "interception module" receives a request from application domain software to access a software services component and therefore operates as an access-control gatekeeper. 955 F.3d at 1329. In other words, the "interception module" sits ***outside*** the software service component and acts as a firewall. In contrast, the '418 Patent defines an "intercept" as "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program," which is ***inside*** the application. ('418 Patent at 1:66-2:3). Claim 9 therefore requires executable code that modifies program flow and, after

repackaging, is integrated with and inseparable from the secure application. (*Id.* at 41:29-31). The gatekeeping "interception module" in *Ericsson* is therefore not comparable to the "intercept." Moreover, the Federal Circuit did not decide whether the Ericsson interception module supplied an inventive concept because Ericsson had waived that argument. 955 F.3d at 1338 (dissent explaining majority's position (*citing id.* at 1329)). Here, CMR argues that construing "intercept" is necessary to determine the term's significance to patent eligibility. (Dkt. 37-1 at 2).

The *Ericsson* claim is also materially different from claim 9 because *Ericsson* agreed that its claim was directed to "controlling access to resources." 955 F.3d at 1327. The *Ericsson* claim is a platform with a perimeter-based runtime access-control system in which an "interception module" receives an access request and a decision entity determines whether to grant access to the software services, *i.e.*, like a firewall. 955 F.3d at 1325-26. The *Ericsson* claim does ***not*** modify an application's executable code, transform or repackage code, or integrate new code inseparably with existing application code. *See id.* In contrast, claim 9 recites a build-time transformation of the application code itself. It imposes intercepts on an application that modifies the code to alter the operational flow of the program, preserves the application's interaction with the operating system, and repackages the resulting secure application so that the intercepts are integrated with, and inseparable from, it. Claim 9 neither receives access requests for an application nor evaluates whether access to an application should be granted. Because *Ericsson* concerns perimeter-based runtime access control and claim 9 concerns a specific application-level code modification, *Ericsson* does not support Imperva's characterization of claim 9.

The claim in *Ericsson* is likewise materially different from claim 1. *Ericsson* recites a perimeter-based access controller with one set of instructions that determines whether access to software should be granted. It does not require a secure application. In contrast, claim 1 recites

operating a secure application in which a second set of functions, associated with secure behavior, has been imposed on the target application's original set of functions. In response to a request to activate the secure application, the method forces the secure behavior to override and take priority over the application's original behavior. *Ericsson* does not require alternative functions or application behaviors, behavioral overrides, prioritization of behaviors, or changes to runtime application behavior; it has one set of instructions that only determines whether to grant access to software. Its access-control method thus does not support Imperva's characterization of claim 1.

**5. The Federal Circuit has Routinely Held Software Claims Patent Eligible Regardless of Whether Conventional Components are Used**

Defendant's argument that the claims only rely on generic computer components and are therefore abstract (Doc. 26 at 10, 14-18) has been rejected by the Federal Circuit. The Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Mentone Solutions LLC v. Digi Int'l Inc.*, 2021 WL 5291802, at *3 (Fed.Cir. 2021). Arguing that the invention uses conventional components "*alone* does not necessarily mean that the claim is *directed* to an abstract idea." *Contour*, 113 F.4th at 1380; *also Core Wireless*, 880 F.3d at 1362.

Furthermore, Defendant's argument that individual elements are conventional and thus cannot be an improvement has also been explicitly rejected by the Federal Circuit. In *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed.Cir. 2020), the defendant asserted "the 'common-place' character of the individual component techniques generally, … or [] at an even higher level of generality of 'encoding, converting, encrypting, and controlling access to data.'" *Id.* at 1297. The Federal Circuit rejected this argument, holding that this "approach is insufficient where... it is the combination of techniques that is what the patent asserts to be the focus of the claimed advance over the prior art." *Id.* (internal quotes and citation omitted); *Id.* at 1295 ("To disregard those

express claim elements is to proceed at 'a high level of abstraction' that is 'untethered from the claim language' and that 'overgeneraliz[es] the claim." (citation omitted)). For example, Imperva argues that intercepts are not new and were conventional. However, the invention in claim 9 is not intercepts generally, rather, it is where and how intercepts are combined with an application: securing an application by imposing intercepts onto a target application and repackaging the application such that the intercepts are integrated and inseparable from the secure application. Using conventional elements in an unconventional manner is patent eligible. *Thales Visionix, Inc. v. U.S.*, 850 F.3d 1343, 1348-1349 (Fed.Cir. 2018) ("Rather, the claims are directed to systems and methods that use [conventional] inertial sensors in a non-conventional manner ….").  Claims 1 and 9 are therefore patent eligible under step one.

### C. Claims 1 and 9 are Patent Eligible Under Step Two Because They Have Several Inventive Concepts

Claims 1 and 9 are also separately patent eligible under step two because individual limitations and each claim as a whole have several inventive concepts.

#### 1. Defendant Failed to Analyze Claim 9 as an Ordered Combination and Failed to Draw Reasonable Inferences in CMR's Favor

Step two of the §101 analysis requires "examin[ing] the elements of the claim [both individually and as an ordered combination] to determine whether it contains an 'inventive concept.'" *Alice*, 134 S.Ct. at 2357, 2355. Claims contain inventive concepts when they "involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128 (internal quotes, brackets, and citation removed). "Whether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact" and, on a motion to dismiss, all factual assertions in the complaint and patent must be weighed in the light most favorable to CMR. *Id.* at 1124, 1128. Imperva did not perform this analysis.

First, Imperva was required to analyze claim 9 as an ordered combination to satisfy its burden of proving patent ineligibility. *Bascom*, 827 F.3d at 1347-48. Imperva did not perform this analysis, which requires denying the motion. *Voiceage EVS LLC v. HMD Glob. Oy*, No. CV 19-1945-GBW, 2025 WL 1397239, at *22-*23 (D. Del. May 14, 2025); *Pay As You Go, LLC v. Verifone, Inc.*, No. 8:25-CV-00660-JLB-CPT, 2026 WL 860686, at *4 (M.D. Fla. Mar. 30, 2026); *Intell. Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2019 WL 2297048, at *17 (E.D. Tex. Mar. 29, 2019); *Gesture Tech. Partners, LLC v. LG Elecs. Inc.*, No. CV 21-19234 (SRC), 2024 WL 5196815, at *9 (D.N.J. Dec. 23, 2024). Second, Imperva disregards the FAC's factual allegations and thus fails to draw all reasonable inferences from those allegations in CMR's favor. As explained below, those allegations support the reasonable inference that the inventive concepts recited in the asserted claims, both individually and as ordered combinations, were not well-understood, routine, and conventional in the industry.

#### 2. Claim 9 has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination

In the context of the claimed invention, the FAC explains what was well-understood, routine, and conventional in the industry. The industry was focused on perimeter-based defenses. (FAC ¶¶14-15, *supra* §II.A.1). If an attacker could bypass the perimeter defenses, an attacker could target the applications themselves which remained unsecured. (FAC ¶20). As explained above, the WAF/RASP distinction illustrates the difference between perimeter-level protection and the claimed application-level security architecture. *Supra* §II.C. The FAC's separate allegations concerning the state of the industry support the reasonable inference that the claimed combination was not well-understood, routine, or conventional in 2012. (FAC ¶¶13–16, 24–29).

The first inventive concept is generating a secure application from a target application. ('418 patent at 41:19-28). The patent explains that an "application" is "a program or programs

that performs one or more particular tasks on a computing device and includes programs that may present a user interface for interaction with a user or that may run in the background of an operating environment that may not present a user interface while in the background." (*Id.* at 10:51-56). In contrast, a "secure application" is "an application that has been modified to restrict communications between the application and unauthorized programs or devices or to alter or add features associated with the operation of the application." (*Id.* at 21:13-17). In 2012, operating systems did not provide any native mechanism to modify the internal behavior of third-party applications to restrict communications or alter features. (FAC ¶16). It was therefore not well-understood, routine, and conventional to generate a secure application from a target application.

The second inventive concept is imposing intercepts on the target application to create a secure application while maintaining its interaction with the operating system. ('418 Patent at 41:24-28). The '418 patent defines "intercept" as "an actual replacement of an existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow." (*Id.* at 1:66-2:3). Replacing or inserting executable instructions is not a generic computer function. The "intercept" modifies executable instructions in the target app, which necessarily requires code-level modification of the target app to be able to interrupt program flow. (FAC ¶28). The patent provides several examples of imposing intercepts including bytecode injection, native code replacement, and link injection. ('418 Patent at 22:45-57; FAC ¶29). This type of app wrapping did not exist in mainstream enterprise tools and was not well-understood, routine, and conventional in the industry. (FAC ¶¶16, 24).

Contrary to Imperva's assertion, as explained above in §IV.B.4, the "intercept" is not the well-understood, routine, and conventional "interception module" in *Ericsson*. The *Ericsson* "interception module" performs an access-control function by "receiving a request from the

requesting application domain software to access the software services component."[1] 955 F.3d at 1325. Claim 9's "intercept," by contrast, is a replacement or new instruction imposed on a target application that can interrupt program flow and conditionally return control to that flow, thereby modifying the application's executable operation. Moreover, the Federal Circuit did not decide whether the *Ericsson* "interception module" supplied an inventive concept because that argument had been waived. *Ericsson*, 955 F.3d at 1338 (dissent citing *id.* at 1329). Imperva's comparison therefore rests on superficial similarity in terminology and conflates two functionally and technologically distinct concepts.

Imperva contends that the '418 Patent's description of injecting new functionality as "a method sometimes referred to as application wrapping or application securitization" constitutes an admission that the technique was well-understood, routine, and conventional. The Federal Circuit, however, has expressly rejected the premise that merely identifying or describing a known technique establishes that it was well-understood, routine, and conventional: "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed.Cir. 2018). "The mere fact that something is disclosed in a piece of prior art… does not mean it was well-understood, routine, and conventional." *Id.*; *also Exergen Corp. v. Kaz USA, Inc.*, 725 F. App'x 959, 965 (Fed.Cir. 2018).

A third inventive concept is that the secure application maintains the interaction with the operating system after the intercepts are added. (*Id.* at 41:27-28). This means that the secure application preserves the operating system interactions that were originally defined for the target

[1] The "interception device" in *StrikeForce Techs., Inc. v. SecureAuth Corp.*, is equally irrelevant because, like *Ericsson*, the device only prevents the host computer from receiving what the interception device received. 2017 WL 8808122, at *7 (C.D. Cal. Dec. 1, 2017), *aff'd*, 753 F. App'x 914 (Fed.Cir. 2019).

application to "ensure that the secure application, even with the modifications to secure it, will continue to work with its intended operating system and the original behavior that was designed into the target application may still be permitted to be performed with the secure application keeping with the scope of any acquired policy enforcement mechanisms." (*Id.* at 2:11-21; FAC ¶26). Again, this application-level security is in contrast with the well-understood, routine, and conventional perimeter-based defenses used in the industry. (FAC ¶¶13-15).

The fourth inventive concept in claim 9 is "repackaging the secure application such that the intercepts are integrated with the secure application and are inseparable from the secure application." (*Id.* at 41:29-31). The patent explains how this repackaging works. (*Id.* at 24:3-21, 25:1-4; Fig. 11). Repackaging results in a new structure with the secure application being rebuilt into a single immutable application whose internal structure has been altered so that the injected intercepts cannot be removed, bypassed, or separated from the application's original code. (*Id.* at 2:4-10; 6:64-7:2, 25:1-4). In other words, it "prevent[s] the secure application from having intercepts removed by an unauthorized party." (*Id.* at 2:10-11; FAC ¶27). Again, the prior art perimeter-based defenses could be bypassed yet perimeter-based defenses continued to be developed. (FAC ¶¶14-16). In contrast, repackaging resulted in the injected security functions becoming part of the application itself rather than operating as a separate external security layer. (FAC ¶25). It was therefore not well-understood, routine, and conventional to create a secure application with integrated and inseparable intercepts to avoid malicious actors infecting the application. (FAC ¶¶15, 27). Imperva argues that repackaging is not a technological solution because the patent purportedly fails to explain how the application is repackaged or how the intercepts become inseparable from it. (Dkt. 26 at 17). The specification, however, explains how repackaging may make the intercepts inseparable from the application: the bound intercepts may

be integrated with the original files as an immutable application, the entity may be obfuscated to prevent further disassembly, and some or all of the references may be statically resolved. ('418 Patent at 6:65-7:3, *see also* 2:4-11, 25:15-17).

Finally, claim 9's ordered combination supplies an inventive concept. Unlike conventional perimeter defenses that operated outside applications and could be bypassed by malicious actors to attack unsecured applications, claim 9 departs from that conventional architecture through a particular sequence of application-level operations: converting a target application into a secure application by imposing program-flow intercepts while preserving operating system interactions, then repackaging the application so the intercepts are integrated and inseparable. (FAC ¶¶13-16, 18). As an ordered combination, these limitations recite a specific application-level transformation, not access control or generic computer functionality, that the FAC plausibly alleges was not well-understood, routine, and conventional. (FAC ¶¶13-16, 18). At minimum, those allegations present fact questions that cannot be resolved against CMR on a Rule 12(b)(6) motion.

### 3. Claim 1 also has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination

Imperva's step two analysis for claim 1 is one sentence that raises immaterial terms: "Beyond the abstract idea itself, Claim 1 adds only the generic computer elements of a 'processing unit' and 'input device.'" (Doc. 26 at 19). This conclusory statement fails to meet Imperva's burden of proving patent ineligibility of claim 1 under step two by clear and convincing evidence. *McRO*, 837 F.3d at 1313 ("a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."). Regardless, claim 1 has inventive concepts.

The first inventive concept is claim 1's structurally defined secure application, created by imposing a second set of functions associated with secure behavior on the target application's original functions and behavior. ('418 Patent at 40:46-51). The resulting application thus contains

both its original functionality and imposed secure functionality capable of altering its execution. The FAC alleges that conventional systems instead relied on perimeter-based defenses and could neither modify the internal execution of compiled third-party applications nor override their behavior. (FAC ¶16). Accepting those allegations as true, creating a secure application with imposed functions capable of governing its original behavior was not well-understood, routine, and conventional in the industry.

The second inventive concept is claim 1's requirement that, upon activation, the secure application be forced to override the original application behavior with the imposed secure behavior, thereby giving the secure behavior priority during execution. ('418 Patent at 40:52-54; 2:47-51). This is not a perimeter-based defense that merely blocks a request before it reaches the application. Instead, the claimed override operates within the application at runtime, allowing the requested operation to proceed through the secure behavior in place of the application's original behavior. (FAC ¶31; '418 Patent at 9:4-12). The FAC alleges that no commercial tool could perform this type of runtime override of application behavior as of the priority date. (FAC ¶16). Accepting that allegation as true, the claimed override was not well-understood, routine, and conventional in the industry.

Finally, claim 1's ordered combination supplies an inventive concept because its limitations work together to change how the application operates at runtime. The claimed secure application contains imposed functions associated with secure behavior alongside the target application's original functions and behavior. Upon receiving a request to activate the secure application, the method does not merely block the request or determine whether access should be granted. Instead, it forces the imposed secure behavior to take priority over and replace the original behavior during execution and then performs that secure behavior. This coordinated sequence—

imposing alternative secure functionality, activating it in response to a request, and substituting it for the application's original behavior—recites a specific application-level execution mechanism, not generic access control. The FAC plausibly alleges that this ordered combination improved upon conventional perimeter defenses and was not well-understood, routine, and conventional as of the priority date. (FAC ¶¶16, 31-32).

**D. The Court's Jurisdiction is Limited to Asserted Claims 1 and 9**

Imperva argues patent eligibility of all claims in the '418 Patent; however, the Court has jurisdiction only over asserted claims 1 and 9. "In patent cases, 'the existence of a case or controversy must be evaluated on a claim-by-claim basis.'" *Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1307 (Fed.Cir. 2012) (*quoting Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed.Cir. 1984)). CMR only asserts claims 1 and 9. When "both parties [know] which claims [are] at issue before the court ruled on [a Rule 12(b) or (c) motion], the district court [has] no jurisdiction over the unasserted claims." *Miller Mendel, Inc. v. City of Anna*, 107 F.4th 1345, 1355 (Fed.Cir. 2024); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1284 (Fed.Cir. 2012). No jurisdiction therefore exists over the unasserted claims. *Fox Group*, 700 F.3d at 1308.

**E. At a Minimum, Claim Construction and Factual Issues Preclude Dismissal**

At a minimum, Imperva's motion raises claim-construction disputes and factual questions concerning what was well-understood, routine, and conventional in the industry—issues that cannot be resolved against CMR at the pleading stage. CMR set forth its proposed constructions in its September 28, 2026, letter to the Court. (Doc. 37-1 at 2). Those constructions are material to the eligibility analysis. "Intercept" must be construed because, although Imperva acknowledges the patent's express definition, it equates the claimed code-level instruction with the functionally distinct "interception module" in *Ericsson* and "interception device" in *StrikeForce*. (*Supra* §§ IV.B.4, IV.C.2). "Application" and "secure application" likewise bear directly on the claimed

departure from conventional perimeter defenses, which protected an external boundary while leaving the application itself unsecured. (Supra § IV.C.2). "Override" must be construed because Imperva's representativeness argument improperly conflates claim 1's runtime substitution of secure behavior with claim 9's imposition of "intercepts." (*See* Doc. 26 at 19). Finally, construing "operating system" is necessary to assess claim 9's requirement that the modified secure application preserve the target application's operating-system interaction. (*Supra* § IV.C.2). Because these disputed terms bear directly on the claims' technological operation and alleged inventive concepts, the Court should not resolve eligibility before construing them.

The '418 Patent and the factual allegations in the FAC raise fact disputes regarding the inventive concepts and what was well-understood, routine, and conventional that weigh against ruling on this issue at the Rule 12(b)(6) stage. *Berkheimer*, 881 F.3d at 1370. The FAC describes what was well-understood, routine, and conventional in the industry. (Doc. 21 at ¶¶11-17, 24-32). Defendant has not refuted these allegations and cannot do so on a motion to dismiss. "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). Accordingly, factual disputes concerning what was well-understood, routine, and conventional, and whether the asserted claims improve upon conventional technology, must be resolved—and all reasonable inferences drawn—in CMR's favor at this stage, requiring denial of Imperva's motion. *Berkheimer*, 881 F.3d at 1369.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated: October 8, 2026

Respectfully submitted,

/s/ David R. Bennett
David R. Bennett
Steven G. Kalberg
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2026, I electronically filed the above documents with the Clerk of Court using CM/ECF, which will send electronic notification of such filings to all registered counsel.

*/s/ David R. Bennett*
David R. Bennett