**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br><br>Plaintiff,<br>v.<br><br>**IMPERVA, INC.,**<br><br>Defendant. | C.A. No. 2:26-cv-00461-JRG<br>(Lead Case)<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |
| v.<br><br>**SILVERFORT, INC.,**<br><br>Defendant. | C.A. No. 2:26-cv-00643-JRG<br>(Member Case)<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

# FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Congruent Media Resourcing LLC, pursuant to Rule 15(a)(1)(B), Fed.R.Civ.P., files this First Amended Complaint for Patent Infringement against Silverfort, Inc. and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Congruent Media Resourcing LLC ("Plaintiff") is a Texas limited liability company with a principal place of business located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

2. On information and belief, Defendant Silverfort, Inc. ("Defendant"), is a corporation organized and existing under the laws of Delaware with its U.S. headquarters at 5525 Granite Parkway, Plano, Texas, 75024. Defendant has a registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 5525 Granite Parkway, Plano, Texas, 75024.

5. Without limitation, on information and belief, within this state and this District, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein. In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas and this District. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas and this District. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas and this District. Defendant has committed such purposeful acts and/or transactions in Texas and this District such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6. Venue is proper in this district under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 5525 Granite Parkway, Plano, Texas, 75024.

On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. UNITED STATES PATENT NO. 9,135,418

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On September 15, 2015, United States Patent No. 9,135,418 ("the '418 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '418 Patent is titled "System and Method for Creating Secure Applications." A true and correct copy of the '418 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10. Congruent Media Resourcing LLC is the assignee of all right, title, and interest in the '418 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '418 Patent. Accordingly, Congruent Media Resourcing LLC possesses the exclusive right and standing to prosecute the present action for infringement of the '418 Patent by Defendant.

### A. Technological Background

11. For more than three decades, the cybersecurity industry has evolved through a series of reactive technological phases, each attempting to address emerging weaknesses in increasingly distributed and autonomous computing environments. In the late 1980s, computing environments were largely isolated. Malware spread primarily through physical media, such as floppy disks, and security threats were localized to individual machines. This era produced the first generation of cybersecurity: signature-based antivirus scanners, which attempted to detect malicious code after it had already reached the endpoint. The signature-based antivirus scanners

relied on static signature databases and could not keep pace with evolving malware. Once malicious code reached the device, there was no real defense to the virus.

12. In the 1990s and early 2000s, as networks expanded, organizations shifted toward network firewalls, which are perimeter-based defenses that filtered traffic at the network boundary. The prevailing assumption was binary: anything inside the firewall was trusted; anything outside was untrusted. But this binary architectural solution had a fatal flaw that would be exposed by the modernization of the workforce.

13. The advent of cloud computing, Software-as-a-Service ("SaaS"), and the proliferation of mobile devices in the late 2000s disrupted this perimeter-based model. Enterprise data was no longer confined to a physical corporate data center. It was hosted in distributed environments, accessed via web platforms, and downloaded onto employee smartphones operating on public Wi-Fi networks. For example, as explained in the '418 Patent, companies were confronted with employees using personal smartphones for work such that corporate apps could be operating on untrusted personal devices with untrusted applications. (Ex. A at 1:25-33). Applications can contain malware or some other questionable code that can lead to security breaches and the release of secure information. (*Id.* at 1:28-38). Corporate applications that would be safe running in a secure corporate environment were therefore exposed to risky environments that could access the corporate applications and through those applications gain access to the secure corporate environment. (Ex. A at 1:44-38). The perimeter therefore dissolved as mobile devices, SaaS platforms, and cloud computing displaced the traditional corporate network.

14. Recognizing the fatal flaw of the perimeter-based defense model, the industry was forced to rethink its foundational security assumptions. In 2010, John Kindervag, an analyst at Forrester Research, published a seminal paper titled *No More Chewy Centers: Introducing the*

*Zero Trust Model of Information Security*. (https://media.paloaltonetworks.com/documents/Forrester-No-More-Chewy-Centers.pdf). Kindervag stated that security professionals must "eliminate the idea of a trusted network" entirely, advocating instead that "all network traffic is untrusted." This Zero Trust mandate required that trust be continuously verified, regardless of a user's location. However, early implementations of Zero Trust were still heavily reliant on network segmentation and micro-perimeters. The industry soon realized that if the network infrastructure could no longer be inherently trusted, the new security boundary had to be tied directly to the entity requesting the access.

15. This realization resulted in the era of Identity and Access Management (IAM) as the primary security control mechanism. As noted by cybersecurity architects in Cyber Defense Magazine, the modern consensus became clear: "In today's cloud-first, hybrid, and borderless world, that perimeter has dissolved.... Identity is no longer a security feature; it is the perimeter." (Sudhakar Tiwari, *Identity Is the New Perimeter: Why IAM Is the Frontline of Cybersecurity*, https://www.cyberdefensemagazine.com/identity-is-the-new-perimeter-why-iam-is-the-frontline-of-cybersecurity-2/). As human-centric identity controls matured and hardened, malicious actors pivoted their attack vectors. Instead of simply trying to steal a user's password to bypass the front door, attackers began targeting the applications themselves. If an attacker could compromise an application running locally on an endpoint, they could bypass network firewalls and cloud identity checks entirely. The inventors of the '418 Patent recognized these security flaws and the need to protect the applications themselves.

16. As of the priority date of the '418 Patent, app wrapping did not exist in the mainstream enterprise tools and there were no systems that would override app behavior. App wrapping is a technical process that modifies a compiled mobile application by injecting additional

executable instructions—commonly referred to as “intercepts”—into the application package without access to the application’s source code. In the 2011–2012 timeframe, neither Android nor iOS provided any native mechanism for enterprises to alter the internal behavior of third-party applications, and no commercial tools existed that could safely decompile, modify, and repackage such applications while preserving their ability to run on the underlying operating system. App wrapping addressed this technical deficiency by disassembling the application, identifying predictable instructions and system-API calls, and binding intercepts that replace or interrupt those instructions at runtime. After injection, the application is repackaged and resigned as a new, “secure” application in which injected security functions intercept, modify, or override selected application behavior at runtime. This process enables fine-grained runtime control—such as enforcing encryption, blocking unsafe file operations, redirecting network traffic, or preventing unauthorized inter-process communication—that cannot be achieved through device-level management tools or OS-level permissions. Existing device-management and perimeter-security solutions could control access to applications, but generally could not directly alter the internal execution of a compiled third-party application without access to source code while preserving compatibility with the operating system. A secure application with imposed functions capable of governing and overriding its original behavior therefore was not well-understood, routine, and conventional in the industry.

17. There are several technologies that have been employed to secure web applications. Two categories of these technologies include a Web Application Firewall (“WAF”) and Runtime Application Self-Protection (“RASP”).[1] A WAF operates in a manner similar to a firewall or

---

[1] The “Hyper Cycle for Application Security” report published in July 2012, by Gartner, a global IT research and consulting firm, is frequently cited as the foundational publication in which RASP

shield like a perimeter-based defense: it monitors and filters traffic between the web application and the Internet. (*See* https://www.checkpoint.com/cyber-hub/cloud-security/what-is-application-security-appsec/rasp-vs-waf/).

18. Although WAF is an effective tool, it has several limitations. These limitations include difficult configuration setup, limitations in detecting or preventing certain attacks, including attacks that evade signature-based detection or exploit application-specific behavior, and high maintenance requirements to avoid attacks from being engineered to bypass the WAF. For example, like traditional network measures, WAF only monitors network traffic and user sessions to identify suspicious activity, but it does not monitor traffic and data within an application, leaving the organization vulnerable to application attacks. (https://www.crowdstrike.com/en-us/cybersecurity-101/cloud-security/runtime-application-self-protection-rasp/#:~:text=RASP%20enables%20protection%20at%20the,oversight%20and%20maintenance%20once%20deployed). WAF is also not effective for protecting against applications containing malware or infected applications. This costly and complex system using WAF requires significant in-house expertise, resulting in significant limitation. (*See* https://sourcedefense.com/glossary/limitations-of-waf/).

19. By contrast, RASP focuses on the application itself and RASP tools often sit inside or alongside the web application code. By being able to analyze applications during runtime, RASP can provide real-time contextual monitoring and to explain what kind of attack was detected and remediated. (*See* https://github.com/resources/articles/security/what-is-rasp). Therefore, RASP helps detect threats and identify vulnerabilities during their operational phase. One key

---

was labeled and contextually defined as an emerging solution bridging gaps left by existing approaches. The published report post-dates the priority date for United States Patent No. 9,135,418.

difference between WAF and RASP is that RASP is generally designed to protect live applications from threats as they execute by integrating with existing infrastructure. (*See* https://www.checkpoint.com/cyber-hub/cloud-security/what-is-application-security-appsec/rasp-vs-waf/). Once an attack is detected, one method RASP uses to remediate is to block the attack. (*See* https://github.com/resources/articles/security/what-is-rasp). RASP can also intercept, modify, or override application behavior during runtime in response to detected threats.

20. WAF and RASP systems are often used together, serving as a multi-pronged approach to security. The two technologies complement each other, as WAF systems operate like a firewall, while RASP systems act as a security agent within the application itself. (*See* https://www.fastly.com/learning/security/waf-vs-rasp-what-are-the-differences). Security experts understand that WAF solutions are an "external first line of defense" as a "perimeter sentinel" whereas RASP solutions "are embedded within the software application" once they have bypassed the WAF perimeter. (*See* https://github.com/resources/articles/security/what-is-rasp). The '418 Patent focuses on integrating security into applications.

21. The need for in-line, application-level security has been exponentially accelerated by the rise of Artificial Intelligence and autonomous AI agents. The cybersecurity industry is no longer securing just human employees, but non-human identities as well. Traditional "Identity as the Perimeter" solutions fail completely when applied to Non-Human Identities (NHI). If an AI agent's static credential is stolen via a prompt injection or source code leak, an attacker gains immediate, programmatic, and automated access to the enterprise infrastructure. Furthermore, because AI agents generate their own code, evaluate data, and execute external "tool calls" without human intervention, security can no longer rely on pre-execution authentication checks. Security must operate dynamically at runtime. This technological imperative has given rise to the modern

necessity of AI Runtime Guardrails and dynamic NHI proxies.

22. These modern architectural systems represent the current apex of the cybersecurity evolution. To properly secure an AI agent, these systems do not merely monitor logs or passively grant access. Instead, they act as an inseparable orchestration layer deeply integrated into the AI application. When an autonomous agent attempts a potentially malicious action or tries to utilize a static credential, these guardrails actively intercept the system call. They physically override the agent's native intent, forcing the application to adopt a secure alternative behavior, such as requesting a Just-In-Time (JIT) token or sanitizing a command, before the operating system is allowed to process the request.

23. Against this technological backdrop, the '418 Patent introduced systems and methods for creating secure applications through the imposition of intercepts, overriding, and repackaging techniques that integrated security functionality directly into the application itself.

**B. Technological Background**

24. The invention in the '418 Patent relates to systems and methods for creating secure workspaces and applications, including the management and enhancement of same. (Ex. A at 1:16-19). The goal of the '418 Patent is to reduce security breaches by creating secure workspaces and applications. (*Id.* at 1:16-38). To do this, the '418 Patent discloses imposing one or more intercepts that convert an unsecured target application to a secure application. (*Id.* at 1:54-57). An intercept may be considered as an actual replacement of existing instruction or a new instruction that may interrupt program flow and conditionally return control to the program flow. (*Id.* at 1:66-2:3). By adding an intercept onto the target applications, the behavior of the secure application can be different from the original behavior of the target application such that the disclosed system modifies the manner in which the application executes, enabling selected application operations to

be intercepted, redirected, substituted, or controlled during runtime. (*Id.* at 1:57-61). Unlike perimeter-based security solutions, the disclosed intercepts become integrated with the secured application itself and are not separable.

25. The '418 Patent further explains that, after one or more intercepts are imposed on the target application, the resulting secure application may be repackaged with the bound intercepts integrated into the original application files. (*Id.* at 2:4-6). Through this repackaging process, the intercepts may become physically inseparable from the application, creating an immutable deployable entity. (*Id.* at 2:7-10). As a result, the secure application can resist attempts to remove or bypass the integrated security functionality. (*Id.* at 2:10-11). The repackaging process therefore creates a modified executable application in which the injected security functions become part of the application itself rather than operating as a separate external security layer.

26. The '418 Patent explains that generating the secure application can preserve the operating-system interactions originally defined for the target application and the operating system for which the target application was designed. (*Id.* at 2:11-15). By preserving those operating-system interactions, the secure application remains compatible with its intended operating system despite the insertion of intercepts and other security functionality. (*Id.* at 2:15-21). As a result, the secure application can continue to perform its intended functions while enforcing enhanced security controls and policy mechanisms. Preserving operating-system interactions permits the modified application to retain its intended functionality despite the insertion of additional executable instructions and security controls.

27. The '418 Patent describes a specific, technical solution to modifying a target application to create a secure application. Specifically, the '418 Patent discusses binding one or more intercepts to a target application that can interrupt program flow and conditionally return

control to the program flow. (*Id.* at 1:54-57, 1:66-2:3). The ‘418 Patent further describes repackaging the bound intercepts with the original files such that they are physically inseparable from the original files. This prevents the secure application from having the intercepts removed by an unauthorized party. (*Id.* at 2:4-11; 6:64-7:6; *see* https://sourcedefense.com/glossary/limitations-of-waf/). Similarly, the ‘418 Patent describes this repackaging to avoid having a malicious attacker remove the intercepts themselves. These techniques alter the executable structure and runtime operation of the target application itself rather than merely applying external rules or monitoring application activity.

28. The ‘418 Patent provides details regarding how application securitization occurs. Specifically, it discloses automated application-securitization techniques that can be performed without modifying source code, thereby reducing programmer oversight and errors. (*Id.* at 12:19-26). Additionally, the ‘418 Patent provides examples of this, including 1) replacing references to system services with references to a library that applies the necessary mechanisms and policies and 2) inserting secure references into the code of an application to replace non secure references. (*Id.* at 12:24-35). Specifically, this securitization process may include interposing system API calls to allow a secure framework to intercept and control application functions. (*Id.* at 21:43-49). This process may further include encryption for additional protection of applications. (*Id.* at 21:49-58). One major benefit may be that management layers may be injected onto the compiled applications, removing the need for source code or developer implemented application changes. (*Id.* at 12:36-47).

29. The ‘418 Patent further discloses concrete implementation techniques for imposing intercepts. One example method is called byte code injection, which replaces byte code API calls with intercepts. (*Id.* at 22:45-51). This is particularly useful for applications formatted for the

Android operating system. (*Id.*; *also* Fig. 11; 23:45-60). Another disclosed technical method is to link replacement calls for native object code. (*Id.* at 22:51-57). This method is useful for applications that use native code and do not run under a virtual machine. (*Id.*). An example of this type of injection is link injection, which replaces preexisting system calls or the inclusion of new instructions in an immutable entity. (*Id.* at 24:64-25:24). The '418 Patent further discloses that linking order may be statically or dynamically linked, and that priority can be established during runtime. (*Id.* at 25:6-17). Finally, a system of obfuscation may prevent further modification or reversal of the securitization process. (*Id.* at 25:15-17).

30. The '418 Patent further discloses a reconstruction and repackaging phase that integrates the injected security functionality into the application. (*Id.* at 24:3-21). This is performed by a repackager. (*Id.* at 3-7). The repackager may be made of software or hardware elements and may be further modified by secure object references injected before. (*Id.* at 24:7-9). In addition, this reconstructed and modified application may need a new certificate to be trusted. (*Id.* at 24:11-16).

31. The '418 Patent provides details regarding runtime behavioral substitution. For example, the original behavior of the target application may be different from that of the secure application through previously-unavailable functional features. (*Id.* at 3:61-64). For example, a new instruction may interrupt program flow. (*Id.* at 2:1-3). Or the secure application can override the first application behavior with the second application behavior such that the second application behavior takes priority over the first application behavior. (*Id.* at 6:25-32). As such, rather than halting the performance of an application, the override allows the request to be completed except through the second application behavior rather than the first application behavior. (*Id.* at 9:4-12). The '481 Patent provides examples of such overriding including overriding pre-existing byte

codes, overriding pre-existing references with secure references, overriding normal system APIs, and overriding restriction messages. (*Id.* at 2:43-3:10, 7:19-25, 27:53-57, 39:63-40:1). For example, the invention can interrupt unsafe API calls, redirect requests to access secure storage, prevent unencrypted network transmissions, and prevent usage of unprotected IPC channels. These techniques enable the secure application to continue operating while substituting secure behavior for original application behavior. This operation of a secure application was not well-understood, routine, and conventional in the industry.

32. The solutions disclosed in the '418 Patent are directed to specific improvements in computer and application security technology. Rather than merely identifying, monitoring, or evaluating security threats, the disclosed techniques modify executable applications through intercept insertion, code-level integration, repackaging, and runtime behavioral substitution to create secure applications capable of maintaining compatibility with their underlying operating systems while enforcing enhanced security functionality. This ordered combination improved upon conventional perimeter defenses and was not well-understood, routine, and conventional in the industry as of the priority date.

**<u>Asserted Claim</u>**

33. Claim 1 of the '418 Patent claims:

> A method of operating a secure application, comprising:
>
> receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior:
>
> in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and

via a processing unit, performing the second application behavior.

## IV. COUNT I
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 9,135,418)

34. Upon information and belief, Defendant has directly infringed claim 1 of the '418 Patent in Texas, in this District, and elsewhere in the United States, by using and performing the claimed method by using the Silverfort Identity Security Platform ("Accused Instrumentality").

35. **Direct Infringement**. As explained below, Silverfort's Identity Security Platform comprises a method of operating a secure application. Silverfort's Identity Security Platform integrates with a user's identity management architecture to provide inline protection to each identity. Identities may include users, third parties, non-human identities, and AI agents. Silverfort's Identity Security Platform is built to provide identity security with a focus on runtime protection. Silverfort's Identity Security Platform provides an identity security solution by reducing ransomware and lateral movement, strengthening compliance readiness, and optimizing authentication activity.




(*E.g.*, https://www.silverfort.com/platform/).




(*E.g.*, https://www.silverfort.com/use-cases/active-directory-protection/).




(*E.g.*, https://www.silverfort.com/use-cases/active-directory-protection/).

36. Silverfort's Identity Security Platform practices the step of receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior. Silverfort's Identity Security Platform prevents misuse and stops threats at runtime without disrupting operations.




(*E.g.*, https://www.silverfort.com/use-cases/active-directory-protection/).




(*E.g.*, https://demo-w1.silverfort.com/player?demoId=65f03d39-c138-45ce-9209-d235d123d4b5&screenId=ec636009-c913-4a28-9bb0-bbb606d3bf38&showGuide=true&showGuidesToolbar=true&showHotspots=true&openGuidesToolbar=false&_gl=1*p9xcig*_gcl_au*MTY1MjE0NjE1

Ny4xNzc2ODE1NTgy*_ga*MTE0Nzg5ODU0My4xNzc2ODE1NTgy*_ga_4052YMBRRZ*czE3NzkxMjM5MTEkbzgkZzEkdDE3NzkxMjUxNDMkajEzJGwwJGgw&utm_campaign=41698086-Walnut+Active+Directory+Protection).

37. Silverfort's Identity Security Platform practices the step of, in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior. Silverfort's Identity Security Platform provides an automated response which detects, redacts, blocks, or redirects malicious activity. This is an override of the first application behavior (for instance, by an unsecured agent). In order to determine whether to override first application behavior, Silverfort's Identity Security Platform builds a behavioral baseline, learning usual access patents, privileges, and frequency of activity. Once the Silverfort Identity Security Platform establishes a baseline, it enforces adaptive policies that permit only expected behavior (allowed behavior) for a service account. The policy will override unexpected behavior with second application behavior (for instance, blocking lateral movement attempts or detected misuse). Silverfort describes the mechanism for overriding a first application behavior (non-secure behavior) with a secure behavior as triggering inline security controls.




(*E.g.*, https://www.silverfort.com/use-cases/active-directory-protection/).




(*E.g.*, https://www.silverfort.com/platform/non-human-identity-security/).

Enforce inline, real-time policies—without breaking automation

**Apply virtual fences and adaptive policies to block compromise.**

Once baselines mature, Silverfort enforces adaptive policies that lock down activity and permit only expected behavior for each service account. These real-time controls act like virtual fences, automatically blocking abnormal activity—such as unexpected source or destination, or lateral movement attempts—without disrupting legitimate processes. Least Privilege can become dynamic and self-adjusting, keeping automation safe while preventing misuse, ransomware spread, and privilege abuse.




forcing the secure application to override the first application behavior with the second application behavior

(*E.g.*, https://www.silverfort.com/platform/non-human-identity-security/).

**A deeper look at Silverfort's innovation: Runtime Access Protection**

With identity security as Silverfort's sole focus and mission, the company pioneered a way to deliver end-to-end identity security—securing every dimension of identity via its patented technology, Runtime Access Protection (RAP). RAP natively integrates into an enterprise's identity infrastructure to secure it from within. It removes the complexity of securing every identity and extends protection to previously "unprotectable" assets like non-human identities (NHIs), legacy systems, command line tools, IT/OT infrastructure and more. Once integrated into an organization's Identity Access Management (IAM) infrastructure, RAP forwards a user's access request to Silverfort for analysis and triggers inline security controls if needed. Silverfort sends its verdict to the IAM infrastructure to grant or deny access. The result is identity security with end-to-end visibility and active protection—with minimal disruption to users or administrators.

forcing secure application to override first application behavior with second application behavior

(*E.g.*, https://www.silverfort.com/press-news/silverfort-stakes-its-claim-in-the-identity-security-market-with-patented-architecture-and-rebrand/).

38. Silverfort's Identity Security Platform performs the step of, via a processing unit, performing the second application behavior. Silverfort's Identity Security Platform enforces adaptive policies and virtual fences by locking down access patterns and blocking deviations in real time. This inline solution is used to execute secure application behavior by preventing behavior that exceeds an expected baseline. Silverfort enforces deny and segmentation policies at authentication in order to block unauthorized or risky access before lateral movement occurs.

Silverfort's Identity Security Platform includes a Logs screen which indicates the IDP result in the right hand side. The IPD result indicates when an override occurred as a result of the inline system taking action.




(*E.g.*, https://www.silverfort.com/platform/non-human-identity-security/).



(*E.g.*, https://www.silverfort.com/wp-content/uploads/2025/12/Silverfort-Company-Overview-2025.pdf).

## How it works

Silverfort enforces deny and segmentation policies directly at the authentication layer by integrating with Active Directory to analyze and control every access attempt in real time.

**Step 1: Connect to Active Directory to gain full visibility**
Silverfort integrates natively with AD to monitor all authentication traffic across cloud, on-prem, and hybrid environments. This provides complete visibility into every access request without changing network architecture.

**Step 2: Enforce deny and segmentation policies at authentication**
Silverfort evaluates every authentication attempt in real time against user identity, behavior, and access context, blocking unauthorized or risky access automatically to stop attackers before they move laterally.

**Step 3: Contain active threats immediately**
When a breach is detected, Silverfort isolates compromised identities and blocks malicious authentications to prevent further spread and minimize impact.

**The result:** organizations gain real-time control over access and containment, stop identity-based attacks before they spread, and enforce least-privilege access across hybrid environments.

(*E.g.*, https://www.silverfort.com/wp-content/uploads/2025/11/Silverfort-Authentication-Firewall.pdf).

## Visibility of User Activity & Authentication

### Full User Context

The Silverfort Logs screen provides full visibility into all user logs, authentication activity, and risk indicators. The moment Silverfort is integrated with your IDP, all user accounts are detected, allowing you to monitor their activity and associated risks. As each user is detected, their details are displayed, including username, risk level assigned by Silverfort, authentication type, Silverfort's action, and the IdP result.

AUTHENTICATION LOGS

LOGS TABLE (126) — EXPORT | CONFIGURE LOGS | CUSTOM REPORTS

Filters: Users : All | Source : All | Destination : All | Date range : Today | Risk : Medium, High, Critical | + More — Save filters | Open saved filters

| TIME (UTC +3) | USERNAME | SOURCE | DESTINATION | RISK | AUTH TYPE | SILVERFORT ACTION | IDP RESULT |
|---|---|---|---|---|---|---|---|
| 10:59:05.332 10/24/2023 | ac-aws-adfs19-1$ ad.acaws.silverfort.io | ac-aws-adfs19-1 10.62.50.86 | ac-aws-adfs19-1 ac-aws-adfs19-1$ | High | Active Directory Kerberos | | Allowed |
| 10:38:26.000 10/24/2023 | adfs19-gmsa$ ad.acaws.silverfort.io | adfs19-gmsa 10.62.50.86 | ac-aws-adfs19-1$@ad.ac... ac-aws-adfs19-1$@ad.acaws.silverf... | High | Active Directory Kerberos | | Allowed |
| 10:34:12.235 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac-aws-app-1 cifs | High | Active Directory Kerberos | MFA Unpaired | Denied |
| 10:34:12.221 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac krbtgt | High | Active Directory Kerberos | | Allowed |
| 10:34:12.199 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac-aws-app-1 cifs | High | Active Directory Kerberos | MFA Unpaired | Denied |
| 10:34:12.172 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac krbtgt | High | Active Directory Kerberos | | Allowed |
| 10:34:12.124 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac-aws-app-1 cifs | High | Active Directory Kerberos | MFA Unpaired | Denied |
| 10:34:12.104 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac krbtgt | High | Active Directory Kerberos | | Allowed |
| 10:34:12.053 10/24/2023 | sf-superadmin ad.acaws.silverfort.io | ac-aws-rd16-2 10.62.51.21 | ac-aws-app-1 cifs | High | Active Directory Kerberos | MFA Unpaired | Denied |

*Screenshot #1: Silverfort's authentication logs screen*

(*E.g.*, https://www.silverfort.com/blog/how-silverfort-empowers-you-to-detect-and-resolve-identity-risks-with-zero-effort/).

39. **Indirect Infringement**. Upon information and belief, Defendant has been and now is indirectly infringing by way of inducing infringement and contributing to the infringement of claim 1 of the '418 Patent in the State of Texas, in this District, and elsewhere in the United States, by providing the Accused Instrumentality for use as described above by Defendant's customers. Defendant advertised, offered for sale, and/or sold the Accused Instrumentality to its customers for use in a manner that Defendant knew infringed claim 1 of the '418 Patent. For example, Defendant provided marketing material and videos advertising that the Accused Instrumentality performs the claimed method of generating a secure application from a target application designed to interact with an operating system as claimed in claim 1 of the '418 Patent. (*Supra* ¶¶17-20 (identifying marketing materials)).

40. On information and belief, since Defendant became aware of the '418 patent and the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of inducing infringement by specifically intending to induce infringement by providing the Accused Instrumentality to its customers and by aiding and abetting its use as demonstrated by the marketing materials in a manner known to infringe by Defendant. Since becoming aware of the infringing use of the Accused Instrumentality, Defendant knew that the use of the Accused Instrumentality by its customers as instructed constituted direct patent infringement. Despite this knowledge, Defendant continued to encourage and induce its customers to use the Accused Instrumentality to infringe as described above and provided instructions for using the Accused Instrumentality to infringe, including through instructional materials, support, and user's guides. Exemplary materials are cited above. (*Supra* ¶¶17-20 (identifying marketing

materials)). Defendant therefore knowingly induced infringement and specifically intended to encourage and induce the infringement of the '418 Patent by its customers.

41. On information and belief, since Defendant became aware of the infringement at least as of the date of the service of the Original Complaint, Defendant is and has been committing the act of contributory infringement by intending to provide the identified Accused Instrumentality to its customers knowing that it is a material part of the invention, knowing that its use was made and adapted for infringement of the '418 Patent, and further knowing that the accused use of the Accused Instrumentality is not a staple article or commodity of commerce suitable for substantially non-infringing use. As described above, Defendant was aware that all material claim limitations are satisfied by the use and implementation of the Accused Instrumentality by Defendant's customers in the manner described above yet continued to provide the Accused Instrumentality to its customers knowing that it is a material part of the invention. (*Supra* ¶¶17-20 (identifying marketing materials)). As described above, since learning of the infringement, Defendant knew that the use and implementation of the Accused Instrumentality by its customers was made and adapted for infringement of the '418 Patent. (*Id.*). A new act of direct infringement occurred each time a customer implemented and/or used the Accused Instrumentality in the manner described above. After Defendant became aware that the use of the Accused Instrumentality infringes at least claim 1 of the '418 Patent, Defendant knew that each such new use was made and adapted for infringement of claim 1 of the '418 Patent and Defendant continued to advertise and provide the Accused Instrumentality for such infringing activities. (*Supra* ¶¶17-20 (identifying marketing materials and videos)). Furthermore, as described more fully above, the Accused Instrumentality has functionality designed to perform the steps in the manner described above and is therefore not a staple article or commodity of commerce suitable for substantially non-infringing use. (*Id.*).

42. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '418 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

43. Unless a preliminary and permanent injunction is issued enjoining Defendant and all others acting in active concert therewith from infringing the '418 Patent, Plaintiff will be greatly and irreparably harmed.

44. Plaintiff is only asserting a method claim and as such the marking requirements of 35 U.S.C. 287(a) do not apply. *Crown Packaging Technology, Inc. v. Rexam, Beverage Can Co.*, 559 F.3d 1308, 1316-1317 (Fed. Cir. 2009) ("Because Rexam asserted only the method claims of the '839 patent, the marking requirement of 35 U.S.C. 287(a) does not apply."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed.Cir. 1983) ("It is 'settled in the case law that the notice requirement of this statute does not apply where the patent is directed to a process or method." (*Quoting Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983)). Plaintiff has therefore complied with the marking requirements 35 U.S.C. 287(a).

## V. <u>JURY DEMAND</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 9,135,418 has been infringed and is being infringed, either literally and/or under the doctrine of equivalents, directly and/or indirectly, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Defendants be preliminarily and permanently enjoined from any further activity or conduct that infringes;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

October 14, 2026

DIRECTION IP LAW

*/s/Steven G. Kalberg*
David R. Bennett (IL Bar No.: 6244214)
Steven G. Kalberg (IL Bar No.: 6336131)
P.O. Box 14184
Chicago, Illinois 60614-0184
Telephone: (312) 291-1667
dbennett@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*