**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **CONGRUENT MEDIA RESOURCING LLC,**<br>Plaintiff,<br>v.<br>**IMPERVA, INC.,**<br>Defendant. | C.A. No. 2:26-cv-00461-JRG<br>(Lead Case)<br>**JURY TRIAL DEMANDED**<br>**PATENT CASE** |
| v.<br>**SILVERFORT, INC.,**<br>Defendant. | C.A. No. 2:26-cv-00643-JRG<br>(Member Case)<br>**JURY TRIAL DEMANDED**<br>**PATENT CASE** |

**PLAINTIFF CONGRUENT MEDIA RESOURCING LLC'S OPPOSITION TO DEFENDANT SILVERFORT, INC.'S RENEWED MOTION TO DISMISS UNDER RULE 12(b)(6)**

November 25, 2026

David R. Bennett
Steven G. Kalberg
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

I. SUMMARY OF THE ARGUMENT ..... 1

II. STATEMENT OF FACTS ..... 2

A. Background ..... 2

1. The Technological Problem Confronting the Industry ..... 2

2. What Was Well-Understood, Routine, and Conventional in Early 2012 and What Was Not ..... 4

B. Asserted Claim 1 ..... 5

III. STATEMENT OF LAW ..... 6

A. Standard of Review for Motions to Dismiss ..... 6

B. Law on 35 U.S.C. §101 ..... 6

IV. ARGUMENT ..... 7

A. The Court's Jurisdiction is Limited to Asserted Claim 1 ..... 8

B. Claim 1 is Not Representative of Independent Claims 9 and 16 Because Claim 1 Addresses A Different Technological Problem and Provides a Different Technological Improvement ..... 8

C. At the Motion to Dismiss Stage, the Court Must Accept the Well-Pleaded Facts in the Amended Complaint as True ..... 10

D. Claim 1 is Directed to a Patent Eligible Concept Under Step One ..... 11

1. Claim 1 is Not Directed to "Controlling Access to, or Limiting Permissions to, Software Resources" Because Claim 1 is a New Method for Operating a Secure Application that Does Not Control Access to Information or Software Like Prior Art Perimeter-Based Defenses ..... 11

2. Claim 1 is a Technological Solution to a Technological Problem ..... 13

3. Federal Circuit Cases Addressing Securing Computer Systems Support the Patent Eligibility of Claim 1 ..... 16

4. *Ericsson's* Access Control is Fundamentally Different from the Secure Application in Claim 1 which has Two Sets of Functions that, Upon Request, Prioritizes Secure Behavior to Override Unsecure Behavior ..... 18

5. The Federal Circuit has Routinely Held Software Claims Patent Eligible Regardless of Whether Conventional Components are Used ..... 21

E. Claim 1 is Patent Eligible Under Step Two Because it has Several Inventive Concepts ..... 22

1. Defendant Failed to Analyze Claim 1 as an Ordered Combination and Failed to Draw Reasonable Inferences in CMR's Favor .......... 22

2. Claim 1 has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination .......... 23

3. *Ericsson*, *Prism* and *StrikeForce* Involved Conventional Generic Computer Components Performing Access Control in a Customary Manner Unlike the Claim 1 Which Requires Application Securitization Through Behavioral Override .......... 26

F. Claim 1 is Not Representative of the Remaining Unasserted Claims .......... 28

G. At a Minimum, Claim Construction and Factual Issues Preclude Dismissal .......... 29

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed.Cir. 2018) ........ 7, 10, 11, 23

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S.Ct. 2347 (2014) ........ 6, 7, 21, 23

*Ancora Techs. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed.Cir. 2018) ........ 16, 17

*Astellas Pharma, Inc. v. Sandoz Inc.*,
117 F.4th 1371 (Fed.Cir. 2024) ........ 6

*Bascom Global Internet Serv. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed.Cir. 2016) ........ 7, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed.Cir. 2018) ........ 25, 30

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed.Cir. 2020) ........ 18

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed.Cir. 2019) ........ 6, 10, 11

*Commil USA, LLC v. Cisco Sys.*,
575 U.S. 632 (2015) ........ 6

*Contour IP Holding LLC v. GoPro, Inc.*,
113 F.4th 1373 (Fed.Cir. 2024) ........ 13, 18, 21

*Core Wireless Licensing v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed.Cir. 2018) ........ 22

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed.Cir. 2014) ........ 7

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F.App'x 529 (Fed.Cir. 2020) ........ 20

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed.Cir. 2016) ........ 7

*Ericsson v. TCL*,
955 F.3d 1317 (Fed.Cir. 2020) ........ 18, 19, 26

*Exergen Corp. v. Kaz USA, Inc.*,
725 F.App'x 959 (Fed.Cir. 2018) ........ 25

*Finjan v. Blue Coat*,
879 F.3d 1299 (Fed.Cir. 2018) ........ 17

*Fox Group, Inc. v. Cree, Inc.*,
700 F.3d 1300 (Fed.Cir. 2012) ........................................ 8

*Gesture Tech. Partners, LLC v. LG Elecs. Inc.*,
No. CV 21-19234 (SRC), 2024 WL 5196815 (D.N.J. Dec. 23, 2024)........................ 23

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed.Cir. 2026) ........................................ 15

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed.Cir. 2022) ........................................ 15

*Intell. Ventures II LLC v. FedEx Corp.*,
No. 2:16-CV-00980-JRG, 2019 WL 2297048 (E.D. Tex. Mar. 29, 2019)........................ 23

*Jervis B. Webb Co. v. S. Sys., Inc.*,
742 F.2d 1388 (Fed.Cir. 1984) ........................................ 8

*Lowrey v. Texas A & M Univ. Sys.*,
117 F.3d 242 (5th Cir. 1997) ........................................ 30

*Mayo Collaborative Services v. Prometheus Labs., Inc.*,
132 S.Ct. 1289 (2012)........................................ 6

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed.Cir. 2016) ........................................ 13, 18, 24

*Mentone Solutions LLC v. Digi Int'l Inc.*,
2021 WL 5291802 (Fed.Cir. 2021) ........................................ 21

*Microsoft Corp. v. i4i Ltd.*,
564 U.S. 91 (2011)........................................ 6

*Miller Mendel, Inc. v. City of Anna*,
107 F.4th 1345 (Fed.Cir. 2024) ........................................ 8

*OpenTV, Inc. v. Apple Inc.*,
2016 WL 344845 (N.D. Cal. Jan. 28, 2016)........................................ 21

*Pay As You Go, LLC v. Verifone, Inc.*,
No. 8:25-CV-00660-JLB-CPT, 2026 WL 860686 (M.D. Fla. Mar. 30, 2026) ........................ 23

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
696 F.App'x 1014 (Fed.Cir. 2017) ........................................ 26, 27

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)........................................ 6

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed.Cir. 2012) ........................................ 8

*StrikeForce Techs., Inc. v. SecureAuth Corp.*,
2017 WL 8808122 (C.D. Cal. Dec. 1, 2017)........................................ 27, 28

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed.Cir. 2020) ........................................ 22

*Thales Visionix, Inc. v. U.S.*,
850 F.3d 1343 (Fed.Cir. 2018) ........................................ 22

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed.Cir. 2017) ........................................ 15

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed.Cir. 2017) ........................................ 6

*Voiceage EVS LLC v. HMD Glob. Oy*,
No. CV 19-1945-GBW, 2025 WL 1397239 (D. Del. May 14, 2025) ........................................ 23

*Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*,
815 F.Supp.3d 527 (E.D. Tex. 2025) ........................................ 21

**Statutes**

35 U.S.C. §101 ........................................ 1, 6, 22

35 U.S.C. §282 ........................................ 6

**Rules**

Rule 12(b)(6), Fed.R.Civ.P. ........................................ passim

Plaintiff Congruent Media Resourcing LLC ("CMR") hereby opposes Defendant Silverfort, Inc.'s ("Silverfort" or "Defendant") Renewed Motion to Dismiss Under Rule 12(b)(6) (Dkt. 53).

## I. SUMMARY OF THE ARGUMENT

Silverfort's Renewed Motion to Dismiss should be denied. It describes claim 1 of U.S. Patent No. 9,124,418 (the "'418 Patent") at an impermissibly high level of abstraction. It also ignores the specific technological problem and solution that claim 1 recites.

CMR asserts only claim 1. The Court therefore has jurisdiction only over claim 1, and Silverfort's challenges to unasserted claims 2–20 present no case or controversy. In any event, claim 1 is not representative of independent claims 9 and 16 or the dependent claims, which solve different technological problems with different technological solutions.

In step one of the 35 U.S.C. §101 analysis, claim 1 is not directed to "controlling access to, or limiting permissions to, software resources." This alleged abstract idea is inapplicable because Silverfort itself concedes that claim 1 "recites no access, permission, authorization, or policy at all." Claim 1 is a runtime method of operating a secure application. The secure application is created from a target application by imposing a second set of functions on the target application's original functions. In response to a request to activate it, the secure application is forced to override its original behavior with secure behavior, and the secure behavior takes priority. Before 2012, the industry relied on perimeter-based defenses that operated outside applications and could be bypassed by attacking the applications themselves. Claim 1 moves security to the application level. That is a specific technological improvement of the kind the Federal Circuit has found eligible in *Ancora*, *Finjan*, *McRO*, *Contour*, and *TecSec*. In contrast, *Ericsson* is distinguishable because it involved an access controller that made allow/deny decisions outside the application. Claim 1 requires no such gatekeeping and instead changes the application's own runtime behavior.

In step two of the §101 analysis, claim 1 is separately eligible because it contains inventive concepts that were not well-understood, routine, and conventional in 2012. First, it recites a structurally defined secure application created by imposing secure functions on a target application. Second, it recites a forced runtime override that gives secure behavior priority. Third, these limitations work together as an ordered combination. Silverfort never analyzed claim 1 as an ordered combination. Silverfort also asks the Court to disregard the First Amended Complaint's factual allegations, which must be accepted as true under *Aatrix* and *Cellspin*.

Furthermore, it is premature to decide Silverfort's motion at this stage. The parties' claim-construction disputes over "application," "secure application," and "override," along with the fact questions about what was well-understood, routine, and conventional, cannot be resolved against CMR under Rule 12(b)(6). The presumption of validity also applies. Accordingly, the Court should deny the motion. Alternatively, CMR requests leave to amend any pleading deficiency identified.

## II. STATEMENT OF FACTS

### A. Background

The '418 Patent addresses a technological problem rooted in computer technology related to improved methods for creating secure workspaces. ('418 Patent at 1:17-19). The '418 Patent claims priority to October 10, 2011. ('418 Patent at Cover). As explained below, prior to 2012, cybersecurity was reactive and relied on perimeter-based defenses that create a protective barrier that secures the boundary of the network to block unauthorized external access and cyber threats. The invention took a fundamentally different approach to cybersecurity by anticipating that an application was a potential bad actor and focusing on specific methods to secure applications.

#### 1. The Technological Problem Confronting the Industry

As alleged in the First Amended Complaint (Dkt. 42, "FAC"), the '418 Patent arose during a fundamental architectural failure in enterprise cybersecurity. For decades, the industry relied on

reactive, perimeter-based defenses that assumed corporate systems were isolated and that anything inside the perimeter was trustworthy. (FAC ¶¶11-12). In the 1980s, signature-based antivirus attempted to detect known malicious code only *after* it reached the endpoint by relying on static signature databases, an approach that could not keep pace with evolving malware. (FAC ¶11). In the 1990s, network firewalls filtered traffic at the network boundary based on the binary assumption that internal traffic was trusted and external traffic was not. (FAC ¶12). Neither technology modified or controlled the internal execution of applications; both operated entirely outside the application layer. (FAC ¶16).

By the late 2000s, that assumption collapsed. Cloud computing, SaaS (Software-as-a-Service) platforms, and the widespread use of personal smartphones for work dissolved the perimeter entirely. (FAC ¶¶13-15). Corporate applications were now running on untrusted personal devices, alongside untrusted third-party apps, exposing sensitive enterprise data to malware and hostile code. (FAC ¶13; ‘418 Patent at 1:25-38). As explained in the ‘418 Patent, applications installed on personal devices may contain malware or some other questionable code, and corporate apps running on such devices were exposed to risky environments capable of accessing secure enterprise systems. (’418 Patent at 1:28-38, 1:44-48).

Around 2010, the industry attempted to address this collapse by adopting the Zero Trust model, which treated all network traffic as untrusted and required continuous verification of identity regardless of location. (FAC ¶14). But early Zero Trust implementations still relied heavily on network segmentation and micro-perimeters. (*Id.*). This led to Identity and Access Management (IAM) systems that verified a user or device’s identity before granting access. (FAC ¶15). IAM hardened identity controls, but it did not address a critical gap: attackers increasingly targeted the applications themselves. (*Id.*). If a malicious actor compromised a local application binary, they

could bypass network firewalls, identity checks, and cloud controls entirely. (*Id.*). As of the priority date of the '418 Patent, there was no mechanism for enterprises to modify or control the internal execution of compiled third-party applications to enforce security policies at runtime. (FAC ¶15).

### 2. What Was Well-Understood, Routine, and Conventional in Early 2012 and What Was Not

The technological landscape in early 2012 was defined by a critical deficiency: although enterprises increasingly relied on mobile applications running on untrusted personal devices, the industry had no well-understood, routine, and conventional mechanism for modifying a compiled application's internal behavior, imposing new functionality, or overriding functionality. (FAC ¶¶13-16). This deficiency is central to the invention in claim 1 of the '418 Patent. Features of the claimed invention include application wrapping, imposing functionality injection, and runtime overriding of application behavior which were not well-understood, routine, and conventional.

Neither Android nor iOS provided any native mechanism to alter the internal behavior of third-party applications. (*Id.*). Existing device-management tools could restrict access to applications, but they generally could not directly alter the internal execution of a compiled third-party application without access to source code. (FAC ¶16). This technical deficiency was addressed by imposing secure functions on unsecure functions to override the unsecure behavior. (*Id.*). Unlike existing device-management and perimeter-security solutions that controlled access to applications but could not protect against infected applications, imposing secure functions to override unsecure behavior secures a system at the application level. (FAC ¶¶18, 22, 24, 31).

The '418 Patent introduced a new technical architecture that did not exist in conventional tools. It discloses imposing a second set of secure functions on first set of unsecure functions to turn a target application into a secure application with different runtime behavior. (FAC ¶¶ 24, 27, 31; '418 Patent at 1:54-57, 1:66-2:3). The second set of secure functions enable the secure

application by overriding original behavior—exactly what claim 1 requires when it recites forcing the secure application to override the first application behavior with the second application behavior. (FAC ¶¶ 24, 31; ’418 Patent at 6:25-32).

In short, as of early 2012, the industry lacked any well-understood, routine, and conventional mechanism for (1) creating a secure application by imposing a second set of secure functions for secure behavior on the first set of functions of a target application; (2) responding to a request to activate the secure functions in the secure application; and (3) overriding application behavior at runtime. The ’418 Patent introduced a specific, technical solution to these problems, and claim 1 recites those non-conventional improvements directly.

### B. Asserted Claim 1

Against this backdrop, the ‘418 Patent introduced a specific, technical solution: modifying software behavior by transforming a target application into a secure application by imposing a second set of functions that override the first application behavior and activating the secure application in response to a request. (FAC ¶¶ 23-32). Claim 1 therefore recites a method of operating a secure application with two sets of functions associated with different application behaviors created from a target application where, in response to a request, the secure application is forced to override original behavior with the prioritized new secure behavior:

> A method of operating a secure application, comprising:
>
> receiving a request to activate the secure application through an input device, wherein the secure application was created from a target application having a first set of functions associated with a first application behavior and the secure application has a second set of functions that are imposed on the first set of functions and that are associated with a second application behavior;
>
> in response to the receipt of the request, forcing the secure application to override the first application behavior with the second application behavior, wherein the second application behavior takes priority over the first application behavior; and

via a processing unit, performing the second application behavior.

('418 Patent at 40:44-58).

## III. STATEMENT OF LAW

### A. Standard of Review for Motions to Dismiss

The standard for ruling on a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., is whether, under any plausible reading of the pleadings, the plaintiff would be entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261-62 (Fed.Cir. 2017).

### B. Law on 35 U.S.C. §101

"[T]he presumption of validity afforded to patents under [35 U.S.C.] § 282 applies equally to *all* grounds of validity, including the eligibility of the claimed subject-matter." *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1378 (Fed.Cir. 2024) (emphasis in original); *also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed.Cir. 2019). This presumption "takes away any need for a plaintiff to prove [its] patent is val*id.*" *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 643 (2015). The burden of establishing invalidity rests on Defendant to prove invalidity by clear and convincing evidence. *Id.* at 632, 648-649; *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011).

The §101 analysis consists of two steps. *Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1296-1297 (2012). The first step determines whether the claim is directed to a patent ineligible concept. *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). The second step examines the claim elements individually and as an ordered combination "to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S.Ct. at 2357 (citation omitted). Even if an invention

recites an abstract idea, the invention is patentable if it has "additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* (internal brackets removed). In this step, the limitations must be considered both individually and as an ordered combination. *Id.* at 2355. Claims have an inventive concept when they "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed.Cir. 2018).

Software claims are not abstract if "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed.Cir. 2014). Even if software claims use generic computers, they are eligible if they do not preempt the idea on the Internet or generic computers performing conventional activities. *Bascom Global Internet Serv. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-51 (Fed.Cir. 2016); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed.Cir. 2016).

Patent eligibility is a question of law, but there can be subsidiary fact questions that must be resolved before the ultimate legal question. *Aatrix*, 882 F.3d at 1127-1128. "Whether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact." *Id.* at 1138.

## IV. ARGUMENT

Silverfort proposes an overgeneralized abstraction for claim 1 that disregards the specific computer-security improvements claim 1 recites. Properly analyzed, claim 1 is directed to a specific method of modifying software behavior at the application level, not to the abstract idea of "controlling access to, or limiting permissions to, software resources." Claim 1 also has inventive concepts including (1) using a secure application created from a "target application" by imposing

a "second set of functions" on the application's original functions to secure the target application and (2) in response to a request, activating the secure application by forcing the override of the first application behavior with the second. Neither of these inventive concepts was well-understood, routine, and conventional. Furthermore, the ordered combination of claim 1 is also an inventive concept because prior security measures did not secure an application to modify the behavior in the manner described in claim 1. At minimum, the pleaded allegations concerning what was well-understood, routine, and conventional, together with claim-construction disputes, preclude dismissal under Rule 12(b)(6). The Court should therefore deny the motion.

### A. The Court's Jurisdiction is Limited to Asserted Claim 1

Silverfort argues patent eligibility of all claims in the '418 Patent; however, the Court only has jurisdiction over asserted claim 1. "In patent cases, 'the existence of a case or controversy must be evaluated on a claim-by-claim basis.'" *Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1307 (Fed.Cir. 2012) (*quoting Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed.Cir. 1984)). As Silverfort admits, only claim 1 is asserted by CMR. (Dkt. 53 at 9). When "both parties [know] which claims [are] at issue before the court ruled on [a Rule 12(b) or (c) motion], the district court [has] no jurisdiction over the unasserted claims." *Miller Mendel, Inc. v. City of Anna*, 107 F.4th 1345, 1355 (Fed.Cir. 2024); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1284 (Fed.Cir. 2012). Furthermore, Silverfort cannot demonstrate a case or controversy by asserting counterclaims of invalidity for claims that were never asserted. *Streck*, 665 F.3d at 1284. CMR only asserts claim 1 in the Amended Complaint and infringement contentions. The Court therefore only has jurisdiction over claim 1. *Fox Group*, 700 F.3d at 1308; *Streck*, 665 F.3d at 1284.

### B. Claim 1 is Not Representative of Independent Claims 9 and 16 Because Claim 1 Addresses A Different Technological Problem and Provides a Different Technological Improvement

Regardless of whether the Court lacks jurisdiction over unasserted claims, Defendant

incorrectly argues that claim 1 is representative of independent claims 9 and 16. Claim 1 addresses different technological problems and different technological improvements than the unasserted independent claims.

Claim 1 is a method for operating a secure application, which is a runtime mechanism. It addresses a different technological problem: how to ensure that a target application's unsecure functions are not operated at runtime. Claim 1 is a method that uses a secure application that was created by imposing a second set of functions on a first set of functions to secure the application. ('418 Patent at 40:46-51). Claim 1 requires operating a secure application by receiving a request to activate the secure application, forcing the secure application to override the first application behavior with the second application behavior, and performing the prioritized second application behavior. (*Id.* at 40:45-46, 52-58). The FAC explains that, as of 2012, no conventional system could override application behavior at runtime, interrupt unsafe API calls, redirect storage requests, prevent unencrypted transmissions, or block insecure IPC channels. (FAC ¶¶16, 31-32). Claim 1 solves that problem by reciting a runtime override mechanism in which the secure application forcibly substitutes secure behavior for original behavior.

In contrast, claim 9 is a method of generating a secure application, which is a build-time transformation of a compiled application. It addresses the technological problem of how to generate a secure application. In 2012, enterprises had no mechanism to modify the internal execution of compiled third-party applications without source code, inject new executable instructions, or repackage the application with inseparable security logic. (FAC ¶¶15-16). Claim 9 introduces a non-conventional app wrapping architecture involving intercept binding, code injection, and inseparable repackaging. (FAC ¶¶24-29; '418 Patent at 1:54-2:3; 21:43-58; 22:45-57; 24:64-25:24, 41:19-31). It generates a secure application by receiving a target application,

imposing intercepts that convert it into a secure application while maintaining operating system interactions, and repackaging the application such that the intercepts are inseparable. ('418 Patent at 41:19-31). Claim 9 is therefore a specific improvement in application-level security technology: creating an immutable, repackaged secure application that preserves operating system interactions after the intercepts are inserted. Claim 1 and claim 9 are therefore not interchangeable because they address different technological problems, operate at different stages of the securitization process, and recite different unconventional technical solutions.

Claim 1 is also not representative of claim 16 because claim 16, like claim 9, requires imposing intercepts on the target application to create the secure application. (*Id.* at 42:14-15). Also, unlike claim 1, claim 16 requires remotely managing the secure application to enforce policies, whereas claim 1 requires receiving an activation request to force the secure application behavior. (*Compare id.* at 42:16 *with id.* at 40:52-53). Claim 1 is therefore not representative.

### C. At the Motion to Dismiss Stage, the Court Must Accept the Well-Pleaded Facts in the Amended Complaint as True

Silverfort argues that the Court should ignore the factual allegations in the FAC because they attempt to rewrite claim 1. However, the FAC serves a different and legally recognized purpose: it provides factual context that bears on whether the claim elements, as written, represent well-understood, routine, and conventional activity. *Aatrix*, 882 F.3d at 1128; *Cellspin*, 927 F.3d 1306, 1314, 1316. Under *Aatrix*, 882 F.3d at 1125, and *Cellspin*, 927 F.3d at 1317, which are cited by Silverfort, a plaintiff's well-pleaded factual allegations about the unconventionality of the claimed invention must be accepted as true at the Rule 12(b)(6) stage and can preclude dismissal where they raise a genuine factual dispute about whether the claim elements are conventional. The Amended Complaint's allegations about byte code injection, link injection, interposing system API calls, encryption, and re-signing certificates are not offered to rewrite claim 1 but to establish

the factual backdrop against which to evaluate the claim's elements; specifically, to demonstrate that the process of creating a "secure application" from a "target application" by imposing a "second set of functions" was not a routine or conventional activity in the cybersecurity industry. These allegations, accepted as true, create a factual dispute about conventionality that cannot be resolved on a motion to dismiss under Rule 12(b)(6) without improperly weighing evidence.

Furthermore, the allegations in the FAC are not conclusory. They are specific factual assertions about the state of the cybersecurity industry and the unconventional nature of the '418 Patent's claimed process. Under the *Twombly* pleading standard applicable at the Rule 12(b)(6) stage, specific factual allegations about the novelty and non-conventionality of the claimed invention — including descriptions of the technical challenges that existed in the industry and the specific technical approaches disclosed by the patent to address those challenges — must be accepted as true. Silverfort's characterization of these allegations as "conclusory" misapplies the standard. The FAC has specific factual allegations (*e.g.*, how prior cybersecurity operated and why imposing second functions (such as byte code injection, link injection, and API call interposition) is different from prior methods) and explains how they relate to claim 1, which is not conclusory. The Federal Circuit's decisions in *Aatrix* and *Cellspin* establish that where a complaint contains specific factual allegations that, if true, would preclude a finding that the claim elements are well-understood, routine, and conventional, dismissal under Rule 12(b)(6) is inappropriate. The FAC's allegations about the state of the cybersecurity industry and the technical novelty of the '418 Patent's approach satisfy this standard and create a genuine factual dispute that cannot be resolved on the pleadings.

### D. Claim 1 is Directed to a Patent Eligible Concept Under Step One

#### 1. Claim 1 is Not Directed to "Controlling Access to, or Limiting Permissions to, Software Resources" Because Claim 1 is a New Method

**for Operating a Secure Application that Does Not Control Access to Information or Software Like Prior Art Perimeter-Based Defenses**

Silverfort's framing of claim 1 as directed to the abstract idea of "controlling access to, or limiting permissions to, software resources (e.g., restricting communications with a secured computer application)" is wrong because claim 1 has no limitations directed to controlling access. Silverfort unequivocally agrees because it states that claim 1 "recites no access, permission, authorization, or policy at all." (Dkt. 53 at 10). Claim 1 imposes secure functions on a target application's executable instructions and overrides application behavior, which is fundamentally different from access control, limiting permissions, or restricting communications. Silverfort's admission that claim 1 has nothing to do with "access, permission, authorization, or policy," shows that Silverfort's step one analysis relies on ignoring the actual claim language, the technological problem identified in the FAC, and the specific technical solution recited in the asserted claim.

The focus of claim 1 is on the structure of the secure application and how the secure application behaves when activated, not access control. Again, the industry previously used perimeter-based defenses to control access to information whereas claim 1 solves a problem at the application level. (*Supra* §II.A.1). Claim 1 requires a secure application created from a target application with two sets of functions: the first functions of the target application and secure functions with different behavior imposed on the first functions. ('418 Patent at 40:46-58). Furthermore, the limitation "forcing the secure application to override the first application behavior with the second application behavior" is a technical execution-flow directive that determines which instructions to execute, not which information may be accessed. (*Id.* at 40:46-58). This "forcing" limitation is the opposite of access control. It does not control access to information; it forces the application to execute secure instructions instead of unsecure ones.

Claim 1 is therefore a runtime behavioral-override mechanism that dictates which executable instructions take priority when the application runs, not an access-control mechanism.

By reducing claim 1 to "controlling access to, or limiting permissions to, software resources," Silverfort improperly abstracts away the express limitations in claim 1 and their technological focus on operating a secure application. Silverfort's abstract idea fails to capture claim 1's distinct method of operating a secure application by imposing a second set of functions on a first set of functions and, upon activation resulting from a request, forcing the prioritized second secure application behavior to override the first application behavior. Silverfort disregards these concrete limitations and describes the claims "at such a high level of abstraction and untethered from the language of the claims [that it] all but ensures that the exceptions to § 101 swallow the rule." *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380 (Fed.Cir. 2024).

Properly analyzed, as explained below, claim 1 is directed to specific technological improvements in operating secure applications, not an abstract idea. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed.Cir. 2016) (claims are patent-eligible when they are "specifically designed to achieve an improved technological result in conventional industry practice.").

**2. Claim 1 is a Technological Solution to a Technological Problem**

The invention in claim 1 solved a technological problem with a technological solution. In the prior art, existing security tools relied on access control that operated outside of the application and could not modify its internal execution. (FAC ¶¶11-20). But access control had a critical gap because malicious actors could bypass perimeter-based defenses like network firewalls, identity checks, and cloud controls entirely by targeting the applications themselves. (FAC ¶¶14-15). This vulnerability became apparent as employees increasingly used personal devices, including smartphones, for work and stored corporate information on those devices, thereby exposing

corporate applications and data to malware present on the devices. (‘418 Patent at 1:23-39). The security problem in the industry was therefore a technical deficiency in computer architecture: access to systems was controlled but applications within the systems were not protected. The invention in the ‘418 Patent solved the technological problems resulting from malicious actors bypassing perimeter-based defenses through a method for operating a secure application with a defined set of operations through a runtime behavioral override mechanism implemented in response to a request to activate the secure application. (FAC ¶¶14-17). The claimed method changed where and how the security is implemented from the perimeter to the application level.

Claim 1 recites a runtime method for operating a structurally defined “secure application” created by imposing a second set of functions, associated with a secure application behavior, on the target application’s original set of functions and application behavior. (‘418 Patent at 40:45-51). When a request is received to activate the secure application, the secure application is forced to override the original behavior with the secure behavior so that the secure behavior takes priority. (*Id.* at 40:52-56). Claim 1 has a secure application with a different structure from an unsecured app: a formerly unsecured app with added secure functions. Claim 1 also requires a technical execution-flow directive: “forcing the secure application to override the first application behavior with the second application behavior.” This specific structure and operation therefore do not cover “any means of making a program run something other than what it was written to run,” as Silverfort contends. (Dkt. 53 at 10). Claim 1 is therefore not directed to an abstract idea because it requires using a new application with a specific structure of original and imposed functions that, when executed in response to a request, forces the application to override its original behavior by prioritizing secure behavior, which improves computer capabilities.

Silverfort argues that claim 1 merely recites desired results because it does not specify what

instructions comprise the "second set of functions," precisely how those functions are imposed, or the particular code used to accomplish the claimed override. (Dkt. 53 at 10, 13-15). But claim 1 does not claim the result of making an application "secure." It requires a particular application-level arrangement and sequence of operations: the secure application must have been created from a target application by imposing a second set of functions on the target application's first set of functions; activation must occur in response to a received request; the secure application must then be forced to override the first application behavior with the second application behavior; the second behavior must take priority; and the processing unit must perform that prioritized behavior. ('418 Patent at 40:44-58).

The cases relied on by Silverfort are readily distinguishable because they did not claim particular means for achieving an improvement. In *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1065 (Fed.Cir. 2026), the claim was directed to a generic template adapted to a requesting device, rather than a technological means of performing that adaptation. In *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed.Cir. 2017), the claim was directed to routing information without explaining why the "converting," "routing," "controlling," "monitoring," and "accumulating records" differed from generic systems. In *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed.Cir. 2022), the claim used functional language that was "divorced from any computer technology." In contrast, claim 1 does not merely say "operate a secure application." Unlike the claims in *GoTV*, *Two-Way Media*, and *Zillow* that merely identify a desired result without specifying a means for achieving it, claim 1 identifies what is modified, what functionality is imposed, what event triggers the change in behavior, how the competing behaviors relate to one another, and which behavior must thereafter be performed. Silverfort's contention that the claim must additionally prescribe the particular code

used to impose each function or implement each override demands implementation details beyond the specific technological mechanism actually recited in the claim.

### 3. Federal Circuit Cases Addressing Securing Computer Systems Support the Patent Eligibility of Claim 1

Silverfort's reliance on cases involving access control is misplaced because the asserted claim is directed to securing applications themselves, not controlling access to information. Federal Circuit decisions addressing specific technological improvements to computer security support the patent eligibility of claim 1.

In *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed.Cir. 2018), the claim was a method of restricting software operation within a license for use with a computer. *Id.* at 1345-46. The claim required storing a structure containing a license in specific BIOS memory and using that structure for verification by interacting with the distinct memory that contains the program to be verified. *Id.* at 1348-49. The district court held that the claim was abstract because it did not focus on how usage of BIOS leads to improved security and that BIOS typically stores data. *Id.* at 1346. The Federal Circuit reversed, holding that "[i]mproving security—here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1348. The claim solved "a technological problem with computers: vulnerability of license-authorization software to hacking" and the claimed method "specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way." *Id.* at 1348-49.

Like the method claim in *Ancora*, claim 1 improves security by a specific technique that departs from earlier approaches to solve the security problem. Earlier approaches used perimeter-based defenses, but applications were left unsecured and vulnerable to attack. (FAC ¶15). Claim 1 departs from the earlier approaches by focusing on securing the application, rather than

perimeter-based defenses, as demonstrated by the preamble: claim 1 is "operating a secure application." ('418 Patent at 40:44). The claim then describes the structural feature that effectuates the functional improvement. Claim 1 requires a secure application with a second set of secure functions and behavior that are imposed on the first set of functions and behavior of the target application; upon receiving a request to activate the secure application, the method forces the second secure application behavior to take priority over and override the first application behavior. (*Id.* at 40:45-56). Like in *Ancora*, claim 1 is "an improvement in computer functionality that has the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Ancora*, 908 F.3d at 1349.

Another relevant Federal Circuit case involving securing computers, *Finjan v. Blue Coat*, 879 F.3d 1299 (Fed.Cir. 2018), involved a method of providing computer security by scanning a downloadable and attaching the results of that scan to the downloadable itself in the form of a "security profile." *Id.* at 1303. The Federal Circuit held the claim was not directed to an abstract idea because the claimed method scans a downloadable and attaches the virus scan results to the downloadable in the form of a newly generated file. *Id.* at 1304. The Court distinguished the claimed invention from traditional code-matching virus scans that compared code to a database of known suspicious code. *Id.* at 1304. The Federal Circuit held that the claimed method was patent eligible because it "employs a new kind of file that enables a computer security system to do things it could not do before." *Id.* at 1305. The *Finjan* defendant argued that the very short method claim was abstract because it did "not sufficiently describe how to implement that idea." *Id.* at 1303, 1305. The Federal Circuit rejected the argument holding that "the claims recite more than a mere result. Instead, they recite specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result." *Id.* at 1305.

Like the method claim in *Finjan*, claim 1 requires a newly secure application created by imposing second functionality on a target application. Claim 1 recites specific steps for operating a secure application created by imposing a second set of functions, associated with secure behavior, on the target application's original set of functions. (*Id.* at 40:46-56). Upon receiving a request to activate the secure application, the method forces the secure behavior to take priority over and override the application's original behavior. (*Id.*). Claim 1 requires an application created by adding new functions, which is distinguishable from perimeter-based security. The asserted claim is therefore patent eligible because it is "drawn to a 'specific means or method that improves the relevant technology.'" *Contour*, 113 F.4th at 1379 (*quoting McRO*, 837 F.3d at 1314); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed.Cir. 2020).

#### 4. *Ericsson's* Access Control is Fundamentally Different from the Secure Application in Claim 1 which has Two Sets of Functions that, Upon Request, Prioritizes Secure Behavior to Override Unsecure Behavior

Silverfort's reliance on *Ericsson v. TCL*, 955 F.3d 1317 (Fed.Cir. 2020), is misplaced because the claim in *Ericsson* bears no resemblance in structure, focus, or technological context to claim 1 of the '418 Patent. The Federal Circuit invalidated the *Ericsson* claim because it focused on an access controller that made binary allow/deny decisions based on access and permission policies. *Id.* at 1326. Silverfort admits that claim 1 is fundamentally different from *Ericsson* because claim 1 "recites no access, permission, authorization, or policy at all." (Dkt. 53 at 10).

*Ericsson* recites a perimeter-based access controller with one set of instructions that determines whether access to software should be granted. 955 F.3d at 1325-26. It does not require a secure application. In contrast, claim 1 recites operating a secure application in which a second set of functions, associated with secure behavior, has been imposed on the target application's original set of functions. In response to a request to activate the secure application, the method forces the secure behavior of the secure application to override and take priority over the

application's original behavior. This is a fundamentally different technical concept: rather than passively gatekeeping access to a software services component like in *Ericsson*, claim 1 affirmatively transforms the behavior of a target application at runtime into a secure application. *Ericsson* does not require alternative functions or application behaviors, behavioral overrides, prioritization of behaviors, or changes to runtime application behavior; it has one set of instructions that only determines whether to grant access to software. Its access-control method thus does not support Silverfort's characterization of claim 1.

Silverfort also relies on the "interception module" in *Ericsson* to argue that it is the "same general concept" as in claim 1 of "securing an application by using an 'interception module' to decide (based on 'permission policies') whether to allow or disallow said application access to a 'software services component.'" (Dkt. 53 at 11). However, claim 1's operation is functionally and technologically distinct. In *Ericsson*, the "interception module" receives a request from application domain software to access a software services component and therefore operates as an access-control gatekeeper. 955 F.3d at 1329. In other words, the "interception module" sits ***outside*** the software service component and acts as a firewall. In contrast, in claim 1 the secure application itself performs the "override"; there is no allowing or disallowing access to the secure application. ('418 Patent at 40:52-54). Furthermore, in claim 1, the "override" of the first application behavior is performed "in response to the receipt of the request," (*id.*); there is no module that "decide[s]" whether to allow or disallow access. Moreover, the Federal Circuit did not decide whether the *Ericsson* interception module supplied an inventive concept because *Ericsson* waived that argument. 955 F.3d at 1338 (dissent explaining majority's position (*citing id.* at 1329)).

When comparing claim 1 to *Ericsson*, Silverfort further mischaracterizes claim 1 by referring to limitations found in unasserted claim 9 or embodiments not relevant to claim 1.

Silverfort alleges that "imposed functions are described as nothing more than 'an actual replacement of an existing instruction or a new instruction' that turns the application into a 'secure application' (e.g., by restricting communications with the application) ('418 Patent, 1:66-2:3, 21:12-16)." (Dkt. 53 at 12). First, "an actual replacement of an existing instruction or a new instruction" quoted by Silverfort is part of the definition of "intercept," which is found in claim 9, not in claim 1. The '418 Patent uses "imposing" as an action that changes an application, whereas "intercepts" are specific code that change the application: "imposing one or more intercepts," ('418 Patent at 4:40; *see also id.* at 2:22-23 ("imposing a secure and unpredictable namespace"); 3:33 ("impos[ing] licensing model"), 24:42-43 ("impos[ing] [default references (new or replacement references)] on all applications that are to undergo the securitization process,"). Claim 1 does not require an "intercept." Second, turning an application into a secure application "by restricting communications with the application" is an embodiment that is not applicable to claim 1 followed by a second embodiment that is applicable to claim 1: "'secure application' is defined as an application that has been modified… to alter or add features associated with the operation of the application." ('418 Patent at 21:12-16; *see also id.* at 21:16-18 ("new functionality can be automatically injected into pre-compiled applications to create secure applications.")). Claim 1 therefore does not require using intercepts restricting communications.

Silverfort string-cites several other cases directed to "access control" without otherwise explaining their relevance. (Dkt. 53 at 10, 11). Those cases involved the prior conventional security firewall access-control technology that, as explained above, is distinguishable from the invention in claim 1. (*Supra* §II.A.1). In *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F.App'x 529, 532, 538-39 (Fed.Cir. 2020), the claims required an apparatus for providing information in response to a request using "access control information" and an "access checker." *Id.* at 532. In

*Web 2.0 Techs., LLC v. Longview Reg'l Med. Ctr.*, 815 F.Supp.3d 527 (E.D. Tex. 2025), the patent explained that the invention was "a system and method for gathering, storing and disbursing personal information to authorized entities," which could be performed by humans. *Id.* at 534. And in *OpenTV, Inc. v. Apple Inc.*, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016), the claim disclosed a "practice of controlling access to information by verifying credentials (via well-known encryption methods)" using "a long-standing and well-understood business practice that predates the internet." *Id.* at *5. None of these claims involved modifying an application to secure it, imposing secure functionality on original target application to secure it, responding to requests to activate a secure application, and, in response to a request, overriding unsecure behavior such that the secure behavior takes priority over the original behavior. Claim 1 is a specific technological solution to a specific technological problem, which does not involve controlling access to, or limiting permissions to, software resources.

### 5. The Federal Circuit has Routinely Held Software Claims Patent Eligible Regardless of Whether Conventional Components are Used

Defendant's argument that the claims only rely on generic computer components and are therefore abstract (Dkt. 53 at 1, 13, 15, 16-17, 18) has been rejected by the Federal Circuit. Claim 1 is not directed to the use of hardware components, but to the specific software method of operating a secure application, forcing a runtime behavioral override of a target application's original functions with a second imposed set of functions. The Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Mentone Solutions LLC v. Digi Int'l Inc.*, 2021 WL 5291802, at *3 (Fed.Cir. 2021). Arguing that the invention uses conventional computer components "*alone* does not necessarily mean that the claim is *directed* to an abstract idea." *Contour*, 113 F.4th at 1380; *also Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356, 1362

(Fed.Cir. 2018).

Furthermore, Defendant's argument that individual elements are generic and conventional and thus cannot be an improvement has also been explicitly rejected by the Federal Circuit. In *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed.Cir. 2020), the defendant asserted "the 'common-place' character of the individual component techniques generally, … or [] at an even higher level of generality of 'encoding, converting, encrypting, and controlling access to data.'" *Id.* at 1297. The Federal Circuit rejected this argument, holding that this "approach is insufficient where... it is the combination of techniques that is what the patent asserts to be the focus of the claimed advance over the prior art." *Id.* (internal quotes and citation omitted); *Id.* at 1295 ("To disregard those express claim elements is to proceed at 'a high level of abstraction' that is 'untethered from the claim language' and that 'overgeneraliz[es] the claim." (citation omitted)). Using conventional elements in an unconventional manner is patent eligible. *Thales Visionix, Inc. v. U.S.*, 850 F.3d 1343, 1348-1349 (Fed.Cir. 2018) ("Rather, the claims are directed to systems and methods that use [conventional] inertial sensors in a non-conventional manner …."). Regardless, in comparison to how computer security was previously addressed through perimeter-based methods, the steps in claim 1 addressing the structure and operation of a secure application are not generic. Claim 1 is therefore patent eligible under step one.

### E. Claim 1 is Patent Eligible Under Step Two Because it has Several Inventive Concepts

Claim 1 is also separately patent eligible under step two because individual limitations and the claim as a whole are inventive concepts.

#### 1. Defendant Failed to Analyze Claim 1 as an Ordered Combination and Failed to Draw Reasonable Inferences in CMR's Favor

Step two of the §101 analysis requires "examin[ing] the elements of the claim [both individually and as an ordered combination] to determine whether it contains an 'inventive

concept.'" *Alice*, 134 S.Ct. at 2357, 2355. Claims contain inventive concepts when they "involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128 (internal quotes, brackets, and citation removed). "Whether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact" and, on a motion to dismiss, all factual assertions in the complaint and patent must be weighed in the light most favorable to CMR. *Id.* at 1124, 1128. Silverfort did not perform this analysis.

First, Silverfort was required to analyze claim 1 as an ordered combination to satisfy its burden of proving patent ineligibility. *Bascom*, 827 F.3d at 1347-48. Silverfort did not perform this analysis and instead only performs a high level description of claim 1, which requires denying the motion. (Dkt. 53 at 14-15 (separately discussing "input device," "processing unit," "'second set of functions' that 'override' the applications original behavior"); *Voiceage EVS LLC v. HMD Glob. Oy*, No. CV 19-1945-GBW, 2025 WL 1397239, at *22-*23 (D. Del. May 14, 2025); *Pay As You Go, LLC v. Verifone, Inc.*, No. 8:25-CV-00660-JLB-CPT, 2026 WL 860686, at *4 (M.D. Fla. Mar. 30, 2026); *Intell. Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2019 WL 2297048, at *17 (E.D. Tex. Mar. 29, 2019); *Gesture Tech. Partners, LLC v. LG Elecs. Inc.*, No. CV 21-19234 (SRC), 2024 WL 5196815, at *9 (D.N.J. Dec. 23, 2024). Second, Silverfort disregards the FAC's factual allegations and thus fails to draw all reasonable inferences from those allegations in CMR's favor. As explained below, those allegations support the reasonable inference that the inventive concepts recited in the asserted claim, both individually and as ordered combinations, were not well-understood, routine, and conventional in the industry.

#### 2. Claim 1 has Inventive Concepts that Were Not Well-Understood, Routine, and Conventional in the Industry and is Inventive as an Ordered Combination

Silverfort's step two analysis for claim 1 is a series of comments on disjointed claim

phrases such as "input device," "processing unit," "second set of functions," and "override," without analyzing any claim term in context. These conclusory statements fail to meet Silverfort's burden of proving patent ineligibility of claim 1 under step two by clear and convincing evidence. *McRO*, 837 F.3d at 1313 ("a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps."). Furthermore, CMR does not contend that the input device or processing unit individually supplies the inventive concept. The claimed secure-application structure and forced behavioral override, and claim 1 considered as an ordered combination, supply inventive concepts.

The first inventive concept is claim 1's structurally defined secure application, created by imposing a second set of functions associated with secure behavior on the target application's original functions and behavior. ('418 Patent at 40:46-51). The resulting application thus contains both its original functionality and imposed secure functionality capable of altering its execution. The FAC asserts that, rather than modifying applications or their functionality, conventional systems instead relied on perimeter-based defenses and could neither modify the internal execution of compiled third-party applications nor override their behavior. (FAC ¶16). Accepting those allegations as true, creating a secure application with imposed functions capable of overriding its original behavior was not well-understood, routine, and conventional in the industry.

Silverfort contends that the '418 Patent's description of injecting new functionality as "a method sometimes referred to as application wrapping or application securitization" constitutes an admission that the technique was well-understood, routine, and conventional. (Dkt. 53 at 15). The Federal Circuit, however, has expressly rejected the premise that merely identifying or describing a known technique establishes that it was well-understood, routine, and conventional: "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply

known in the prior art." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed.Cir. 2018). "The mere fact that something is disclosed in a piece of prior art… does not mean it was well-understood, routine, and conventional." *Id.*; *also Exergen Corp. v. Kaz USA, Inc.*, 725 F.App'x 959, 965 (Fed.Cir. 2018). Furthermore, Silverfort has not provided any evidence (nor could it at the Rule 12(b)(6) stage) to refute that the specific method of creating a "secure application" by imposing a "second set of functions" that override the original application behavior upon receipt of an activation request was not a well-understood, routine, and conventional practice in the industry.

The second inventive concept is claim 1's requirement that, upon activation, the secure application is forced to override the original application behavior with the imposed secure behavior, thereby giving the secure behavior priority during execution. ('418 Patent at 40:52-54; 2:47-51). This is not a perimeter-based defense that merely blocks a request or controls access before the request reaches the application. Instead, the claimed override operates ***within*** the application at runtime, allowing the requested operation to proceed through the secure behavior in place of the application's original behavior. (FAC ¶31; '418 Patent at 9:4-12). The FAC asserts that no commercial tool (such as Android or iOS) had any native mechanism to alter internal behavior of third-party apps nor could commercial tools perform this type of override of application behavior at runtime as of the priority date. (FAC ¶16). Accepting these allegations as true, the claimed override was not well-understood, routine, and conventional in the industry.

Finally, claim 1's ordered combination is an inventive concept because its limitations work together to change how the application is secured and operates at runtime. The claimed secure application contains imposed functions associated with secure behavior alongside the target application's original functions and behavior. ('418 Patent at 40:46-51). Upon receiving a request to activate the secure application, the method does not block the request or determine whether

access should be granted. Instead, it forces the imposed secure behavior to take priority over and replace the original behavior during execution and then performs that secure behavior. (*Id.* at 40:52-56). This coordinated sequence—imposing alternative secure functionality, activating it in response to a request, and substituting it for the application's original behavior—recites a specific application-level execution mechanism, not generic access control. The FAC plausibly alleges that this ordered combination improved upon conventional perimeter defenses and was not well-understood, routine, and conventional as of the priority date. (FAC ¶¶16, 31-32).

#### 3. ***Ericsson***, ***Prism*** and ***StrikeForce*** Involved Conventional Generic Computer Components Performing Access Control in a Customary Manner Unlike the Claim 1 Which Requires Application Securitization Through Behavioral Override

Neither *Ericsson*, *Prism*, nor *StrikeForce*, on which Silverfort relies, are relevant to the step two analysis of claim 1. As explained above, *Ericsson* is not relevant to claim 1. (*Supra* §IV.D.4). In its step two analysis, Silverfort contends that the claim in *Ericsson* is comparable and then lists portions of three steps in claim 1 followed by three ***components*** in the *Ericsson* claim without any explanation as to why they are comparable. (Dkt. 53 at 15). For example, Silverfort provides no explanation for why the generic "an access controller for controlling access" in *Ericsson* is comparable to "forcing the secure application to override the first application behavior with the second application behavior" in claim 1. (*See id.*). Nor does Silverfort's comparison with *Ericsson* consider how the "secure application" in claim 1 is created by imposing a second set of functions associated with secure behavior on the target application's original functions and behavior. (*See id.*; '418 Patent at 40:46-51). *Ericsson* is not comparable or relevant.

In *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F.App'x 1014 (Fed.Cir. 2017), the claim was a "method for controlling access" in which, if "authentication server successfully authenticates the client computer and determines that it is authorized, the system provides protected computer

resources to that device over an untrusted network." *Id.* at 1016. Silverfort quotes *Prism* for the position that the "asserted claims recite no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner," which is receiving, authenticating, and permitting access using an authentication server. (Dkt. 53 at 16 (*citing Prism*, 696 F.App'x at 1018). Claim 1 does not receive, authenticate, or permit access using an authentication server; this is the prior perimeter-based security system. In contrast, as explained above, claim 1 requires a secure application with second functionality imposed on the functions of the first application, which was not well-understood, routine, and conventional. (*Supra* §II.A.1-2). Nor is overriding first application behavior with the second application behavior in response to a request well-understood, routine, and conventional. (*Id.*). The only wording overlap with *Prism* is "receiving"; except in *Prism* the claim was "receiving… identity data" and forwarding it to an access server, 696 F.App'x at 1016, whereas claim 1 does not receive data nor forward data. Instead, claim 1 "receiv[es] a request to activate the secure application" that "forc[es] the secure application to override the first application behavior with the second application behavior." This is fundamentally different because claim 1 is not analyzing or forwarding data and instead the receipt results in the performance of a specific override operation. ('418 Patent at 40:45, 52-54).

Silverfort's reliance on *StrikeForce Techs., Inc. v. SecureAuth Corp.*, 2017 WL 8808122, at *7 (C.D. Cal. Dec. 1, 2017), is similarly misplaced. *StrikeForce* involved an "interception element" similar to "diverting identity data from the access server to the authentication server" in *Prism* using generic components. *Id.* at *2, *8. First, claim 1 does not require an "intercept"; "intercept" is a term in unasserted claim 9. As explained above, "imposing" a second set of functions on a first set of functions is not imposing an "intercept." (*Supra* §IV.D.4). Second, the "interception element" in *StrikeForce* diverted data for analysis. 2017 WL 8808122, *8. Claim 1

neither analyzes, stores, diverts, or forwards data. Nor does claim 1 use generic components to form the secure application or operate the secure application by overriding the functionality. *StrikeForce* is therefore irrelevant.

**F. Claim 1 is Not Representative of the Remaining Unasserted Claims**

Regardless of whether the Court has jurisdiction over unasserted claims, claim 1 is not representative of the remaining unasserted claims. Claim 1 is not representative of unasserted dependent claims 2-8 because those claims recite additional limitations that materially alter the eligibility analysis. While claim 1 concerns overriding a first application behavior with a second application behavior, claims 2-4 additionally require selectively permitting the original behavior based on predetermined criteria and policy; claim 5 requires encapsulating the secure application to prevent data sharing with non-secure applications; claim 6 requires receipt from a secure application repository; and claims 7-8 require password/PIN enforcement coupled, in claim 8, with a grace period that selectively waives authentication. (‘418 Patent at 40:59-41:18). These limitations implicate different mechanisms for controlling application execution, inter-application communication, distribution, and authentication. Thus, analyzing claim 1 alone would fail to address limitations that must independently be considered in determining whether claims 2-8 are directed to patent-eligible technological improvements or contain an inventive concept.

Claim 1 is not representative of claims 10-15 because the claims are directed to materially different subject matter and recite materially different limitations relevant to the §101 inquiry. Claim 1 concerns the operation of an already-created secure application by overriding a first application behavior with a second. Claims 10-15, by contrast, depend from unasserted claim 9 and concern the technological process by which a target application is converted into a secure application, including through the imposition and integration of intercepts. (*Supra* §IV.B; ‘418 Patent at 41:19-42:9). Those claims further require, among other things, replacing or inserting

application references (claim 11), applying predetermined intercepts on a group basis (claim 12), modifying an application without access to its source code (claim 13), and preserving the availability of operating-system APIs (claim 15). (‘418 Patent at 41:32-42:9). These limitations materially affect what each claim is “directed to” and whether the claimed combination supplies an inventive concept. An eligibility analysis focused on claim 1’s application-behavior override therefore does not resolve the eligibility of claims 10-15.

Claim 1 is also not representative of claims 17-20 because those claims depend from a different unasserted independent claim and recite materially different functionality relevant to patent eligibility. Claim 1 concerns operating a secure application by causing a second application behavior to override a first application behavior. Claims 17-20, by contrast, depend from unasserted claim 16 and concern remote management of a secure application through policy enforcement. (*Supra* §IV.B; ‘418 Patent at 42:10-48). Those claims further require remote management on an individual or group basis (claim 17); enforcement of specific time-, location-, and licensing-based restrictions, as well as remote application or data removal (claim 18); operation within a secure partition that prevents communications from non-secure applications (claim 19); and remote management without interference with personal data on the computing device (claim 20). These limitations materially change both what the claims are directed to and the claimed technological mechanisms relevant to the inventive-concept inquiry. (‘418 Patent at 41:21-48). An eligibility analysis confined to claim 1’s behavior-override functionality therefore cannot establish that claims 17-20 are ineligible.

### G. At a Minimum, Claim Construction and Factual Issues Preclude Dismissal

At a minimum, Silverfort’s motion raises claim construction disputes and factual questions concerning what was well-understood, routine, and conventional in the industry—issues that cannot be resolved against CMR at the pleading stage. CMR set forth its proposed constructions

in its November 9, 2026, letter to the Court. (Dkt. 57-1 at 2). Those constructions are material to the eligibility analysis. "Application" and "secure application" bear directly on the claimed departure from conventional perimeter defenses, which protected an external boundary while leaving the application itself unsecured. (*Supra* §§IV.B, IV.D.1, IV.D.2). "Override" must be construed because Silverfort's representative claim argument improperly conflates claim 1's runtime substitution of secure behavior with claim 9's imposition of "intercepts." (*See* Dkt. 53 at 11, 12, 15, 18). Because these disputed terms bear directly on the claim's technological operation and alleged inventive concepts, the Court should not resolve eligibility before construing them.

The '418 Patent and the factual allegations in the FAC raise fact disputes regarding the inventive concepts and what was well-understood, routine, and conventional that weigh against ruling on this issue at the Rule 12(b)(6) stage. *Berkheimer*, 881 F.3d at 1370. The FAC describes what was well-understood, routine, and conventional in the industry. (Dkt. 42 at ¶¶11-17, 24-32). Defendant ignores and does not refute these allegations and cannot do so on a motion to dismiss. "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). Accordingly, factual disputes concerning what was well-understood, routine, and conventional, and whether the asserted claim improves upon conventional technology, must be resolved—and all reasonable inferences drawn—in CMR's favor at this stage, requiring denial of Silverfort's motion. *Berkheimer*, 881 F.3d at 1369. If the Court identifies deficiencies in connecting the factual allegations in the FAC to the express claim limitations, those deficiencies could be cured by amendment.

## CONCLUSION

For the foregoing reasons, Defendant's Renewed Motion to Dismiss should be denied.

Dated: November 25, 2026

Respectfully submitted,

*/s/ David R. Bennett*
David R. Bennett
Steven G. Kalberg
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Congruent Media Resourcing LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2026, I electronically filed the above documents with the Clerk of Court using CM/ECF, which will send electronic notification of such filings to all registered counsel.

*/s/ David R. Bennett*
David R. Bennett